# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF TEXAS

|  |  |
|---|---|
| Mark Hay, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br>   vs.<br><br>United Development Funding IV, UMT Services, Inc., UMTH General Services, L.P., UMTH Land Development, L.P., UMT Holdings, L.P.,<br><br>Hollis M. Greenlaw, Todd Etter, Cara D. Obert, David A. Hanson, Scot W. O'Brien, Phillip K. Marshall, J. Heath Malone, Steven J. Finkle, Michael K. Wilson, Ben L. Wissink, Robert Laak, Melissa H. Youngblood, J. Brandon Jester,<br><br>Nicholas S. Schorsch, William Kahane, John H. Grady, Louisa H. Quarto, Kamal Jafarnia, Joseph Neary, Brian S. Block, William A. MacGillivray, Ralph L. Roth, Daniel S. Beaton, Edward M. Weil Jr.,<br><br>Centurion American Development Group, Mehrdad Moayedi, and<br><br>Whitley Penn LLP<br>            Defendants. | CASE No. 2016-XXXXX<br><br><br><br><br><br><br><br><br><br><br><br>**COMPLAINT – CLASS ACTION**<br><br>**JURY DEMAND** |

Mark Hay ("Plaintiff"), by and through undersigned counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by United Development Funding IV ("UDF IV"), and other United Development

Fund-sponsored investment programs ("UDF Programs") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by UDF IV and other UDF Programs; (c) media reports concerning UDF IV and other UDF Programs; and (d) review of other publicly available information concerning UDF IV and other UDF Programs.

## I.  NATURE AND SUMMARY OF THE ACTION

1.      Plaintiff brings this class action under the Texas Securities Act on behalf of (1) all persons or entities who purchased or otherwise acquired non-listed shares of UDF IV, a Texas-based real estate investment trust ("REIT"), from March 8, 2011 until June 3, 2014, inclusive (the "Class Period."

2.      This action arises out of material misrepresentations and omissions UDF IV and its co-defendants made, allowing UDF IV to raise over $640 million from those who purchased UDF IV shares during the Class Period ("Class Members").  All statements made herein are on information and belief unless otherwise stated.

3.      As alleged more fully herein, UDF IV has engaged in a Ponzi-like scheme under which it used capital raised in new offerings to pay investors in earlier offerings. Through opaque lending practices, materially misleading disclosures, and through omissions, UDF IV maintained the illusion that it and its affiliates were healthy enough to sustain regular distribution payments, which, in turn, allowed them to raise additional retail capital.

4.      Numerous individuals and entities have participated in the scheme or facilitated it through their negligence. Their independent public accountant, Whitley Penn LLP, audited not only the financial statements of UDF IV, but also those of affiliated entities whose investors and creditors benefitted directly and indirectly from UDF IV capital.

5.      The broker dealer for UDF IV, Realty Capital Securities, not only served as an underwriter for its offerings, but, along with and on behalf of its corporate parents and control persons, played a crucial role in the creation of  UDF IV and its affiliates, entities it spoke of as "our REITs."

II.     **PARTIES**

        a.  **Plaintiff**

Plaintiff Mark Hay is a Houston, Texas resident. On July 5, 2011, Mark Hay purchased 2,500 common shares of UDF IV in the Offering for a total of $50,000. On May 7, 2013, Mark Hay purchased 2,000 common shares of UDF IV in the Offering for a total of $40,000.

        b.  **Defendants**

**The UDF Entity Defendants**

6.      Defendant UDF IV is a Maryland real estate investment trust ("REIT") organized on May 28, 2008, with its principal executive offices located at 1301 Municipal Way, Suite 100, Grapevine, Texas 76051. It may be served with process by serving its registered agent, Corporation Service Company d/b/a CSC - Lawyers Incorporating Service Company, at 211 East 7th Street, Suite 620, Austin, Texas 78701.

7.      Defendant UMT Services, Inc. ("UMTS"), is the General Partner of Defendant UMT Holdings, L.P., Defendant UMTH General Services, L.P., and Defendant UMTH Land Development, L.P. Defendant Hollis Greenlaw is CEO, Director and 50% shareholder of UMTS. Defendant Todd Etter is Chairman, Director and 50% shareholder of UMTS. Defendant Wilson is also a director of UMTS. Defendant Obert is CFO and Treasurer of UMTS. Defendant Hanson is CFO of UMTS. UMTS controls Defendant UMTH General Services, L.P.

3

8.     Defendant UMT Holdings, L.P. ("UMTH") is the Limited Partner for both Defendant UMTH General Services, L.P. and Defendant UMTH Land Development, L.P. Defendants Etter, Greenlaw, Wilson, Obert, Wissink and Youngblood are all owners of limited partnership interests in UMTH. UMTH also owns 99.9% of the limited partnership interests in Defendants UMTH General Services, L.P. and UMTHLD.

9.     Defendant UMTH General Services, L.P. ("UMTHGS") is a Delaware Limited Partnership and the General Partner of Defendant UDF IV. UMTHGS was the advisor to UDF IV during the Class Period, as well as the advisor to UDF IV affiliate UMT.  According to UDF IV's SEC filings, UTMHGS is "responsible for managing the Trust's affairs on a day-to-day basis." UMTHGS engaged Defendant UMTHLD as UDF IV's asset manager to oversee the investing and financing activities of the affiliated programs manages and advised by UMTHGS and UMTHLD.

10.     Defendant UMTH Land Development, L.P. ("UMTHLD") served as UDF IV's asset manager during the Class Period. Its role was to "identify and underwrite real estate professionals in each region or, in some cases, each sub-market in which [UDF IV] invest[ed], and… utilize these proprietary strategic partner relationships to actively manage each loan or investment."

11.     UMTS, UMTHGS, UMTHLD, UMTH are referred to herein as the "UDF Entity Defendants." The UDF Entity Defendants shared a common group of equity holders, directors, officers and executives (*i.e.*, the UDF Individual Defendants, defined *infra*), headed in particular (but not solely) by Defendants Greenlaw, Etter and Obert. As alleged more fully herein, the UDF Entity Defendants were individually and collectively instrumental in the creation of UDF IV's false and misleading financial statements. Their co-defendants were able to structure loans and obligations by and through the UDF Entity Defendants, which concealed UDF IV's true financial

condition. By failing to perform their duties as advisors and asset managers with reasonable care, the UDF Entity Defendants negligently facilitated the issuance of UDF IV's material misstatements and omissions.

**The UDF Individual Defendants**

12.     Defendant Hollis M. Greenlaw ("Greenlaw") was, at all relevant times herein, CEO and Chairman of the Board of Trustees for UDF IV and UDF V.  Greenlaw signed the UDF IV Shelf Registration Statement (defined herein) as well as numerous additional UDF IV prospectuses and SEC filings.  Greenlaw is listed among "Key Personnel" of UDF IV. The Shelf Registration lists Greenlaw as a 32.83% owner of UMT Holdings. He served on the UDF IV Investment Committee.  He is also listed as the owner of one half of the equity interest in UMTS., which is the general partner in UMTHGS. UMTHGS is the advisor to UDF IV and to several of its affiliate funds.  The Shelf Registration states that Greenlaw owns 45% of United Development Funding Inc., the General Partner for UDF I, a predecessor fund to UDF IV. He also owns 50% of United Development Funding II, Inc., the General Partner for UDF II, another predecessor fund to UDF IV. As discussed, *infra*, UMTHGS received tens of millions of dollars in fees in its role as advisor to UDF IV. According to UDF IV's website, Greenlaw has been personally involved not only in all aspects of UDF IV's operations and management, but with numerous UDF IV predecessors and affiliates (*i.e.*, the "family" of UDF funds) as well:

> Mr. Greenlaw has served as our Chief Executive Officer and Chairman of our board of trustees since our formation in May 2008. Mr. Greenlaw also has served as Chief Executive Officer of UMTHLD since March 2003 and served as its president from March 2003 until July 2011. He also has served as partner, Vice Chairman and Chief Executive Officer of UMT Holdings and as President, Chief Executive Officer and a director of UMT Services since March 2003. Mr. Greenlaw is also the co-founder and Chief Executive Officer of UDF I, UDF II, and UDF III, affiliated real estate finance companies that provide custom financing and make opportunistic purchases of land for residential lot development and home construction. **As Chief Executive Officer of the United Development Funding**

5

**family of entities, Mr. Greenlaw has directed the funding of more than $2 billion in loans and equity investments through United Development Funding products, receiving more than $946 million in repayments to date.** From March 1997 until June 2003, Mr. Greenlaw served as Chairman, President, and Chief Executive Officer of a multi-family real estate development and management company owned primarily by The Hartnett Group, Ltd., a closely-held private investment company managing more than $40 million in assets. There he developed seven multi-family communities in Arizona, Texas, and Louisiana with a portfolio value exceeding $80 million. Prior to joining The Hartnett Group, Mr. Greenlaw was an attorney with the Washington, D.C. law firm, Williams & Connolly, where he practiced business and tax law. Mr. Greenlaw was a member of Phi Beta Kappa at Bowdoin College and received his Juris Doctorate from the Columbia University School of Law in 1990. Mr. Greenlaw is a member of the Maine, District of Columbia, and Texas bars. Our board of trustees selected Mr. Greenlaw to serve as a trustee because he is our Chief Executive Officer and has served in various executive roles with our sponsor or its affiliates since 2003. He has expansive knowledge of the public homebuilding and real estate industries, and has relationships with chief executives and other senior management at a multitude of real estate companies. His demonstrated leadership skills, business expertise and extensive REIT executive experience provide him with the skills and qualifications to serve as a director.

http://www.udfiv.com/leadership/ (visited March 6, 2016).

13.     Defendant Todd Etter ("Etter") was, at all relevant times during the Class Period Executive Vice President of UMTHLD, Director and Chairman of UMTS, its general partner, and Chairman of UMTH. The Shelf Registration lists Etter as a 32.83% owner of UMTH. Etter served on the UDF IV Investment Committee.  He is listed among "Key Personnel" of UDF IV. He is also listed as the owner of one half of the equity interest in UMTHGS.  According to the Shelf Registration, Etter "serves as Chairman of the general partner of UDF I and UDF II and Executive Vice President of the general partner of UDF III, each of which are limited partnerships formed to originate, purchase, sell and service land development loans and/or equity participations." The Shelf Registration states that Etter owns 22.5% of United Development Funding Inc., the General Partner for UDF I, and 50% of United Development Funding II, Inc. According to UDF IV's

website, Etter has been involved not only with UDF IV, but with each of its predecessor funds and numerous other UDF affiliate entities:

> Mr. Etter has served as director, partner and Chairman of UMT Services, the general partner of UMT Holdings and UMTH LD and Executive Vice President of UMTH LD since March 2003. UMT Holdings originates, purchases, sells and services loans for the development of single-family lots and loans for the construction of single-family homes through its subsidiary UMTH LD. UMT Holdings also provides real estate-related corporate finance services through its subsidiary UMTH GS. UMTH GS serves as the advisor to UDF IV and United Mortgage Trust. Mr. Etter serves as Chairman of the general partner of UDF I and UDF II and Executive Vice President of the general partner of UDF III, each of which are limited partnerships formed to originate, purchase, sell and service land development loans and/ or equity participations. Since 2000, Mr. Etter has been the Chairman of UMT Advisors, Inc., which served as the advisor to United Mortgage Trust from 2000 through July 31, 2006, and since 1996, he has been Chairman of Mortgage Trust Advisors, Inc., which served as the advisor to United Mortgage Trust from 1996 to 2000.

*See* http://www.udfiv.com/leadership/ (visited March 6, 2016).

14. Defendant Cara D. Obert ("Obert") was, at all relevant times during the Class Period, CFO of UMTHLD, and CFO and Treasurer of UDF IV. Obert signed the Shelf Registration statements, and numerous other UDF IV prospectuses and SEC filings. The Shelf Registration listed Obert as a 3.87% owner of UMT Holdings. She is identified as a UDF IV "Key Personnel." She is a CPA, and was formerly employed at Arthur Andersen LLP. According to the Shelf Registration, Obert "was a self-employed consultant, assisting clients, including Fortune 500 companies, in creating and maintaining financial accounting systems." According to UDF IV's website, not only Obert has long been involved in the management of UDF's predecessors and affiliates, but she has special expertise in financial accounting systems:

> Ms. Obert served as the Chief Financial Officer for UMT Holdings from March 2004 until August 2006 and served as Controller for UMT Holdings from October 2003 through March 2004. She has served as the Chief Financial Officer of UMTH LD since August 2006. From 1996 to 2003, she was a self-employed consultant, assisting clients, including Fortune 500 companies, in creating and maintaining financial accounting systems. From May 1995 until June 1996, she served as

Controller for Value-Added Communications, Inc., a Nasdaq-listed telecommunications company that provided communications systems for the hotel and prison industries. From 1990 to 1993, she was employed with Arthur Andersen LLP, an international accounting and consulting firm. She graduated from Texas Tech University in 1990 with a Bachelor of Arts degree in accounting. She is a Certified Public Accountant.

*See* http://www.udfiv.com/leadership/ (visited March 6, 2106)

15.     Defendant Michael K. Wilson ("Wilson") is listed as President of UMTH FS and Executive Vice President and Director of UMTS. He is listed among "Key Personnel" of UDF IV. The Shelf Registration listed Wilson as a 2.47% owner of UMTH. It further notes: "Mr. Wilson has served as President of UMTH FS and as Executive Vice President and a director of UMT Services since August 2005 and has been a partner of UMT Holdings since January 2007. Mr. Wilson is currently responsible for Sales, Marketing and Investor Relations for UMT Holdings, and from August 2005 through June 2008 directed the capital raise of over approximately $200 million in United Development Funding securities through independent FINRA-member broker-dealers. From January 2004 through July 2005, Mr. Wilson served as Senior Vice President of Marketing for UMT Holdings."

16.     Defendant Ben L. Wissink ("Wissink") was the Chief Operating Officer of UMTHLD, as well as COO of UMTS.  He served on the UDF IV Investment Committee.  Wissink is listed among "Key Personnel" of UDF IV. According to the Shelf Registration, Wissink "directs the management of over approximately $126 million in loans and investments for UDF I and UDF II, and over $105 million in loans for UDF III."  According to UDF IV's website, Wissink has been involved with UDF since 2005 and was personally involved in the management of UDF loans:

Mr. Wissink joined UMTH Land Development L.P. (asset manager of United Development Funding IV) in September 2005, serving as its President since June 2011. Prior to June, he served as Chief Operating Officer from 2005 through 2011,

and has been a partner of UMT Holdings since September 2008. Mr. Wissink has directed the management of more than $1.21 billion in loans and equity investments through United Development Funding (UDF) products, receiving more than $592 million in repayments to date. From June 2003 through August 2005, Mr. Wissink served as the Controller for the Dallas/Fort Worth land division for the national homebuilding company, Lennar Corporation. During that time, Mr. Wissink also served as an analyst for the Texas region. Mr. Wissink graduated from the University of Iowa in 2003 with a Bachelor of Business Administration degree in finance.

http://www.udfiv.com/leadership/ (visited March 6, 2016).

17.     Defendant Robert A. Laak ("Laak") was the Chief Investment Officer of UMTHLD, and served on the UDF IV Investment Committee.  Laak is listed among "Key Personnel" of UDF IV.  According to the Shelf Registration, Laak "joined UMTH LD as Chief Investment Officer in March 2008 and directs the underwriting, origination and management of the investments of the United Development Funding family of funds."  The Shelf Registration states that "Laak has also served as an auditor for three national and local CPA firms."

18.     Defendant David Hanson ("Hanson") is listed as COO and Chief Accounting Officer of UMTH, President of UMTHGS, and CFO of UMTS. Hanson was a trustee of UDF IV and signed the Shelf Registration as well as numerous additional UDF IV prospectuses and SEC filings. Hanson is also listed among "Key Personnel" of UDF IV.  According to the Shelf Registration, "Hanson has over 20 years of experience as a financial executive in the residential housing industry as an accountant with an international public accounting firm." According to UDF IV's website, not only was Hanson fully involved in the accounting for UDF IV, but he has special expertise in accounting for off-balance sheet financing:

Mr. Hanson has served as our Chief Accounting Officer since our formation in May 2008 and as our Chief Operating Officer from inception through February 2014. Mr. Hanson also serves as President of UDFH GS, our sub-advisor, and as Chief Financial Officer of UDF Services. He has also served as President of UMTH General Services, L.P. (UMTH GS), Chief Financial Officer of UMT Holdings, L.P. (UMT Holdings), and Chief Financial Officer of UMT Services, Inc. (UMT

Services) since June 2007. Mr. Hanson has over 25 years of experience as a financial executive in the residential housing industry and as an accountant with an international public accounting firm. From 2006 to 2007, he was a Director of Land Finance for the Central/Eastern Region at Meritage Homes Corporation (Meritage), the twelfth largest publicly traded homebuilder. While at Meritage, **Mr. Hanson handled all aspects of establishing, financing, administering and monitoring off-balance sheet FIN 46-compliant entities for the Central/Eastern Region**. From 2001 to 2006, he was employed with Lennar Corporation, a national homebuilding company, as the Regional Finance Manager and served as acting homebuilding Division President, Regional Controller, and Controller for both homebuilding and land divisions. From 1999 to 2001, Mr. Hanson was the Director, Finance and Administration for One, Inc., a technology consulting firm. From 1996 to 1999, Mr. Hanson was the Vice President, Finance and Accounting for MedicalControl, Inc., a publicly traded managed healthcare company. Prior to 1996, he was employed with Arthur Andersen LLP, an international accounting and consulting firm, for approximately nine years. He graduated from the University of Northern Iowa in 1984 with a Bachelor of Arts degree in Financial Management/Economics and in 1985 with a Bachelor of Arts degree in Accounting. He is a Certified Public Accountant and Certified Management Accountant.

*See* http://www.udfiv.com/leadership/ (visited March 6, 2016) (emphasis added).

19.     Defendant Scot W. O'Brien ("O'Brien") was a trustee of UDF IV and signed the Shelf Registration as well as numerous additional UDF IV prospectuses and SEC filings. According to the Shelf Registration, O'Brien is an attorney and member of the Bar of the State of Texas, who practices business and tax law as a shareholder of the Dallas, Texas law firm of Hallett & Perrin PC.

20.     Defendant Phillip K. Marshall ("Marshall") was a trustee of UDF IV and signed the Shelf Registration as well as numerous additional UDF IV prospectuses and SEC filings.  He was also a trustee for UMT and Chairman of its Audit Committee, giving him unique access to the financial operations not only of UDF IV, but also to UMT.  Marshall is a CPA, who from 2001 to 2003 was a principal with Defendant Whitley Penn, independent auditor for UDF IV. Prior to serving with Whitley Penn, he was an audit partner for Toombs, Hall and Foster and KPMG Peat Marwick.

10

21.     Defendant J. Heath Malone ("Malone") was a trustee of UDF IV and signed the Shelf Registration as well as numerous additional UDF IV prospectuses and SEC filings. According to the Shelf Registration, he is the co-founder and partner of Max Industries, Ltd., which does business as Max Furniture.  He is a CPA who was formerly employed at Arthur Anderson LLP, where he "specialized in manufacturing and retail companies and served on a fraud audit team."

22.     Defendant Steven J. Finkle ("Finkle") was an independent trustee of UDF and signed the Shelf Registration as well as numerous additional UDF IV prospectuses and SEC filings. According to the Shelf Registration, he is the founder and President of National Brokerage Associates, a full service insurance brokerage house. Finkle holds Series 7, 24, and 63 securities licenses and serves on the advisory committee for multiple insurance carriers.

23.     Defendant Melissa H. Youngblood is listed in the UDF IV SEC filings and prospectuses as the 4.83% owner of UMTH, and the 4.0% owner of UDFH. She has served as COO of UMTHLD since July 2011. The UDF IV filings and prospectuses list her among the key personnel (including Defendants Etter, Greenlaw, Wilson, Wissink, Obert, Hanson and Jester) upon whose expertise in "the selection, acquisition, structuring and monitoring of our lending and investment activities" the UDF IV offerings would depend. Prior to joining UMTHLD, she was a partner at the law firm of Hallet & Perrin (where Defendant O'Brien is presently listed as a shareholder) in the firm's corporate and securities section, with a concentration in real estate and lending transactions.  According to UDF IV's website, Ms. Youngblood has represented both publicly and privately owned business entities, including public and private finance, mergers and acquisitions, general contracting and commercial real estate transactions. Her legal career has focused on representation of borrowers and lenders in private and commercial lending transactions,

11

and real estate syndicators and financiers in connection with real estate-based lending, documentation of loans, and real estate financing. She has also represented businesses in various aspects of securities laws, ***with an emphasis on federal securities reporting and compliance***. Her experience includes corporate reorganizations, mergers, asset acquisitions and sales, shareholder, partnership and joint venture agreements, sales of equity and debt interests, and representation of issuers in connection with private placements of equity and secondary public offerings of debt and equity. Mrs. Youngblood received her J. D. from the University of Texas at Austin law school in 1992, and became a member of the State Bar of Texas upon taking the bar exam in 1993. *See* http://www.udfiv.com/leadership/ (visited March 6, 2016) (emphasis added).

24.     Defendant J. Brandon Jester is listed as the 2.0% owner of UDFH. According to UDF IV's website, Jester serves as UDF IV's Director of Asset Management where "***he oversees the department and the transaction process in every UDF market***." Jester joined UDF in 2008 as an Asset Manager, responsible for managing UDF's financing activities in the Austin and San Antonio markets. *See* http://www.udfiv.com/leadership/ (visited March 6, 2016) (emphasis added).

25.     Defendants Greenlaw, Etter, Obert, Wilson, Hanson, Wissink, Laak, O'Brien, Marshall, Malone, Finkle, Weil, Youngblood, and Jester (the "UDF Individual Defendants"), because of their positions at UDF IV, as well as their senior positions with numerous UDF affiliates, possessed the power and authority to control and did control the content and form of UDF IV's prospectuses, annual reports, quarterly reports, press releases and other materials provided to the SEC, securities analysts, money and portfolio managers and investors. The UDF Individual Defendants authorized the publication of the documents and materials alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent the issuance of

these false statements or to cause them to be corrected. Because of their positions with UDF IV, as well as their senior positions with numerous UDF affiliates, they had access to material non-public information, and they knew, or recklessly or negligently failed to know, that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The UDF Individual Defendants are liable for the false statements pleaded herein.

**Centurion American Defendants**

26.     Defendant Centurion American Development Group ("Centurion") was founded by Mehrdad Moayedi in 1990. Centurion is located at 1800 Valley View Lane, Suite 300, Farmers Branch, Texas 75234.

27.     Defendant Mehrdad Moayedi ("Moayedi") is the Chairman and CEO of Centurion.

28.     Moayedi and Centurion, and entities they own and/or control, are collectively the largest borrower from UDF IV and its affiliates.

29.     As discussed herein, Moayedi and Centurion were the largest borrowers from UDF IV and from the entire UDF "family" of funds, with over half of all amounts loaned by UDF IV. Shortly before the UDF IV offering, they and/or entities they controlled had been sued by third parties for failing to timely pay their financial obligations.  Such financial difficulties experienced by Moayedi and Centurion, as evidenced by said lawsuits, were never disclosed to the UDF IV investors. The funds' concentration of risk in loans to Centurion- and Moayedi- controlled entities was not disclosed fully or adequately to investors.

**RCS Entities and Defendants**

30.     Non-defendant Realty Capital Securities LLC ("RCS") is a New York City-based brokerage firm owned by RCS Capital Holdings, LLC.  Its principal place of business is 405 Park

Avenue, 12th Floor, New York, NY 10022. According to its FINRA brokerage registration, RCS was indirectly owned by RCS Capital Corporation or its corporate predecessors (together, "RCAP") through RCS Capital Holdings, LLC ("RCSC Holdings"). RCAP "directs the management or policies of" of RCS through RCSC Holdings. RCS was founded by Defendants Schorsch, Kahane, Weil and several others in 2008. RCS, RCAP and RCSC are not Defendants in this action due to their recent petitions for relief under Chapter 11 of the United States Bankruptcy Code, as discussed, *infra*.

31. The corporate structure to which RCS and RCAP belong, designed by, *inter alia*, Defendants Schorsch and Kahane, is illustrated in the chart below, from RCAP's June 5, 2013 prospectus filed with the SEC (color scheme in the original):



32. According to the website SeekingAlpha.com, "UDF commenced its capital formation as a non-traded REIT, one of 6 public REIT products incubated on RCS Capital's [RCAP] wholesale/retail broker-dealer platform." In a January 2010 interview with

blackswanzine.com, Schorsch referred to UDF IV as "our mortgage REIT," and noted that "it is more of a yield play that's very stable."   He touted the fact that his REITs do not charge "internalization fees," that his advisors waive their fees to cover dividends, and that his advisors–

> —lower the fees – reduce acquisition fees, reduce financing fees, reduce asset management fees – to make them more 'institutional' in their cost structure. We're seeing it in our own platform – all of our fees have been lowered. All of our fees look more institutional – for example, 1% acquisition fees instead of 2-3%.

33.    RCS served as the managing broker-dealer and underwriter for each of UDF IV's offerings during the Class Period, helping structure the offering and prepare the offering documents, organizing, overseeing and compensating the syndicate of retail broker-dealers, and offering and selling UDF IV shares to investors through best efforts.

34.    On January 31, 2016, RCS, its Parent, RCS Capital Holdings ("RCS Holdings"), and RCS Holdings' parent, RCAP, all filed voluntary petitions for bankruptcy under Chapter 11 of Title 11 of the United States Code in the United States District Court for the District of Delaware. *See In re Realty Capital Securities,* LLC, No. 16-10230-MFW; *In re RCS Capital Holding LLC, et al,* No. 16-10229; *In re RCS Capital Corp, et al,* No. 16-10223. RCS and RCAP are referred to herein as the "RCS Entities."

35.    According to RCS's January 31, 2016 Chapter 11 petition, "Realty Capital Securities, LLC is wholly owned by RCS Capital Holding, LLC, which is wholly owned by RCS Capital Corporation [RCAP]."

36.    RCAP, RCS' parent company, is a holding company that does not have its independent business or operations. Rather, according to its Prospectus dated June 5, 2013 (the "2013 RCAP Prospectus," RCAP is comprised of four "operating subsidiaries," one of which is RCS, and its activity consists of operating and managing such operating subsidiaries, including RCS. There is no substantive separation between the business of RCAP and the business of RCS,

because RCAP does not have a standalone business. Rather, RCS' business is part of RCAP's business. This is illustrated, for instance, by RCAP's reference, in its 2013 Prospectus, to "our leading position as a wholesale broker-dealer," its assertion that "[W]e presently are under contract to provide distribution ... marketing and promotional services to 11 real estate-focused investment programs," and its references to its "lines of business," which include RCS. This is further illustrated, by RCAP's assertion, in its Prospectus dated __, 2014 (the "2014 RCAP Prospectus") that "[w]e are an integrated financial service company …. We currently are engaged in … the wholesale distribution, investment banking, capital markets … through our … operating subsidiaries," "we have developed substantial distribution capabilities through a selling group of approximately 260 brokerage firms," and "our wholesale distribution platform has distributed 24 offerings." The wholesale distribution "platform" refers to RCS.  Also, the pronoun "we" used throughout both the 2013 and 2014 RCAP Prospectuses and in the statements above comprises not only RCAP but also its operating subsidiaries such as RCS, according to the RCAP Prospectus. Most importantly, this is illustrated by RCAP's representation that the funds raised pursuant to the RCAP's 2013 Prospectus were intended to be used "to expand our lines of business, which consists of our wholesale broker dealer [and others]" and that all its lines of business were led by the same "highly experienced executive management team," with Schorsch and Kahane as the executives at the team's helm.

37.     Defendant Daniel S. Beaton was a Financial and Operations Principal (FINOP) at RCS from September 2007 through the entire Class Period. According to FINRA, a FINOP's duties include:

> (A) final approval and responsibility for the accuracy of financial reports submitted to any duly established securities industry regulatory body;

> (B) final preparation of such reports;

(C) supervision of individuals who assist in the preparation of such reports;

(D) supervision of and responsibility for individuals who are involved in the actual maintenance of the member's books and records from which such reports are derived;

(E) supervision and/or performance of the member's responsibilities under all financial responsibility rules promulgated pursuant to the provisions of the Act;

(F) overall supervision of and responsibility for the individuals who are involved in the administration and maintenance of the member's back office operations; or

(G) any other matter involving the financial and operational management of the member.

Beaton has a bachelor's degree in Business Administration.  He is registered with more than two dozen brokerage firms, including RCS. According to FINRA, He has passed the Series 7 (General Securities), Series 24 (General Securities Principal), Series 27 (Financial and Operations Principal), Series 28 (Introducing Broker/Dealer Financial Operations Principal) and Series 63 (Uniform Securities Agent State Law) exams.

38.     Defendant Edward Michael Weil, Jr. was the Co-Founder, Chairman, Chief Executive Officer, and Chief Operating Officer of RCS during the Class Period. During the Class Period, Mr. Weil also served as an executive officer of RCAP, RCS' corporate parent and control person. Weil was also as a trustee of UDF V until October 8, 2014, when he voluntarily resigned and was replaced by Defendant Kahane.  He is also listed as the President, COO, Treasurer and Secretary to Defendant ARCR Advisors. According to FINRA, Weil has passed the Series 7, 24 and 63 exams.

39.     Defendant Nicholas S. Schorsch was the Co-Founder and Chief Executive Officer of RCS, Director of RCS during the Class Period, and also RCAP's Co-Founder and principal

during the Class Period. Schorsch is listed as owning 10% or more of RCAP. Defendant Schorsch was the main driving force and decision maker behind both RCS and RCAP.

40.     Defendant William M. Kahane was the Co-Founder of RCS and also RCAP's Co-Founder and principal. He also served as a trustee for UDF V, a successor fund to UDF IV. Kahane resigned as a trustee on November 24, 2015.

41.     Defendants Schorsch and Kahane in particular were the control persons of RCS at all relevant times, with "the ability to control all matters affecting [RCS and RCAP]" according to the RCAP 2014 Prospectus. They were the two leading, executive members of the "highly experience executive management team" that led and managed all of RCAP's "lines of business," including RCS, according to the RCAP 2013 Prospectus.

42.     Defendant John Henry Grady was the Chief Operating Officer and Chief Compliance Officer of RCS during the Class Period.

43.     Defendant Louisa Quarto served as RCS' President and Chief Compliance Officer during the Class Period. Ms. Quarto joined RCS' affiliate, American Realty Capital Advisors, LLC (which was founded by Defendants Kahane and Schorsch), on or about April 10, 2008. According to FINRA, Quarto has passed the Series 7, 24 and 63 exams.

44.     Defendant Joseph Neary served as RCS' Chief Compliance Officer during the Class Period.

45.     Defendant Kamal Jafarnia served as RCS' Chief Compliance Officer during the Class Period. According to FINRA, Jafarnia has passed the Series 6, 7, 24 and 63 and 65 exams.

46.     Defendant Brian S. Block served as Chief Financial Officer of RCS during the Class Period.

47.     Defendant William A. MacGillivray served as Executive Vice President of RCS during the Class Period, and was with RCS through April 2015. According to FINRA, MacGillivray has passed the Series 6, 7, 24, 26 and 63 exams.

48.     Defendant Ralph L. Roth served as the CEO of RCS beginning in September 2013 through June 2014. According to FINRA, Roth has passed the Series 7, 22, 24 and 63 exams.

49.     Defendants Beaton, Weil, Schorsch, Kahane, Grady, Quarto, Neary, Jafarnia, MacGillivray, and Block are referred to herein as the "RCS Individual Defendants."

50.     The RCS Individual Defendants, because of their positions at RCS, which was the underwriter for UDF IV, possessed the power and authority to control the content and form of UDF IV's prospectuses, annual reports, quarterly reports, press releases and other materials provided to the SEC, securities analysts, money and portfolio managers and investors. The RCS Individual Defendants authorized and/or the publication of the documents and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions with RCS, they had access to material non-public information, and they knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The RCS Individual Defendants are liable for the false statements pleaded herein.

51.     Defendant Whitley Penn, LLP served as UDF IV's independent public accountant throughout the Class Period.  It also served as the independent public accountant for United Mortgage Trust ("UMT"), UDF III and UDF V, all of which share a management team and are located in the same principal place of business. Because it served as the independent public accountant for numerous UDF IV affiliates, Defendant Whitley Penn was uniquely privy to

related-party transactions that involved UDF IV and its affiliates. Defendant Whitley Penn was also uniquely privy to related-party transactions that involved UDF IV and its officers and trustees. Defendant Whitley Penn was in a unique position to be aware of undisclosed exposure to Centurion and Buffington across the entire UDF family of funds and entities. It was also in a unique position to be aware of the material misstatements and omissions in UDF IV's prospectuses and incorporated SEC filings.

52. UDF IV's Shelf Registration included the following organizational chart for the UDF family of funds:



III. **JURISDICTION AND VENUE**

53.     Defendant UDF IV has a principal place of business in Grapevine, Tarrant County, Texas, which is located in this judicial district. Venue is therefore proper in this District.

54.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C §1332, because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs, and on information and belief, between 1/3 and 2/3 of UDF IV shareholders are residents of states other than Texas.

## IV.     SUBSTANTIVE ALLEGATIONS

### a.     The RCS / UDF Scheme

55.     The UDF Individual Defendants formed UDF IV on May 28, following the creation of several processor funds: UDF I (2003), UDF II (2004) and UDF III (Offering May 15, 2006).

56.     According to the UDF website's corporate overview, the UDF funds operate as part of a group or 'family': "UDF invests in the development and construction of new, affordable, single-family homes *through a family of public and private funds*, which direct investor capital towards the financing of homebuilders and land developers." http://www.udfonline.com/corporate-overview. (Visited March 5, 2016) (emphasis added).

57.     Through a number of complicated, opaque and undisclosed financial maneuvers and accounting practices, the UDF Defendants have sought to conceal the financial instability of their entire family of funds.  Their effort to mislead investors is aided by spreading information amongst the filings of different related entities, making it virtually impossible for an ordinary investor to put the pieces together.

### i.     Misleading Debt Obligation Assets

58.     Prior to the formation of UDF IV, the UDF Defendants' entities incurred losses on bad loans originated before the financial crisis of late 2000s.  After foreclosing on and disposing

of the collateral for these bad loans, the UDF Defendants did not recoup the amounts outstanding on the loans.  Rather than recognize these losses on the financial statements of United Mortgage Trust ("UMT"), which carried the loans on its balance sheets, the UDF Defendants instead created instruments, which appeared to be valuable assets, to conceal their loan losses.  Rather than record loan losses, UMT recorded as valuable assets official sounding "**deficiency notes**" and "**recourse obligations,**" that UMT Holdings ("UMTH"), UDF I, and other UDF affiliates issued.

59.    In UMT's 2012 annual report filed on Form 10-K with the SEC, audited by Defendant Whitley Penn, it described its deficiency note and recourse obligation arrangement with its affiliates as follows:

> **Related Parties Foreclosed Properties.** We do not reclassify foreclosed loans that have been pledged to us as collateral (an "underlying loan") for recourse loans we have made to affiliates of our Advisor, because our related parties are obligated to perform under the term of those recourse loans with us ("related parties loans"). If the borrower on an underlying loan defaults, the affiliate has the option to accrue interest payable to us while they bring the underlying loan current in its payments. We, in turn, accrue an interest receivable on the recourse loan. When the underlying loan becomes a paying loan again, the related party resumes paying us interest on the recourse loan. If the underlying loan is foreclosed and the real estate sells, our related party pays us all accrued interest and principal from the proceeds from the sale of the property. Any deficiency is reclassified to Recourse Obligations, related parties or Deficiency Notes, related parties. (UMT 10-K P.34)

60.    The chart below is from **UMT**'s 2012 10-K illustrating the structure of these deficiency notes and recourse obligations:



61.     In other words, when a UMT loan fails, rather than write it off, a UMT affiliate

assumes the loan, which accrues interest.  UMT maintains the failed loan on its balance sheet as

a (non-impaired) asset until the affiliate pays interest or it is foreclosed.   If the foreclosure leaves

a balance unpaid, then that balance is still not written off by UMT.  Rather, it is maintained as a

recourse obligation or deficiency note of a related party.

62.     UMT's 2012 annual report also disclosed to its investors – but not to UDF IV

investors – its heavy reliance on the performance of related parties:

> A significant portion of our entire mortgage loan portfolio is comprised of loans we
> have made to related entities. Although we regularly conduct collectability analyses
> of these related entities, including UDF, the obligors under the recourse notes, UMT
> Holdings, L.P. and UMTHGS, because the security we hold for payment of a
> number of these obligations consists ***in significant part of receivables of these
> affiliates from other affiliates*** as well as from unaffiliated third parties and because
> ***our ultimate ability to collect on these obligations is dependent to a large extent
> upon the continued financial performance of those related parties we are exposed
> to a concentrated credit risk***. In the event of a failure by those related parties to
> perform financially as they have regularly done in the past, our ability to collect on
> those obligations could be severely impaired or precluded. In such case, our

earnings could be negatively impacted which in turn may limit distributions that we are able to pay to our shareholders.

(UMT 10-K p.11) (emphasis added).

63.     In other words, the security UMT receives from UMTH and UMTHGS is actually an interest in the fees those parties hope to receive from their advisory work—that is, the exorbitant fees they charge for managing and advising UDF IV.

64.     This arrangement, in which new investors' funds (and fees charged to new investors) are used to shore up the balance sheets of funds serving prior investors, is not sufficiently disclosed to UDF IV shareholders.   In fact, terms such as "deficiency note" and "recourse obligation" do not appear in UDF IV's prospectuses or annual reports.

65.     UMTH is owned by Defendants Greenlaw, Etter, Obert, Wilson and several others. These UMT instruments were, in both purpose and effect, IOUs to UMT that were never reasonably likely to be repaid.   On information and belief, they were issued at artificially low interest rates, when comparable notes and obligations to unaffiliated third-party borrowers bore far higher interest rates.   UMT concealed its true financial picture by keeping these inflated assets on its balance sheets.

66.     Meanwhile, the UDF and RCS Individual Defendants touted UMT's prior performance to the UDF IV investors, but failed to disclose the improper affiliate transactions and accounting practices at UMT.

67.     UMTH records these notes as liabilities (notes payable) on its own balance sheets. To remain solvent, UMTH itself needed assets. UMTH's primary assets were accounts receivable from related parties, which were actually management fees improperly earned from UDF III and UDF IV.

### ii.  **Ponzi-like Loan Practices**

68.     Unbeknownst to UDF IV investors, UDF funds have engaged in Ponzi-like loan practices that misled UDF IV investors into believing that the funds are able to maintain consistent dividends.  The gist of these practices is that UDF IV investment funds are used to pay earlier investors in UDF affiliates.

69.     For example, UDF III owned underperforming and non-performing, under-secured loans.  Rather than realize that loan as impaired and record an operating loss for UDF III, which would disappoint UDF III investors, Defendants instead caused UDF IV to acquire the loans with new retail investor funds.  UDF III investors were therefore paid with funds from later, UDF IV investors.  Moreover, Defendants were able to tout UDF III's continued performance, while concealing UDF III's (and Defendants' family of funds') true financial health and material risks.

70.     Similarly, UDF III issued a loan to a subsidiary of UDF I, which later found itself unable to repay the loan.  Rather than have UDF III record the loan to its affiliate as impaired, Defendants caused UDF IV to make a new loan to the UDF I subsidiary so that it could repay UDF III.  Again, UDF III investors were paid with funds from UDF IV investors, while Defendants concealed UDF III's true financial health, and the financial wherewithal of their family of funds and entities, including UDF IV.

71.     Similarly, UDF III lent money to an entity affiliated with one of UDF's largest borrowers, which had undisclosed business relationships with Defendants. When that borrower was unable to repay UDF III, UDF V lent money to the borrower, which in turn repaid UDF III.  UDF V funds were funneled to UDF III investors, and Defendants continued to conceal the true financial picture of UDF III and their family of funds and entities, including UDF IV and UDF V.

72.     UDF IV also engaged in classic Ponzi-like behavior of using capital raised in an offering to fund distributions to investors in its own earlier offerings: New investor funds flowed directly and indirectly to earlier investors.  UDF IV also pledged its own collateral in exchange for bank loans, which it then distributed to investors.  This practice allowed UDF IV to maintain the illusion that it was sufficiently healthy to sustain regular distribution payments, which, in turn, allowed the fund to raise additional retail capital.

73.     This Ponzi-like practice can be illustrated through two specific loans that were misrepresented in UDF V's initial prospectus. Because UDF V had no operating history, it presented on the very last page of its July 25, 2014 prospectus to investors the following summary table of UDF IV's lending history:

### UNITED DEVELOPMENT FUNDING IV

| Loan or Equity Investment | Date Funded[1] | Date of Final Repayment[2] | Payments Received | Original Loan and Funds Advanced Net of Interest | Amount of Loan Repaid & Interest Earned or Equity & Profit Returned[3] | Interest Earned[4] |
|---|---|---|---|---|---|---|
| Frisco Hills, LP | August 20, 2010 | October 5, 2010 | $ 11,000,709 | $ 10,954,230 | $ 11,000,709 | $ 46,479 |
| United Development Funding III, L.P. | January 8, 2010 | October 28, 2010 | 5,814,502 | 5,435,844 | 5,814,502 | 378,658 |
| United Development Funding III, L.P. | March 24, 2010 | August 12, 2011 | 468,734 | 461,800 | 468,734 | 6,934 |
| BHM Highpointe, LTD | November 16, 2010 | September 22, 2011 | 4,386,444 | 4,191,878 | 4,386,444 | 194,566 |
| Buffington Land, LTD | December 13, 2010 | September 29, 2011 | — | — | — | — |
| 165 Howe, LP | April 19, 2010 | October 4, 2011 | 3,079,310 | 2,763,410 | 3,079,310 | 315,900 |
| Andrew C. Befumo, Inc. | May 16, 2011 | October 5, 2011 | 1,195,133 | 1,138,450 | 1,195,133 | 56,683 |
| Buffington Signature Homes, LLC | April 30, 2010 | October 28, 2011 | 1,375,306 | 1,261,435 | 1,375,306 | 113,871 |
| BHM Highpointe, LTD | May 25, 2011 | December 21, 2011 | 3,303,798 | 3,093,185 | 3,303,798 | 210,613 |
| CTMGT Williamsburg, LLC | September 27, 2011 | February 7, 2012 | 17,318,863 | 17,042,225 | 17,318,863 | 276,638 |
| Cheldan MM, LLC | April 26, 2010 | January 25, 2012 | 3,196,639 | 2,968,702 | 3,196,639 | 227,937 |
| Pine Trace Village, LLC | March 29, 2010 | May 31, 2012 | 6,475,329 | 5,091,906 | 6,475,329 | 1,383,423 |
| Buffington Brushy Creek, LTD | September 21, 2010 | June 1, 2012 | 2,090,526 | 1,980,860 | 2,090,526 | 109,666 |
| Buffington Brushy Creek, LTD | July 20, 2011 | June 1, 2012 | 2,435,251 | 2,269,622 | 2,435,251 | 165,629 |
| UMT Home Finance II, LP | October 26, 2011 | October 26, 2012 | — | — | — | — |
| Mehrad Moayedi | August 10, 2012 | December 20, 2012 | 892,560 | 852,192 | 892,560 | 40,368 |
| One Prairie Meadows, Ltd. | May 28, 2010 | January 25, 2013 | 4,662,767 | 4,277,826 | 4,662,767 | 384,941 |
| HLL Land Acquisitions of Texas, LP | January 18, 2010 | May 6, 2013 | 5,216,424 | 4,816,809 | 5,216,424 | 399,615 |
| UMT Home Finance III, LP | June 10, 2011 | May 31, 2013 | 3,544,101 | 3,206,611 | 3,544,101 | 337,490 |
| Len-Buff Land Acquisitions of Texas, LP | October 28, 2010 | June 5, 2013 | 3,556,004 | 3,244,165 | 3,556,004 | 311,839 |
| 165 Howe, LP | July 29, 2011 | July 26, 2013 | 8,091,081 | 7,285,756 | 8,091,081 | 805,325 |
| UMT Home Finance III, LP | October 4, 2011 | November 6, 2013 | 3,156,815 | 2,843,689 | 3,156,815 | 313,126 |
| CTMGT Buckingham, LLC | June 28, 2013 | December 16, 2013 | 1,492,628 | 1,409,383 | 1,492,628 | 83,245 |
| BLD Bratton Hill, LLC | July 31, 2013 | December 16, 2013 | 1,242,473 | 1,184,193 | 1,242,473 | 58,280 |
|  |  |  | $ 93,995,397 | $ 87,774,170 | $ 93,995,397 | $ 6,221,227 |

74.     UDF V's prospectus offers little context for this table of 24 loans. The prospectus states only that "[t]he table below reflects the performance of the portfolio in terms of loans made,

loans repaid and interest income received on loans." The table itself indicates that the loans were all repaid in full as of December 31, 2013, and that UDF IV earned $6,221,227 in interest from these loans. Based on the summary table, a prospective investor was led to believe that the UDF IV loans represented or "reflected" how UDF IV's portfolio was performing as of December 31, 2013.

75.     UDF IV's own SEC filings contradict UDF V's representation, however. According to UDF IV's annual report filed with the SEC on form 10-K on December 31, 2013, two of the loans listed were not repaid in full on December 16, 2013. Rather, they were repackaged and reported as different loans.

76.     According to the table, UDF IV lent $1,409,383 to CTMGT Buckingham, LLC on June 28, 2013, and was repaid with interest on December 16, 2013 in the amount of $1,492,628 -- for a profit of $83,245 (the "Buckingham Loan"). Similarly, UDF IV lent $1,184,193 to BLD Bratton Hill, LLC on July 31, 2013, and was repaid with interest also on December 16, 2013 in the amount of $1,242,473 -- for a profit of $58,280 (the "Bratton Loan").

77.     UDF IV's 10-K, filed the same day, states the following about these loans:

*URHF Buckingham Participation*

On December 16, 2013, we entered into a participation agreement (the "URHF Buckingham Participation") with URHF pursuant to which we purchased a participation interest in URHF's $4.9 million loan (the "URHF Buckingham Loan") to CTMGT Buckingham, LLC ("Buckingham"), a Texas limited liability company. Our Advisor also serves as the advisor for UMT, which owns 100% of the interests in URHF. The URHF Buckingham Loan provides financing to Buckingham to acquire and develop 81 paper lots located in Texas. The URHF Buckingham Loan is evidenced by a secured promissory note and secured by a first lien deed of trust on the lots and is guaranteed by principals of the borrower.

The URHF Buckingham Participation gives us the right to receive payment from URHF of principal and accrued interest relating to amounts funded by us under the URHF Buckingham Participation. The interest rate under the URHF Buckingham Loan is the lower of 13% or the highest rate allowed by law. Our interest will be

repaid as Buckingham repays the URHF Buckingham Loan. Buckingham is required to make loan payments upon the sale of lots covered by the deed of trust. The URHF Buckingham Loan and our participation in this loan are due and payable in full on June 28, 2016.

*URHF Bratton Hill Participation*

On December 16, 2013, we entered into a participation agreement (the "URHF Bratton Hill Participation") with URHF pursuant to which we purchased a participation interest in URHF's $3.0 million loan (the "URHF Bratton Hill Loan") to BLD Bratton Hill, LLC ("Bratton Hill"), a Texas limited liability company. Our Advisor also serves as the advisor for UMT, which owns 100% of the interests in URHF. The URHF Bratton Hill Loan provides financing to Bratton Hill to acquire and develop 52 paper lots located in Texas. The URHF Bratton Hill Loan is evidenced by a secured promissory note and secured by a first lien deed of trust on the lots and is guaranteed by principals of the borrower.

The URHF Buckingham Participation gives us the right to receive payment from URHF of principal and accrued interest relating to amounts funded by us under the URHF Bratton Hill Participation. The interest rate under the URHF Bratton Hill Loan is the lower of 13% or the highest rate allowed by law. Our interest will be repaid as Bratton Hill repays the URHF Bratton Hill Loan. Braxton Hill is required to pay make loan payments upon the sale of lots covered by the deed of trust. The URHF Bratton Hill Loan and our participation in this loan are due and payable in full on July 31, 2016.

UDF IV 2013 10-K at p.101.

78.     Unlike the UDF V table, which represents that the Buckingham and Bratton loans were retired with interest, UDF IV's 10-K includes a table that shows outstanding balances for these two loans, which are approximately the same amounts as the original loan balance:

| Loan Name | December 31, 2013 | December 31, 2012 |
|---|---|---|
| Buffington Participation Agreements | $        2,826,000 | $        7,203,000 |
| Buffington Lot Participation Agreements | 279,000 | 499,000 |
| TR Finished Lot Participation | 3,346,000 | 3,560,000 |
| TR Paper Lot Participation | 12,617,000 | 10,620,000 |
| Carrollton Participation Agreement | - | 817,000 |
| 165 Howe Participation Agreement | - | 1,289,000 |
| Pine Trace Participation Agreement | 6,646,000 | 5,193,000 |
| Northpointe Participation Agreement | 1,585,000 | 212,000 |
| Northpointe II Participation Agreement | 3,000,000 | - |
| UMTHF Megatel Participation | - | - |
| URHF Buckingham Participation | 1,425,000 | - |
| URHF Bratton Hill Participation | 1,186,000 | - |
| Total | $      32,910,000 | $      29,393,000 |

UDF IV 2013 10-K at 102.

79.     The 10-K also includes the "approximate accrued interest in accrued receivable – related parties" for these two loans:

| Loan Name | December 31, 2013 | December 31, 2012 |
|---|---|---|
| Buffington Participation Agreements | $        47,000 | $               - |
| Buffington Lot Participation Agreements | 16,000 | 20,000 |
| TR Finished Lot Participation | 66,000 | 175,000 |
| TR Paper Lot Participation | 197,000 | 401,000 |
| Carrollton Participation Agreement | - | 4,000 |
| 165 Howe Participation Agreement | - | 21,000 |
| Pine Trace Participation Agreement | 562,000 | 134,000 |
| Northpointe Participation Agreement | - | - |
| Northpointe II Participation Agreement | - | - |
| UMTHF Megatel Participation | - | - |
| URHF Buckingham Participation | 91,000 | - |
| URHF Bratton Hill Participation | 64,000 | - |
| Total | $     1,043,000 | $       755,000 |

*Id.*

80.     UDF IV therefore recorded, as assets, outstanding balances and interest receivables (as opposed to cash) of $1,516,000 for the Buckingham Loan, and $1,250,000 for the Bratton Loan, on the exact same day that they purported to retire the Buckingham and Bratton Loans.

81.     Moreover, the complicated manner in which the Buckingham and Bratton loans were "retired" was not adequately disclosed. According to the UDF IV 10-K, UDF affiliate, United Residential Home Finance, L.P. ("URHF"), which is owned by UMT, made a $4.9 million loan to CTMGT Buckingham LLC (a Moayedi/Centurion company).   That loan is secured by a promissory note and is guaranteed by "principals of the borrower," *i.e.*, Defendant Moayedi.   As described, *supra*, UDF IV's 10-K "participation" in this loan gives it the right to payments, not from Buckingham, but instead from URHF when it is repaid by Buckingham. Moreover, this loan is due and payable in full on June 28, 2016, exactly three years after the date of the original Buckingham loan, *see supra* ¶74, not the date of the participation loan.

82. The Bratton Loan was similarly repackaged, rather than retired, with URHF lending to BLD Bratton Hill (a Buffington company), with a lien and guarantee from Bratton's principal. UDF IV's participation gave it the right to be paid by URHF as Bratton repaid URHF. Just as with the Buckingham Loan, this loan is due and payable on July 31, 2016, three years after the original Bratton Hill loan *see supra* ¶74, not the date of the participation loan.

83. A potential UDF V investor reading the UDF IV summary table would have no way of knowing that UDF IV had almost the exact same exposure to the Buckingham and Bratton borrowers before and after December 16, 2013.

### iii.  Undisclosed High Concentration of Loans to Risky Borrower: Centurion

84. Unbeknownst to UDF IV investors, the largest single borrower from the family of UDF funds and entities is a group of affiliated companies operated by Defendant Moayedi. These companies are listed in UDF IV's SEC filings under various names, including Centurion, CTMTH, and many others (hereafter referred to collectively as "Centurion").

85. Moayedi is the President and CEO of Centurion. In an article dated December 21, 2015, he stated that "his company has never been questioned about its dealings with United Development. He said all of his loans with the company are current… UDF is just one of my lenders and we have always done arms-length transactions with them… I have 30 other lenders." http://www.dallasnews.com/business/stocks/20151221-anonymous-allegations-of-improper-deals-hammer-united-development-fundings-stock.ece (last visited March 3, 2016).

86. Undisclosed to Plaintiff and other UDF IV investors, Moayedi and Defendant Greenlaw have had extensive business ties outside of the UDF web, including joint ownership of a private jet. In addition, according to public reports, Centurion and a private UDF affiliate co-

own a Dallas high-rise condo building, and Centurion and a private subsidiary of UDF I shared a 50/50 partnership to purchase and sell residential lots near Austin, Texas.

87.     Such undisclosed and extensive business ties created conflicts of interests between the UDF funds, including UDF IV, and their management, on one side, and the largest borrower, Centurion, on the other side, given that the UDF funds provided capital to Centurion and Centurion's ongoing solvency and financial well-being were crucial to the success of the undisclosed businesses and ventures between the UDF entities and their management, and Centurion and Moayedi. Such conflicts of interests were never disclosed to UDF IV investors.

88.     Approximately sixty-seven percent (67%) of UDF IV's loans have gone to Centurion.

89.     Moreover, on information and belief, UDF III, UDF IV and UDF V have collectively lent Centurion approximately $615 million, or 57% of their total lending.

90.     Between May 21, 2010 and September 30, 2015, UDF IV made loans to entities controlled by Moayedi with a combined principal balance $380,716,016, which represents 73.12% of the combined principal balance of all UDF IV loans ($520,672,043).

91.     The average interest rate of loans to Centurion is 13%.

92.     UDF IV offering documents fail to disclose the high concentration of loans to Centurion, or that Defendant Greenlaw has a prior business relationship with Moayedi.

93.     While the UDF IV offering documents disclosed it had given multiple loans to "related entities," it failed to disclose that such entities were not merely "related" to each other but were all controlled by, and highly dependent financially on, a single person: Moayedi.

94.     The UDF IV offering documents also failed to disclose to their investors that *other* UDF funds were similarly overexposed to Defendants Moayedi and Centurion, and that the risk of

a default by a Moayedi or Centurion entity to any one UDF fund was likely to trigger cascading and debilitating defaults as to *all* UDF funds, greatly exacerbating the exposure of the UDF fund family to Moayedi and Centurion.

### iv.   Moayedi's and Centurion's Pre-Class Period Loan and Obligation Defaults

95.     UDF IV's failure to disclose its true exposure to Moayedi and Centurion is more significant in light of the fact that Moayedi and Centurion had defaulted on several loans and financial obligations prior to the UDF IV offerings.  Their defaults were red flags to any reasonably prudent loan underwriter, asset manager, securities issuer or independent auditor.

96.     In August 2008 Moayedi entered into a personal guaranty for a $696,000 loan to Villages of Sanger, Ltd ("Villages"). Moayedi was the President of Pars Investments, Inc. ("Pars"), which was Villages' general partner.

97.     Pars, along with Centurion Acquisitions, L.P., were themselves borrowers from UDF III, the predecessor fund to UDF IV.   On November 16, 2006, PARS and Centurion Acquisitions gave a secured promissory note for $5,272,250 to UDF III, backed by a security agreement pledging all of their assets. Moayedi signed the security agreement as President of both Centurion Acquisitions and Pars.

98.     In May of 2009, Villages failed to make a $20,880 interest payment on the note. The balance of the note was $716,880, and it was deemed to be in default, with the entire principal and balance due and payable. The lender foreclosed on the real property that secured the note, but the property sold for only $487,200. The lenders demanded that Moayedi remit his guarantee, but Moayedi refused to do so. The lender sued Moayedi. *See Interstate 35/Chisam Road, L.P. and Malachi Dev. Corp. v. Mehrdad Moayedi*, No. DC-09-12666-A (Dallas County, Sept. 17, 2009).

Ultimately, the Texas Supreme Court held that Moayedi was liable for the guaranty. *Moayedi v. Interstate 35/Chisam Road, L.P.*, 438 S.W. 3d 1 (2014).

99.     Despite the fact that Moayedi was the largest borrower from UDF IV, none of the UDF IV public filings disclosed Villages' default, Moayedi's refusal to honor his personal guaranty, and Moayedi's willingness to force his lenders to litigate to the Texas Supreme Court to collect their debt.

100.     Subsequently, in 2011, Citibank, N.A. sued Moayedi in this Court for failing to pay amounts due on a payment and performance guaranty into which he had entered in 2003 for an $8.8 million loan.  *See Citibank, N.A. v. Mehrdad Moayedi*, No. 4:11-cv-00016 (N.D. Tex. Jan 6, 2011) (ECF No. 1).  According to the Complaint, when the note matured on December 1, 2009, and all outstanding principal and interest immediately became due and payable, Moayedi failed to honor his guaranty, which was approximately $1.45 million.

101.     Moreover, Contrary to Moayedi's public statements, numerous loans to Centurion and its affiliates were not current throughout the Class Period. Public records indicate that Centurion is, and has likely been for a period of years, including throughout the Class Period, unable to service financial obligations.  UDF IV has taken few if any steps to protect itself against Moayedi's or Centurion's default on these accrual loans, the fund's exposure to which is in the hundreds of millions of dollars.

102.     By failing to record losses from Moayedi's and Centurion's loans, and allowing them to accrue interest, the UDF Defendants concealed from investors the true financial picture for UDF IV. The UDF Defendants were also able to conceal from the UDF IV investors the exposure of all of their funds to the risk of a cascading failure should Moayedi or Centurion default on their obligations.

103. The RCS Individual Defendants, having performed due diligence in connection with the UDF IV offerings, were aware or recklessly and/or negligently unaware of the undisclosed credit concentration risk that UDF IV faced in light of its exposure to Moayedi and Centurion.

104. Similarly, Defendant Whitley Penn, which audited the financial statements for UDF IV, UMT and numerous other affiliated entities, was aware, or recklessly and/or negligently unaware, of the of the undisclosed credit concentration risk that UDF IV faced in light of its exposure to Moayedi and Centurion. Nevertheless, Whitley Penn signed "clean audit" reports for each of UDF IV's 10-K annual reports throughout the Class Period.

105. Centurion and Moayedi, who were the largest borrowers from UDF IV, were also, by virtue of receiving loans and providing guarantees to UDF IV, and its affiliates, the main source of UDF IV's undisclosed credit concentration risk, and were thus instrumental in the creation of UDF IV's materially false and misleading financial statements.

106. Centurion's and Moayedi's repeated pre-Class Period defaults, as well as their Class Period delinquencies, inconsistent payments and non-payments, were material omissions from UDF IV's public filings in light of the great exposure the two funds and the family of UDF funds had to Centurion and Moayedi.

### v. Undisclosed High Concentration of Loans to Risky Borrower: Buffington

107. Thomas Buffington ("Buffington") controls a family of entities that, unbeknownst to the UDF IV investors, was the second largest single borrower from UDF III and UDF IV.

108. On information and belief, Buffington loans account for approximately 10% of UDF IV's loan assets.

109. On information and belief, Buffington past due loans to UDF III represent 25% of UDF III's portfolio.

110.    A Buffington entity ("Buffington Land") and UDF IV are presently co-defendants in a lawsuit involving a fraudulent transfer in Travis County, Texas. *Hanna/Magee L.P. #1 v. BHM Highpointe Ltd.*, et al, D-1-GN-15-004985 (D. Ct. Travis County 2015). The lawsuit alleges, *inter alia*, that, in November 2011, Buffington Land used improperly assigned reimbursement rights to secure a loan, the proceeds of which it used to repay UDF IV more than $5 million.

111.    UDF IV was aware of the impropriety of the assignment of reimbursement rights. Indeed, UDF IV's August 22, 2012 Prospectus reports cash receipts from Buffington Land of $1,773,247 in 2011 and $3,976,994 in 2012, the latter payment being the single largest receivable payment listed among non-related parties. A note indicated that "[i]n addition, loan is secured by reimbursements of development costs due to the developer under contracts with a district or city." *See* Form 424(b)(3) Prospectus Supp. No. 2 dated August 22, 2012, at p.2. A prior prospectus dated May 22, 2012 lists the Buffington Land loan, but does not list the $3,976,994 payment, or reference "reimbursements." *See* Form 424(b)(3) Prospectus Supp. No. 1 dated May 22, 2012 at p.2.

112.    The *Hanna/Magee* plaintiff has sued UDF IV and its codefendants for tortious interference with an existing contract, and alleges that UDF IV actively solicited the improper assignment to Buffington Land for its own benefit. The lawsuit also seeks recoupment of the amount of the loans repayment to UDF IV and its co-defendants as a fraudulent transfer. UDF IV's alleged conduct as described in this lawsuit demonstrates not only the financial weakness of Buffington, one of its largest borrowers, but also the willingness of Defendants to violate the law for the purpose of maintaining the appearance that its assets were performing.

###### vi.  Inflated Fees

113.    UDF IV's operations generated tens of millions of dollars in management fees, advisor fees and other fees during the Class Period.

114.    The 2009 Prospectus stated that advisor UMTHGS would receive between $30,000 and $15 million in "Organization and Offering Expenses."

115.    UMTHGS would also receive "Acquisition and Origination Fees and Expenses" of between $25,340 and $18,495,146.

116.    UMTHGS would also receive "Advisory Fees" of between $16,893 and $12,330,097. (P.14)

117.    UMTHGS would also receive annual 1% "Debt Financing Fees" of between $8,447 plus $2,112 annually and $6,165,049 plus $1,541,262 annually.  (P.14)

118.    UMTHGS would also receive contingent payments for "Other Operating Expenses," "Subordinated Incentive Fee," "Securitized Loan Pool Placement Fees," Disposition Fees," and "Subordinated Incentive Listing Fee."

119.    According to UDF IV's Definitive Proxy statements, UDF-related entities earned over $60 million in fees between 2010 and 2014 (figures represented in $$ thousands):

|  | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|
| **UMTH GS** | | | | | | |
| O&O Reimbursement | n/a | 1,502 | 2,731 | 5,878 | 8,167 | n/a |
| Advisory Fees | n/a | 557 | 1,776 | 3,924 | 7,819 | 9,751** |
| Debt Financing Fees | n/a | 318 | 158 | 148 | 361 | 754 |
| **UMTH LD** | | | | | | |
| Acquisition and Origination Fees* | n/a | 1,319 | 2,387 | 5,155 | 7,953 | 259 |
| **UDF III** | | | | | | |
| Credit Enhancement Fees | n/a | 64 | 161 | 115 | 132 | 416 |

| **Total Payments** | n/a | **$3,760** | **$7,213** | **$15,220** | **$24,432** | **$11,192** |

*\*Acquisition and Origination fees were labeled "Placement Fees" in the company's earlier proxy statement.*
*\*\*Advisory fees were labeled "Management Fees" in the 2014 proxy statement.*

120.    UDF IV's proxy statements also indicate that UDF IV paid substantial credit enhancement fees to UDF III, in exchange for the latter's agreement to guarantee certain of UDF IV's "financing arrangements," lines of credit into which UDF IV entered.  Between 2010 and 2014, UDF IV paid UDF III $888,000 in such "credit enhancement" fees, $416,000 of which was paid in 2014 alone.

121.    In fact, Defendants had multiple incentives to inflate UDF IV's profitability and to maintain its creditworthiness.  The numerous fees paid by UDF IV to Defendants and their related entities were calculated based on, *inter alia*, a percentage of assets available for investment, a percentage of net amounts available for investment in secured loans and other real estate assets, a percentage of amounts made available through debt financing, 15% of the amount by which net income exceeded at 10% per annum return, a percentage of proceeds upon successful placement of loan pool interests, a percentage of proceeds from disposition of properties, and a percentage of the profit from any public securities offering.

122.    To the extent Defendants concealed UDF IV's liabilities, inflated the value of its assets and avoided recording operating losses, the fees that were paid, as calculated from these financial metrics, were materially inflated.  These inflated fees were not disclosed in UDF prospectuses or financial statements.

123.    Similarly, to the extent UDF IV was able to maintain a good credit rating based on its false and misleading financial statements, the UDF Entity Defendants and UDF Individual Defendants stood to receive fees based on loans and lines of credit obtained by virtue of that

inflated credit rating.  These inflated fees were not disclosed in UDF IV's prospectuses or financial statements.

124.    Moreover, other UDF entities benefit directly from Defendants' reaping inflated fees. As noted, *supra*, UMTH recorded fee income from UDF IV as a receivable on its balance sheets.  Without these fees as a receivable, UMTH would likely have been insolvent.

### b.   RCS' and the RCS Individual Defendants' Role in the UDF Scheme

125.    Non-Defendant RCS and the RCS Individual Defendants played a controlling role in the UDF IV offerings as the underwriter, offeror, and sellers for UDF IV shares. UDF IV's November 12, 2009 prospectus (the "November 2009 Prospectus") for up to 35,000,000 common shares to the public, filed with the SEC on form e424b3, notes, *inter alia*, the following about the relationship between RCS and UDF IV:

> ***The shares are being offered by Realty Capital Securities, LLC***, the exclusive dealer manager for this offering, and select members of the Financial Industry Regulatory Authority (FINRA) ***on a reasonable best efforts basis***. The dealer manager and soliciting dealers are not required to sell or purchase any specific number or dollar amount of shares but will use their reasonable best efforts to sell the shares offered hereby.  (p. 3)
> ...
>
> Our Dealer Manager Realty Capital Securities, LLC (Realty Capital Securities), member FINRA/SIPC, is based in Boston, Massachusetts and will serve as the exclusive dealer manager for this offering. Realty Capital Securities' sales, operational and executive management teams have extensive experience in financial services and provide expertise in product distribution, marketing and educational initiatives aimed at the direct investment industry. Realty Capital Securities is not affiliated with us, our advisor or our advisor's affiliates. (p. 11)
>
> The shares are being offered by Realty Capital Securities, the exclusive dealer manager for this offering, and select members of FINRA on a reasonable best efforts basis, which means the dealer manager and soliciting dealers will only be required to use their reasonable best efforts to sell the shares and have no firm commitment or obligation to purchase any of the shares. (pp. 11-12) (emphasis added)

126. The November 2009 Prospectus stated that RCS would be compensated handsomely: between $65,000 and $32.5 million in sales commissions and between $35,000 and $17.5 million in "Dealer Manager Fees." (P. 161).

127. According to an Amended and Restated Exclusive Dealer Manager Agreement dated November 10, 2009 (the "DM Agreement"), UDF IV appointed RCS "to act as the exclusive dealer manager for the Offering, and the Dealer Manager desires to accept such  engagement."

128. The DM Agreement also noted that UDF IV would enter into an escrow agreement through which RCS would control investors' subscription funds:

> The Trust will enter into an amended and restated escrow agreement (the "Escrow Agreement") with the Dealer Manager and LegacyTexas Bank (the "Escrow Agent"), substantially in the form included  as an exhibit to the Registration Statement, which provides for the establishment of an escrow account (the "Escrow Account") to receive and hold subscription funds in respect of Shares of the Trust. Once a minimum of $1,000,000 of subscription funds has been deposited in the Escrow Account, the Trust will deposit (or cause to be deposited upon instruction to the Dealer Manager and the Soliciting Dealers (as defined in Section 3(a))) all subscription funds to a designated deposit  account in the name of the Trust (the "Deposit Account") at a bank which shall be subject to the reasonable prior approval  of the Dealer Manager, subject to any continuing escrow obligations imposed by certain states as described in the  Prospectus. The Deposit Account shall be subject to a deposit control agreement executed by the depositary, the Trust, and the Dealer Manager, which shall be substantially in the form included as an exhibit to the Registration Statement (the "Control Agreement").

129. The DM Agreement further noted that, as Dealer Manager, RCS would take the primary role in offering and selling UDF IV shares:

> The Dealer Manager is, and during the term of this Agreement will be, duly registered as a broker-dealer pursuant to the provisions of the Exchange Act, a member in good standing of FINRA, and a broker or dealer duly registered as such in those states where the Dealer Manager is required to be registered in order to carry out the Offering as contemplated by this Agreement. Moreover, the Dealer Manager's employees and representatives have all required licenses and registrations to act under this Agreement. There is no provision in the Dealer Manager's FINRA membership agreement that would restrict the ability of the Dealer Manager to carry out the Offering as contemplated by this Agreement.

130.    The DM Agreement further provided:

Upon the terms and subject to the conditions set forth in this Agreement, the Trust hereby appoints the Dealer Manager as its agent and exclusive distributor to solicit and to retain the Soliciting Dealers (as defined in Section 3(a)) to solicit subscriptions for the Shares at the subscription price to be paid in cash. The Dealer *Manager hereby accepts such agency and exclusive distributorship and agrees to use its reasonable best efforts to sell or cause to be sold the Shares in such quantities and to such persons in accordance with such terms as are set forth in this Agreement, the Prospectus and the Registration Statement*. The Dealer Manager shall do so during the period commencing on the initial Effective Date and ending on the earliest to occur of the following: (1) the later of (x) two years after the initial Effective Date of the Registration Statement and (y) at the Trust's election, the date on which the Trust is permitted to extend the Offering in accordance with the rules of the Commission; (2) the acceptance by the Trust of subscriptions for 35,000,000 Shares; (3) the termination of the Offering by the Trust, which the Trust shall have the right to terminate in its sole and absolute discretion at any time, provided that if such termination shall occur at any time during the 180-day period following the initial Effective Date, the Trust shall not commence or undertake any preparations to commence another offering of Shares or any similar securities prior to the 181st date following the initial Effective Date; (4) the termination of the effectiveness of the Registration Statement, provided that if such termination shall occur at any time during the 180-day period following the initial Effective Date, the Trust shall not commence or undertake any preparations to commence another offering of Shares or any similar securities prior to the 181st date following the initial Effective Date; and (5) the liquidation   or dissolution of the Trust (such period being the "**Offering  Period**"). (Emphasis added).

131.    The DM Agreement further provided: "The number of Shares, if any, to be reserved for sale by each Soliciting Dealer may be determined, from time to time, by the Dealer Manager upon prior consultation with the Trust."

132.    The DM Agreement further provided that "[e]ach person desiring to purchase Shares through the Dealer Manager, or any other Soliciting Dealer, will be required to complete and execute the subscription documents described in the Prospectus."

133.    With respect to RCS' compensation, the DM Agreement provided, in pertinent part:

Subject to the volume discounts and other special circumstances described in or otherwise provided in the "Plan of Distribution" section of the Prospectus or this Section 3(d), the Trust agrees to pay the Dealer Manager selling commissions in

the amount of six and one half percent (6.5%) of the selling price of each Share for which a sale is completed from the Shares offered in the Primary Offering....

The Dealer Manager will reallow all the selling commissions, subject to federal and state securities laws, to the Soliciting Dealer who sold the Shares, as described more fully in the Soliciting Dealers Agreement....

(ii) Subject to the special circumstances described in or otherwise provided in the "Plan of Distribution" section of the Prospectus or this Section 3(d), as compensation for acting as the dealer manager, the Trust will pay the Dealer Manager, a dealer manager fee in the amount of three and one half percent (3.5%) of the selling price of each Share for which a sale is completed from the Shares offered in the Primary Offering (the "Dealer Manager Fee").... The Dealer Manager may retain or reallow all or a portion of the Dealer Manager Fee, subject to federal and state securities laws, to the Soliciting Dealer who sold the Shares, as described more fully in the Soliciting Dealers Agreement.

134.    The DM Agreement provided that RCS had undertaken, would continue undertake, and would be compensated for, due diligence with respect to the offering.

135.    In May 2011, RCS announced that it had hired three new members of its due diligence team: Alan Calderon, Hazel "Hazy" Malcolmson and Anthony Bains. Defendant Schorsch stated: "Our comprehensive approach to due diligence relies on the depth and breadth of expertise across a diverse and skilled team…. The appointments of Alan, Hazel and Anthony will strengthen our efforts to provide enhanced transparency to the broker-dealer community on all dimensions of RCS platform product offerings." *See* http://webcache.googleusercontent.com/search?q=cache:lY5JQaTVaR0J:www.americanrealtyca p.com/news/92/72/Realty-Capital-Securities-Adds-Three-Skilled-Professionals-to-its-Due-Diligence-Team.html+&cd=6&hl=en&ct=clnk&gl=us&client=safari (last visited March 1, 2016). RCS President, Defendant Quarto stated: "We couldn't be happier and more excited about the evolution of the diligence team and are confident that this serves as another example of how we continue to lead the industry in best practices."

136.    Unbeknownst to shareholders, non-Defendant RCS and the RCS Individual Defendants did not perform *bona fide* due diligence for any of the offerings during the Class Period, and earned tens of millions of dollars in fees by intentionally disregarding, or with deliberate indifference looking away from, the financial misdeeds taking place at UDF IV and its affiliates.

137.    The RCS Individual Defendants, by virtue of their roles at RCS and RCAP as more fully described above, exercised general control over RCS' activities and management, and specifically exercised control over RCS' underwriting, offering, and sales of UDF IV securities to the investing public.  By virtue of their respective positions described above, the RCS Individual Defendants oversaw RCS' distribution activities as to the real estate investment programs RCS offered and sold, including UDF IV; helped select such real estate investment programs that RCS would agree to distribute, including UDF IV; and played a key role in the due diligence conducted by RCS as to such programs, including UDF IV.

138.    Defendants Schorsch and Kahane were the decision-makers with ultimate management control over RCS, and played a crucial role in selecting the UDF products to be added to RCS' "multi-product distribution platform," agreeing to distribute, offer, and sell the UDF IV securities to the investing public, and overseeing and controlling the distribution, offering, and sale of UDF IV securities.

139.    As stated above, Schorsch and Kahane were the leading executive members of the "executive management team" that managed RCS and RCAP's other "lines of business," and had "the ability to control all matters" affecting RCS.

140.    The closeness of the relationship between Defendants Schorsch and Kahane, on one side, and UDF, and the direct, hands-on involvement of both Schorsch and Kahane in the

promotion of UDF IV are illustrated by the fact that Schorsch and Kahane approved UDF IV as one of the very first programs to be offered through RCS' touted "multi-product distribution platform" that, according to them, differentiated RCS from its competitors and gave it a crucial competitive advantage. Such close relationship and hands-on involvement by the two Defendants is further illustrated by the fact that Kahane agreed to serve as a board member of UDF V. Such close relationship and hands-on involvement with UDF by the two Defendants is further illustrated by the fact that a Schorsch and Kahane-controlled entity, AR Capital, acted as a co-sponsor of UDF V, while another Schorsch and Kahane-controlled entity ARCR Advisors, acted as an external advisor of UDF V.

141.   Given their involvement in selecting the UDF programs to be sold by RCS, their personal involvement in the structuring of the UDF product distribution by RCS, and their oversight and management of the distribution, offering, and sales of UDF IV securities by RCS, the RCS Individual Defendants – and in particular Defendants Schorsch and Kahane – were in a position, and had ample and ongoing opportunities to prevent the UDF IV fraudulent securities offering.

142.   Given their involvement in selecting the UDF programs to be sold by RCS, their personal involvement in the structuring of the UDF product distribution by RCS, and their oversight and management of the distribution, offering, and sales of UDF IV securities by RCS, the RCS Individual Defendants cannot sustain the burden of proof that they did not know and in the exercise of reasonable care could not have known of the misrepresentations and omissions in the UDF IV offering documents.

c.   **Whitley Penn's Role in the Scheme**

143.    Defendant Whitley Penn served as UDF IV's independent public accounting firm from its S-11 Shelf Registration on August 5, 2008 through November 2015, when it declined to stand again as UDF IV's independent auditor.

144.    Between August 5, 2008 and November 19, 2015 During the interim period, Defendant Whitney Penn issued Reports of Independent Registered Public Accounting Firm for every annual report on form 10-K UDF-IV filed with the SEC.

145.    In its reports attached to UDF IV's Forms 10-K for the years ending December 31, 2009, 2010, 2011, 2012 and 2013, Defendant Whitney Penn issued substantially the following statement:

> We have audited the accompanying balance sheets of United Development Funding IV (the "Trust") as of December 31, 2009 and 2008 and the related statements of operations, changes in shareholders' equity and cash flows for the year ended December 31, 2009 and for the period from May 28, 2008 (Inception) through December 31, 2008. These financial statements are the responsibility of the Trust's management. Our responsibility is to express an opinion on these financial statements based on our audits.

> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Trust is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Trust's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

> In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of United Development Funding IV as of December 31, 2009 and 2008, and the results of its operations and its cash flows

for the year ended December 31, 2009 and for the period from May 28, 2008 (Inception) through December 31, 2008 in conformity with accounting principles generally accepted in the United States of America.

/s/ Whitley Penn LLP
Dallas, Texas
March 31, 2010

146.     Because of its role as auditor of UMT and UDF IV, Defendant Whitley Penn was aware that UMT carried as assets deficiency notes and recourse obligations that were, in effect, IOUs from UMTHGS, which, in turn, were dependent upon UMTHGS's ability to exact exorbitant, unearned fees from UDF IV. Whitley Penn was also fully aware that this Ponzi-like arrangement, in which new investors' funds were used to pay prior investors, was not meaningfully disclosed to UDF IV investors in any prospectuses or incorporated SEC filings, all of which it had also audited.

147.     Whitley Penn was also aware that the various UDF affiliated entities, all of whose financial statements it audited, were collectively far more exposed to Moayedi/Centurion and Buffington than was expressly revealed to UDF IV investors. Thus, Whitley Penn was fully aware that the full risk accompanying the failure of either Maoyedi/Centurion or Buffington was unreasonably high, and far higher than the risk reported piecemeal to potential UDF IV share purchasers.

148.     Whitley Penn was also aware, by virtue of its auditing of UDF IV's financial statements along with those of its affiliate entities, that statements in UDF IV's prospectuses and incorporated SEC filings to the effect that UDF IV's loan portfolio was 100% collectible were materially false and misleading.

149.     Whitley Penn was also aware, by virtue of its auditing of UDF IV's financial statements along with those of its affiliate entities, that the fees earned by UDF IV's advisor and

manager were artificially inflated—derived from materially false and misleading financial statements that inflated the financial metrics from which such fees were calculated.

150.    Whitley Penn was also aware, by virtue of its auditing of UDF IV's financial statements along with those of its affiliate entities, of the undisclosed management risk UDF IV investors faced due to the Ponzi-like practices, affecting all of the UDF affiliated entities, in which Defendants were engaging.

## V.    UDF IV's False and Misleading Offerings

151.    As of May 1, 2013, UDF IV had accepted subscriptions and issued an aggregate of 24,071,084 common shares of beneficial interest, consisting of 23,347,467 shares that had been issued in exchange for gross proceeds of approximately $465.3 million and another 723,617 shares issued in accordance with UDF IV's DRIP. As of May 1, 2013, 10,928,916 shares remained available for sale to the public pursuant to UDF IV's offering.

152.    UDF IV raised a total of $642.3 million through the sale of 32,115,232 shares (Including DRIP shares, registered alongside the shares to be publicly offered to new investors) as of December 31, 2013.

153.    On August 5, 2008, UDF IV filed a shelf registration statement with the SEC on Form S-11 (the "Shelf Registration"), indicating its intention to sell 35,000,000 common shares of beneficial interest for a proposed aggregate offering price of $700 million.

154.    The Shelf Registration was signed by Defendants Greenlaw, Obert, Hanson, O'Brien, Marshall, Malone and Finkle.

155.    UDF IV was part of a series of affiliated REITs and real estate companies, which included UDF I, UDF II, UDF III and United Mortgage Trust (UMT).

156.    In the Shelf Registration, UDF IV described its investment plan as raising capital

to issue loans for real estate development of residential real estate, stating, in pertinent part:

> We intend to derive a significant portion of our income by originating, purchasing, participating in and holding for investment secured loans made directly by us or indirectly through our affiliates to persons and entities for the acquisition and development of parcels of real property as single-family residential lots, and the construction of model and new single-family homes, including development of mixed-use master planned residential communities, typically with the loan allocation for any single asset in the range of $2.5 million to $15 million…

> In addition to our investments in secured loans, we intend to make direct investments in land for development into single-family lots, model homes and finished lots and homes. When we acquire properties, we most often will do so through a special purpose entity formed for such purpose or a joint venture formed with a single-family residential developer, homebuilder, real estate developer or other real estate investor, with us providing equity and/or debt financing for the newly-formed entity. In limited circumstances, and in accordance with the federal tax rules for REITs and the exemptions from registration under the Investment Company Act of 1940, as amended (Investment Company Act), we may make equity investments through special purpose entities in land for development into single-family lots, new and model homes and finished lots.

157.    The Shelf Registration then purported to explain the intended security structure of

its loans:

> In most cases, we will obtain a first or subordinate lien on the underlying real property to secure our loans (mortgage loans), and we also may require a pledge of all of the equity ownership interests in the borrower entity itself as additional security for our loans. In instances where we do not have a lien on the underlying real property, we will obtain a pledge of all of the equity ownership interests of the borrower entity itself to secure such loans (so-called "mezzanine loans") and/or a pledge of the equity ownership interests of the developer entity or other parent entity that owns the borrower entity. We also may require a pledge of additional assets of the developer, including parcels of undeveloped and developed real property and/or the personal guarantees of principals or guarantees of operating entities in connection with our secured loans….

> We will oftentimes subordinate our loans to the terms of indebtedness from other lenders relating to the subject real property to allow our borrowers to avail themselves of additional land and lot acquisition and development financing at a lower total cost to the borrower than the cost of our loan, although we will not subordinate our loans to any debt or equity interest of our advisor, our sponsor or any of our trustees, or any of our affiliates.

158. The Shelf Registration made express assurances concerning the rigorous underwriting criteria for its loans:

> We will apply the same underwriting criteria and analysis of the underlying real property to all of our secured loans, regardless of how we decide to structure the secured loans.

159. The Shelf Registration also noted opaquely that UDF IV might enter into joint ventures with and provide credit to other UDF funds and other entities:

> We also may enter into joint ventures with unaffiliated real estate developers, homebuilders, land bankers and other real estate investors, or with other United Development Funding-sponsored programs, to originate or acquire, as the case may be, the same kind of secured loans or real estate investments we may originate or acquire directly.

> We may seek an increased return by entering into participation agreements with real estate developers, homebuilders or real estate investors or joint venture entities, or by providing credit enhancements for the benefit of other entities that are associated with residential real estate financing transactions. The participation agreements and credit enhancements are expected to come in a variety of forms, including profit agreements, ownership interests, participating loans, guarantees, pledges of assets, letters of credit and inter-creditor agreements. **We also intend to provide secured senior and subordinate lines of credit to real estate developers, homebuilders, land bankers and other real estate investors, including other United Development Funding-sponsored programs**, for the purchase of finished lots and for the construction of single-family homes. Furthermore, we intend to purchase participations in, or finance for other real estate investors the purchase of, securitized real estate loan pools, including pools originated by our affiliates. We also may purchase participations in discounted cash flows secured by state, county, municipal or similar assessments levied on real property.

160. The Shelf Registration does not state why UDF IV would choose to provide lines of credit to "other United Development Funding-sponsored programs."

**November 2009 Prospectus**

161. On or about November 16, 2009 UDF IV filed a prospectus (the "November 2009 Prospectus") to sell up to 35,000,000 common shares to the public, with the SEC on Form 424(b)(3).

162.    The November 2009 Prospectus states: "The shares are being offered by Realty Capital Securities, LLC, the exclusive dealer manager for this offering, and select members of the Financial Industry Regulatory Authority (FINRA) on a reasonable best efforts basis."

163.    The November 2009 Prospectus incorporates much of the same language as the Shelf Registration concerning the intended use of investor funds. It further states: "As of the date of this prospectus, we have neither made nor acquired any investments, ***nor have we identified any assets in which there is a reasonable probability that we will invest***." (Emphasis added).  This statement was materially false and misleading because Defendants omitted to state the material fact that UDF IV investment funds were always intended to flow directly or indirectly to other UDF entities that needed liquidity.

164.    The November 2009 Prospectus lists numerous loans made by UDF I, UDF II and UDF III to Centurion entities, all of which appear to have been profitable loans.

165.    The November 2009 Prospectus lists numerous loans made by UDF L.P., UDF II and UDF III to Buffington entities, all of which appear to have been profitable loans.

166.    The November 2009 Prospectus notes with respect to UDF III's loans:

UDF III originated 49 loans during the period of May 2003 through December 31, 2008. Of the loans originated, approximately 28.6%, or 14 loans, have been repaid. No loans were foreclosed. UDF III's aggregate provision for loan losses through December 31, 2008 was approximately $318,000; **however, actual loan losses after sales of foreclosed assets were $0**. All of the loans originated were residential real estate loans secured by residential lots or land designated for development into single-family or residential lots. The aggregate dollar amount of the loans originated by UDF III, as of December 31, 2008, was approximately $386 million.

(Emphasis added).

167.     On December 18, 2009, UDF IV announced in an 8-K current report, signed by Defendant Greenlaw, that it had satisfied the minimum offering of $1,000,000 in connection with best efforts public offering of its common shares of beneficial interest.

168.     Between November 2009 and May 2013, UDF IV filed numerous post-effective amendments to its Shelf Registration.

**2009 10-K**

169.     On March 31, 2010, UDF IV filed its annual report on Form 10-K with the SEC (the "2009 10-K").

170.     The 2009 10-K was signed by Defendants Greenlaw, Obert, Hanson, O'Brien, Marshall, Malone and Finkle.

**2010 10-K**

171.     On March 31, 2011, UDF IV filed its annual report on Form 10-K with the SEC (the "2010 10-K").

172.     The 2010 10-K was signed by Defendants Greenlaw, Obert, Hanson, O'Brien, Marshall, Malone and Finkle.

173.     2010 10-K was false and misleading because, as described more fully herein, it did not present a true financial picture of UDF IV's financial health.

**May 2, 2011 Prospectus**

174.     On May 2, 2011, UDF issued a prospectus on SEC form 424(b)(3) (the "May 2011 Prospectus").

175.     The May 2011 Prospectus notes that "[t]he shares are being offered by Realty Capital Securities, LLC, the exclusive dealer manager for this offering, and select members of the Financial Industry Regulatory Authority (FINRA) on a reasonable best efforts basis."

176.     The May 2011 Prospectus states: "We apply the same underwriting criteria and analysis of the underlying real property to all of our secured loans, regardless of how we decide to structure the secured loans."

177.     The May 2011 Prospectus notes that: "We depend on the diligence, experience and skill of certain executive officers and other key personnel of us, our advisor and its affiliates, including Todd F. Etter, Hollis M. Greenlaw, Michael K. Wilson, Ben L. Wissink, Cara D. Obert and David A. Hanson, *for the selection, acquisition, structuring and monitoring of our lending and investment activities*." (Emphasis added).

178.     The May 2011 Prospectus incorporates by reference UDF IV's materially false and misleading annual reports on SEC Form 10-K for the years ending December 31, 2009, December 31, 2010, as well as the prior May 28, 2008 through December 31, 2008.

179.     The May 2011 Prospectus includes a table entitled "Experience in Raising and Investing Funds," which purports to provide information "with regard to the manner in which the proceeds of the offerings have been applied. Also set forth is information pertaining to the timing and length of these offerings and the time period over which the proceeds have been invested in the properties."

180.     The May 2011 Prospectus also includes tables purporting to show the annual operating results of "Prior Real Estate Programs," including, *inter alia*, UMT, UDF I, UDF II, and UDF III.

181.     The May 2011 Prospectus was materially false and misleading because, *inter alia*:

- It failed to disclose that UDF IV was using new retail investor funds to pay distributions to investors in earlier UDF funds.
- It failed to disclose that UDF IV was using new retail investor funds to pay distributions to earlier investors UDF IV.

- It materially misrepresented the non-collectability of loans through the misleading use of deficiency notes and recourse obligations to related parties, and in non arm's length transactions.

- It materially misrepresented the non-collectability of loans through the misleading use of deficiency notes and recourse obligations to non-related parties.

- It materially misrepresented that Defendants applied the same underwriting criteria and analysis of the underlying real property to all of secured loans, regardless of how UDF IV decided to structure the secured loans.

- It failed to disclose the fact of, and/or the degree to which, each of the UDF-affiliated funds was highly exposed to Centurion and its affiliate entities.

- It failed to disclose that Centurion was not repaying its loans upon maturity.

- It failed to disclose that Centurion and Moayedi had defaulted on several loans prior to the Class Period.

- It failed to disclose that Centurion was not making payments on its loans, and that defendants were permitting Centurion to accrue the interest on its loans and capitalize that interest into the loan principal.

- It failed to disclose the material conflict of interest between Defendant Greenlaw and Defendant Moayedi, owner of Centurion.

- It failed to disclose the fact of, and/or the degree to which, each of the UDF-affiliated funds was highly exposed to Buffington.

- It failed to disclose that UDF IV and its affiliated funds were failing to accrue loan losses to Centurion, Buffington and other borrowers.

- It failed to disclose that UDF IV and its affiliated funds were not recording reserves for impaired loans to Centurion, Buffington and other borrowers.

- It materially misrepresented a 100% collectability level for UDF IV loans.

- It failed to note that neither RCS nor anyone else had performed *bona fide* due diligence in advance of the offering.

- It failed to disclose that UDF IV and its affiliated funds were reaping inflated management and other fees derived from UDF IV's false and misleading financial statements

- It failed to disclose that Defendants required management fees from UDF IV to sustain the balance sheets and the credit of other UDF entities.

182.    Throughout the Class Period, the material misstatements and omissions in the UDF

IV financial statements, registration statements and prospectuses grew more significant as the

individual and collective exposure of UDF IV and its affiliates to ever-growing unreported, non-

performing assets increased. Moreover, as the fund took in additional investor money each year it

52

paid itself and its affiliates proportionally higher fees, which were, in turn, used directly and indirectly to prop up the entire scheme.

**2011 Q1 10-Q**

183.    On May 16, 2011, UDF IV filed with the SEC a Quarterly Report on Form 10-Q for the period ending March 31, 2011 (the "2011 Q1 10-Q").

184.    The 2011 Q1 10-Q was materially false and misleading for the same reasons as the May 2011 Prospectus.

**June 15, 2011 Prospectus**

185.    On June 15, 2011, UDF IV issued Supplement No. 1 to the May 2, 2011 Prospectus (the "June 2011 Prospectus").

186.    The June 2011 Prospectus states: "This document supplements, and should be read in conjunction with, our prospectus dated May 2, 2011 relating to our offering of 35,000,000 common shares of beneficial interest."

187.    The June 2011 Prospectus was materially false and misleading for the same reasons (stated *supra*) as the May 2011 Prospectus.

188.    The June 2011 Prospectus attached and incorporated by reference the 2011 Q1 10-Q and was materially false and misleading for the same reasons as the 2011 Q1 10-Q.

**2011 Q2 10-Q**

189.    On August 15, 2011, UDF IV filed with the SEC a Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2011 (the "2011 Q2 10-Q").

190.    The 2011 Q2 10-Q was materially false and misleading for the same reasons as the May 2011 Prospectus.

**September 2, 2011 Prospectus**

191.    On September 2, 2011, UDF IV issued Supplement No. 2 to the May 2, 2011 Prospectus (the "September 2, 2011 Prospectus").

192.    The September 2, 2011 Prospectus states: "This document supplements, and should be read in conjunction with, our prospectus dated May 2, 2011 relating to our offering of 35,000,000 common shares of beneficial interest, as supplemented by Supplement No. 1 dated June 15, 2011."

193.    The September 2011 Prospectus was materially false and misleading for the same reasons as the May 2011 Prospectus.

194.    The September 2011 Prospectus attached and incorporated by reference the 2011 Q2 10-Q and was materially false and misleading for the same reasons as the May 2011 Prospectus.

**2011 Q3 10-Q**

195.    On November 14, 2011, UDF IV filed with the SEC a Quarterly Report on Form 10-Q for the quarterly period ending September 30, 2011 (the "2011 Q3 10-Q").

196.    The 2011 Q3 10-Q was signed by Defendants Greenlaw and Obert.

197.    The 2011 Q3 10-Q was material false and misleading for the same reasons as the May 2011 Prospectus.

**December 1, 2011 Prospectus**

198.    On December 1, 2011, UDF IV issued Supplement No. 3 to the May 2011 Prospectus (the "December 2011 Prospectus")

199.    The December 2011 Prospectus incorporates by reference the May 2011 and September 2011 Prospectuses.

200.    The December 2011 Prospectus was materially false and misleading for the same reasons as the May 2011 and September 2011 Prospectuses.

201.    The December 2011 Prospectus also attached and incorporate by reference the 2011 Q3 10-Q and was materially false and misleading for the same reasons as the 2011 Q3 10-Q.

**2011 10-K**

202.    On March 30, 2012, UDF IV filed with the SEC an Annual Report on Form 10-K for the year ended December 31, 2011 (the "2011 10-K").

203.    The 2011 10-K was signed by Defendants Greenlaw, Obert, Hanson, O'Brien, Marshall, Malone and Finkle.

204.    The 2011 10-K notes that, as of December 31, 2010 and December 31, 2011, UDF IV had not placed any loans on non-accrual status. (P. F-13).

205.    The 2011 10-K further stated: "Loans are considered impaired when, based on current information and events, it is probable that we will be unable to collect all amounts due in accordance with the contractual terms of the loan agreement, including scheduled principal and interest payments. Impairment is generally evaluated on an individual loan basis for each loan in the portfolio." (P. F-13).

206.    The 2011 10-K was false and misleading for the same reasons as the May 2011 Prospectus.

**April 4, 2012 Prospectus**

207.    On April 4, 2012, UDF IV issued Supplement No. 4 to the May 2011 Prospectus on SEC Form 424(b)(3) (the "April 4, 2012 Prospectus").

208.    The April 4, 2012 Prospectus incorporates by reference the 2011 10-K.

209.    The April 4, 2012 Prospectus was signed by Defendants Greenlaw, Obert, Hanson, O'Brien, Marshall, Malone and Finkle.

210.    The April 4, 2012 Prospectus was false and misleading for the same reasons (stated supra) that the May 2011, September 2011 and December 2011 Prospectuses were materially false and misleading.

**April 27, 2012 Prospectus**

211.    On April 27, 2012, UDF IV issued Prospectus on SEC Form 424(b)(3) (the "April 27, 2012 Prospectus").

212.    The April 27, 2012 Prospectus incorporates by reference the 2011 10-K.

213.    The April 27, 2012 Prospectus was false and misleading because, *inter alia*:

- It failed to disclose that UDF IV was using new retail investor funds to pay distributions to investors in earlier UDF funds

- It failed to disclose that UDF IV was using new retail investor funds to pay distributions to earlier investors UDF IV

- It materially misrepresented the non-collectability of loans through the misleading use of deficiency notes and recourse obligations to related parties, and in non arm's length transactions.

- It materially misrepresented the non-collectability of loans through the misleading use of deficiency notes and recourse obligations to non-related parties.

- It materially misrepresented that Defendants applied the same underwriting criteria and analysis of the underlying real property to all of secured loans, regardless of how UDF IV decided to structure the secured loans.

- It failed to disclose the fact of, and/or the degree to which, each of the UDF-affiliated funds was highly exposed to Centurion and its affiliate entities.

- It failed to disclose that Centurion was not repaying its loans upon maturity,

- It failed to disclose that Centurion was not making payments on its loans, and that defendants were permitting Centurion to accrue the interest on its loans and capitalize that interest into the loan principal.

- It failed to disclose that Centurion and Moayedi had defaulted on several loans prior to the Class Period.

- It failed to disclose the material conflict of interest between Defendant Greenlaw and Moayedi, owner of Centurion.

- It failed to disclose the fact of, and/or the degree to which, each of the UDF-affiliated funds was highly exposed to Buffington.

- It failed to disclose that UDF IV and its affiliated funds were failing to accrue loan losses to Centurion, Buffington and other borrowers.

- It failed to disclose that UDF IV and its affiliated funds were not recording reserves for impaired loans to Centurion, Buffington and other borrowers.

- It materially misrepresented a 100% collectability level for UDF IV loans

- It failed to note that neither RCS nor anyone else had performed *bona fide* due diligence in advance of the offering

- It failed to disclose that UDF IV and its affiliated funds were reaping inflated management and other fees derived from UDF IV's false and misleading financial statements

- It failed to disclose that Defendants required management fees from UDF IV to sustain the balance sheets and the credit of other UDF entities.

## **2012 Q1 10-Q**

214. On May 15, 2012, UDF IV filed with the SEC a Quarterly Report on Form 10-Q for the quarterly period ending March 31, 2012 (the "2012 Q1 10-Q").

215. The 2012 Q1 10-Q was signed by Defendants Greenlaw and Obert.

216. The 2012 Q1 10-Q was material false and misleading for the same reasons as the April 27, 2012 Prospectus.

## **May 22, 2012 Prospectus**

217. On May 22, 2012, UDF IV issued Supplement No. 1 to the April 27, 2012 Prospectus on SEC Form 424(b)(3) (the "May 22, 2012 Prospectus").

218. The May 22, 2012 Prospectus incorporates by reference the 2011 10-K and the 2012 Q1 10-Q.

219. The May 22, 2012 Prospectus was signed by Defendants Greenlaw and Obert.

220. The May 22, 2012 Prospectus was false and misleading for the same reasons as the April 27, 2012 prospectus and the 2012 Q1 10-Q.

**2012 Q2 10-Q**

221.    On August 14, 2012 UDF IV filed with the SEC a Quarterly Report on Form 10-Q for the quarterly period ending June 30, 2012 (the "2012 Q2 10-Q").

222.    The 2012 Q2 10-Q was signed by Defendants Greenlaw and Obert.

223.    The 2012 Q2 10-Q was material false and misleading for the same reasons as the April 27, 2012 prospectus.

**August 22, 2012 Prospectus**

224.    On August 22, 2012, UDF IV issued Supplement No. 2 to the April 27, 2012 Prospectus on SEC Form 424(b)(3) (the "August 22, 2012 Prospectus").

225.    The August 22, 2012 Prospectus incorporates by reference the 2011 10-K and the 2012 Q2 10-Q.

226.    The August 22, 2012 Prospectus was signed by Defendants Greenlaw and Obert.

227.    The August 22, 2012 Prospectus was false and misleading for the same reasons as the April 27, 2012 prospectus and the 2012 Q2 10-Q.

**October 19, 2012 Prospectus**

228.    On October 19, 2012, UDF IV issued Supplement No. 3 to the April 27, 2012 Prospectus on SEC Form 424(b)(3) (the "October 19, 2012 Prospectus").

229.    The October 19, 2012 Prospectus was false and misleading for the same reasons as the April 27, 2012 prospectus and the 2012 Q2 10-Q.

**2012 Q3 10-Q**

230.    On November 14, 2012 UDF IV filed with the SEC a Quarterly Report on Form 10-Q for the quarterly period ending September 30, 2012 (the "2012 Q3 10-Q").

231.    The 2012 Q3 10-Q was signed by Defendants Greenlaw and Obert.

232.    The 2012 Q3 10-Q was material false and misleading for the same reasons as the April 27, 2012 prospectus.

**November 29, 2012 Prospectus**

233.    On November 29, 2012, UDF IV issued a prospectus on form 424(b)(3) (the "November 2012 Prospectus").

234.    The November 2012 Prospectus was signed by Defendants Greenlaw and Obert.

235.    The November 2012 Prospectus was false and misleading for the same reasons as the April 27, 2012 prospectus and the 2012 Q3 10-Q.

## VI.    POST CLASS PERIOD EVENTS: THE UDF SCHEME BEGINS TO UNRAVEL

### a.   Defendant Whitley Penn Terminates Relationship with UDF IV.

236.    On November 24, 2015, UDF IV announced in a current report on SEC form 8-K that Defendant Whitley Penn had declined to stand for reappointment as its independent public accounting firm. The 8-K further stated, in pertinent part:

> Whitley Penn's audit reports on the Company's consolidated financial statements for the period from October 1, 2013 (Inception) through December 31, 2013 and the fiscal year ended December 31, 2014 did not contain an adverse opinion or disclaimer of opinion, nor were they qualified or modified as to uncertainty, audit scope or accounting principles.
>
> During the period from October 1, 2013 (Inception) through December 31, 2013, the fiscal year ended December 31, 2014, and the subsequent interim period from January 1, 2015 through September 30, 2015, (i) there were no disagreements between the Company and Whitley Penn on any matters of accounting principles or practices, financial statement disclosure or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of Whitley Penn, would have caused Whitley Penn to make reference to the subject matter of the disagreement in its report on the Company's consolidated financial statements, and (ii) there were no "reportable events" as that term is defined in Item 304(a)(1)(v) of Regulation S-K.
>
> The Company has provided Whitley Penn with a copy of the foregoing statements and has requested and received from Whitley Penn a copy of the letter addressed to

the Securities and Exchange Commission stating that Whitley Penn agrees with the above statements. A copy of the letter from Whitley Penn is attached as Exhibit 16.1 to this Form 8-K.

237.     On November 24, 2015, Defendant Whitley Penn submitted a letter to the SEC stating the following:

> November 24, 2015
>
> U.S. Securities & Exchange Commission
> Office of the Chief Accountant
> 100 F Street, N.E.
> Washington DC 20549-7561
>
> Re: United Development Funding Income Fund V
> File Number: 333-194162
>
> Dear Sir or Madam:
>
> We have read Item 4.01 in Form 8-K of United Development Funding Income Fund V, dated November 24, 2015, and agree with the statements concerning our firm contained therein.
>
> Very truly yours,
>
> /s/ Whitley Penn LLP

### b.   Defendant Kahane Resigns from UDF V's Board.

238.     Also on November 24, 2015, Defendant Kahane voluntarily resigned as a member of the Board of Trustees for UDF V.

### c.   UDF Discloses Investigation by the Securities and Exchange Commission.

239.     On December 10, 2014, Defendant UDF IV belatedly disclosed to its investors that it and UDF III have been investigated by the Securities and Exchange Commission since April 2014.

**d.   FBI Searches UDF Offices, Seize Records, Serve Grand Jury Subpoena.**

240.    On February 18, 2016, law enforcement authorities affiliated with the Federal Bureau of Investigation searched the UDF Offices in Grapevine and seized numerous records and computer hard drives. The FBI authorities conducted the search and seizure pursuant to a search warrant issued by a Magistrate Judge of the United District Court for the Northern District of Texas.

241.    On February 18, 2016, the UDF Defendants also disclosed that the law enforcement authorities "served executive officers of [UDF IV] and certain other employees of [UDF IV's] advisor and its affiliates with grand jury subpoenas seeking the production of documents related to the operations of [UDF IV]."

**e.   UDF IV Stock Price Collapses, NASD Indefinitely Suspends UDF IV from Trading.**

242.    On February 18, 2016, following the news of the FBI raid to UDF's offices, UDF IV's stock price plummeted by over 50% to $3.20, from a high of approximately $19/share during most of 2015.

243.    That same day, NASDAQ ordered an indefinite suspension of trading in UDF IV's stock, and initiated its own review of UDF IV.

**f.   UDF V Prematurely Terminates Offering, De-Registers Shares.**

244.    On March 4, 2016, UDF V announced that its Board of Trustee decided to prematurely terminate the UDF V pending securities offering. UDF V also announced its plans to wind down its operations, repay any outstanding debt, and return capital to its shareholders.

245.    That same day, UDF V filed a Post-Effective Amendment with the SEC and de-registered its unsold common shares that had earlier been registered for public offering.  In its deregistration request, UDF V indicated that, as of March 4, 2016, it had sold a total of 2,952,526

shares pursuant to its registration statement, and sought to deregister the remaining 47,705,369 registered shares that remained unsold as of that date.

246.    On March 4, 2016, UDF V also announced the resignation of one of its trustees, Eustice Mita.

## CLASS ACTION ALLEGATIONS

247.    This action is brought by Plaintiff, for himself and on behalf of all others similarly situated, as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

### Class Definition

248.    The Proposed Class is defined as follows:  All persons and entities that purchased or otherwise acquired UDF IV shares in or pursuant to an offering of UDF IV shares between March 8, 2011 and July 3 2014.

249.    Excluded from the class are: (1) any individuals who signed an agreement with UDF IV or RCS pursuant to which they must arbitrate claims arising out of the sales of UDF IV shares in FINRA arbitration; (2) Any of the Defendants; any judge or judicial officer who may hear any aspect of this case and his or her law clerks; and (3) any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

### Numerosity

250.    The members of the Proposed Class are so numerous and geographically dispersed that joinder of all members is impracticable. While the exact number of Proposed Class members remains unknown at this time, reports filed by UDF IV with the SEC indicate there are hundreds of members of the proposed class. The exact number of UDF IV investors is within the knowledge of Defendant.

## Typicality

251.    The claims of Plaintiff are typical of the claims of all Class members. Plaintiff is situated identically to all members of the Class with respect to the issues presented in this case, as Plaintiff and all members of the Class were investors in UDF and suffered the exact same loss (in proportion to the amount of their investment). The claims of Plaintiff are based on the same fundamental factual allegations and legal theories as the claims of all other members of the Class.

252.    All investors in UDF IV have been adversely affected by the wrongdoing of Defendants as described herein.

## Commonality

253.    There are common questions of law and fact in this class action that relate to and affect the rights of each member of the Class including, *inter alia*:

   a.  Whether Defendants failed to disclose that UDF IV was using new retail investor funds to pay distributions to investors in earlier UDF funds.

   b.  Whether Defendants failed to disclose that UDF IV was using new retail investor funds to pay distributions to earlier investors UDF IV

   c.  Whether Defendants materially misrepresented the non-collectability of loans through the misleading use of deficiency notes and recourse obligations to related parties, and in non arm's length transactions.

   d.  Whether Defendants materially misrepresented the non-collectability of loans through the misleading use of deficiency notes and recourse obligations to non-related parties.

   e.  Whether Defendants materially misrepresented that UDF IV applied the same underwriting criteria and analysis of the underlying real property to all of secured loans, regardless of how UDF IV decided to structure the secured loans.

   f.  Whether Defendants failed to disclose the fact of, and/or the degree to which, each of the UDF-affiliated funds was highly exposed to Centurion and its affiliate entities.

   g.  Whether Defendants failed to disclose that Centurion was not repaying its loans upon maturity.

   h.  Whether Defendants failed to disclose that Centurion was not making payments on its loans, and that UDF IV and its affiliates were permitting Centurion to accrue the interest on its loans and capitalize that interest into the loan principal.

i.  Whether Defendants failed to disclose the material conflict of interest between Defendant Greenlaw and Moayedi, owner of Centurion.

j.  Whether Defendants failed to disclose the fact of, and/or the degree to which, each of the UDF-affiliated funds was highly exposed to Buffington.

k.  Whether Defendants failed to disclose that UDF IV and its affiliated funds were failing to accrue loan losses to Centurion, Buffington and other borrowers.

l.  Whether Defendants failed to disclose that UDF IV and its affiliated funds were not recording reserves for impaired loans to Centurion, Buffington and other borrowers.

m.  Whether Defendants materially misrepresented a 100% collectability level for UDF IV loans.

n.  Whether Defendants failed to note that neither RCS nor anyone else had performed *bona fide* due diligence in advance of the UDF IV offerings.

o.  Whether Defendants failed to disclose that UDF IV and its affiliated funds were reaping inflated management and other fees derived from UDF IV's false and misleading financial statements

p.  Whether Defendants failed to disclose that Defendants required management fees from UDF IV to sustain the balance sheets and the credit of other UDF entities.

q.  Whether the RCS Individual Defendants acted recklessly or negligently in connection with their role as broker/dealer and underwriter of the UDF IV offerings.

## **Adequacy**

254.    The representative parties and undersigned counsel will fairly and adequately protect the interests of the proposed class.

255.    Plaintiff also satisfies Rule 23(b) of the Federal Rules of Civil Procedure because the questions of law or fact common to the members of the proposed class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**Count I**
**Texas Securities Act, Tex. Rev. Civ. Art. 581-33-A**
**Fraudulent Sale**
**UDF IV**

256.     Plaintiff repeats and realleges the foregoing paragraphs as if stated in full.

257.     The Texas Securities Act ("TSA"), Tex. Rev. Stat. Art. 581-33-A, provides, in

pertinent part:

A. *Liability of Sellers*. (A)(2) *Untruth or Omission*. A person who offers or sells a
security (whether or not the security or transaction is exempt under Section 5 or 6
of this Act) by means of an untrue statement of a material fact or an omission to
state a material fact necessary in order to make the statements made, in the light of
the circumstances under which they are made, not misleading, is liable to the person
buying the security from him, who may sue either at law or in equity for rescission,
or for damages if the buyer no longer owns the security.

258.     As alleged herein, UDF IV offered or sold securities to Plaintiff and the proposed

class by means of untrue statements of material fact and by its omission to state material facts

necessary in order to make the statements made, in the light of the circumstances under which they

were made, not misleading.

**Count II**
**Texas Securities Act, Tex. Rev. Civ. Art. 581-33-F(1)**
**Control Person Liability**
**UDF Individual Defendants**

259.     Plaintiff repeats and realleges the foregoing paragraphs as if stated in full.

260.     The TSA, Tex. Rev. Stat. Art. 581-33-F(1), provides, in pertinent part:

**F. Liability of Control Persons and Aiders.**
(1) A person who directly or indirectly controls a seller, buyer, or issuer of a
security is liable under Section 33A, 33B, or 33C jointly and severally with the
seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or
issuer, unless the controlling person sustains the burden of proof that he did not
know, and in the exercise of reasonable care could not have known, of the existence
of the facts by reason of which the liability is alleged to exist.

261.    A person is liable as a "control person" where he or she has the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Depending on the circumstances, a control person might include an employer, an officer or director, a large shareholder, a parent company, and a management company.

262.    As alleged herein, UDF IV offered or sold securities to Plaintiff and the proposed class by means of untrue statements of material fact and by its omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

263.    The UDF Individual Defendants were all officers and directors of UDF IV, and each directly or indirectly possessed the power to direct or cause the direction of the management or policies of UDF IV.

264.    The UDF Individual Defendants are jointly and severally liable with UDF IV for UDF IV's violation of the TSA.

### Count III
### Texas Securities Act, Tex. Rev. Civ. Art. 581-33-F(2)
### Materially Aiding Violations of the Texas Securities Act Art. 581-33(A)(2)
### UMTHGS and UMTHLD

265.    Plaintiff repeats and realleges the foregoing paragraphs as if stated in full.

266.    The TSA, Tex. Rev. Civ. Art. 581-33-F(2),  provides, in pertinent part:

**F. Liability of Control Persons and Aiders.**

(2) A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

267.    To establish liability for aiding fraud under the TSA, a plaintiff must demonstrate:

(1) a primary violation of the securities laws occurred;

(2) the alleged aider had "general awareness" of its role in this violation;

(3) the actor rendered "substantial assistance" in this violation; and

(4) that the alleged aider either (a) intended to deceive the plaintiff or (b) acted with reckless disregard for the truth of the representations made by the primary violator.

268.    An aider may be held liable where it rendered assistance "in the face of a perceived risk" and must possess "a general awareness that his role was part of an overall activity that is improper."

269.    As alleged herein, UDF IV committed a primary violation by offering or selling securities to Plaintiff and the proposed class by means of untrue statements of material fact and by their omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

270.    Defendants UMTHGS, UMTHLD had an identical mental state as the UDF Individual Defendants, who served individually and collectively as the equity owners, trustees, directors, officers and executives of these Defendants.

271.    As the advisors and asset managers to UDF IV , Defendants UMTHGS, UMTHLD, intentionally and/or recklessly disregarded numerous red flags indicating that UDF IV's Class Period financial statements were materially false and misleading, and that UDF IV's offerings were therefore made in violation of the TSA.

272.    UMTHGS and UMTHLD provided substantial assistance to UDF IV and its co-defendants, by structuring loans and obligations that concealed UDF IV's true financial condition.

273.    UMTHGS and UMTHLD are jointly and severally liable with UDF IV for UDF IV's violation of the TSA.

274. The misconduct of UMTHGS and UMTHLD was the proximate cause of the Class Members' losses, because they directly and proximately resulted in the Class Members' investments in UDF IV.

275. As a direct and proximate consequence of the misconduct of UMTHGS and UMTHLD, as described above and throughout this Complaint, Plaintiff and the Class Members have lost a substantial portion of the money they invested in UDF IV in an amount to be determined at trial but well in excess of $5,000,000.

**Count IV**
**Texas Securities Act, Tex. Rev. Civ. Art. 581-33-F(2)**
**Materially Aiding Violations of the Texas Securities Act Art. 581-33(A)(2)**
**Whitley Penn**

276. Plaintiff repeats and realleges the foregoing paragraphs as if stated in full.

277. The TSA, Tex. Rev. Civ. Art. 581-33-F(2), provides, in pertinent part:

**F. Liability of Control Persons and Aiders.**

(2) A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

278. To establish liability for aiding fraud under the TSA, a plaintiff must demonstrate:

(1) a primary violation of the securities laws occurred;

(2) the alleged aider had "general awareness" of its role in this violation;

(3) the actor rendered "substantial assistance" in this violation; and

(4) that the alleged aider either (a) intended to deceive the plaintiff or (b) acted with reckless disregard for the truth of the representations made by the primary violator.

279.   An aider may be held liable where it rendered assistance "in the face of a perceived risk" and must possess "a general awareness that his role was part of an overall activity that is improper."

280.   As alleged herein, UDF IV committed primary violations by offering or selling securities to Plaintiff and the proposed class by means of untrue statements of material fact and by their omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

281.   As the independent auditor for UDF IV and numerous of its affiliates, Whitley Penn knew, or, as discussed *supra*, recklessly disregarded numerous red flags indicating, that UDF IV's Class Period financial statements were materially false and misleading, and that UDF IV's offerings were therefore made in violation of the TSA.

282.   Whitley Penn provided substantial assistance to UDF IV and its co-defendants because its "clean audit" opinions were necessary for UDF IV and its co-defendants to proceed with the Class Period offerings.

283.   Whitley Penn is jointly and severally liable with UDF IV for UDF IV's violation of the TSA.

284.   Whitley Penn's misconduct was the proximate cause of the Class Members' losses, because they directly and proximately resulted in the Class Members' investments in UDF IV.

285.   As a direct and proximate consequence of Whitley Penn's misconduct as described above and throughout this Complaint, Plaintiff and the Class Members have lost a substantial portion of the money they invested in UDF IV, in an amount to be determined at trial but well in excess of $5,000,000.

**Count V**
**Texas Securities Act, Tex. Rev. Civ. Art. 581-33-F(1)**
**Control Person Liability**
**RCS Individual Defendants**

286.     The TSA provides, in pertinent part:

A. ***Liability of Sellers***. (A)(2) ***Untruth or Omission***. A person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security.

287.     A "seller" under the TSA can include '[a] person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner,' such as a broker." *Highland Cap. Mgmt. L.P. v. Ryder Scott Co.*, 402 S.W. 3d 719, 742 (Ct. App. Tex. 2012).

288.     RCS is not a defendant in this action. However, as alleged herein, RCS served as the broker/dealer and underwriter of UDF IV securities throughout the Class Period, solicited Plaintiff and the proposed class to acquire UDF IV shares motivated by a desire to serve its own financial interests, and is therefore a "seller" and "offeror" in privity with Plaintiff and the proposed class.

289.     As alleged herein, non-Defendant RCS sold UDF IV securities to Plaintiff and the proposed class by means of untrue statements of material fact and by omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

290.     The TSA, Tex. Rev. Stat. Art. 581-33-F(1), provides, in pertinent part:

**F. Liability of Control Persons and Aiders.**
(1) A person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the

seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer, unless the controlling person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

291.    A person is liable as a "control person" where he or she has the possession, direct or indirect, of the power to direct or cause the direction of the operations, management or policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Depending on the circumstances, a control person might include an employer, an officer or director, a large shareholder, a parent company, and a management company.

292.    The RCS Individual Defendants were, as described herein, all officers, directors, and otherwise control persons of RCS and each directly or indirectly possessed the power to direct or cause the direction of the operations, management or policies of RCS, whether through the ownership of its voting securities, by contract, or otherwise, and specifically controlled, oversaw, and managed RCS' distribution, offering, and sales of UDF IV securities through misrepresentations and omissions.

293.    Indeed, the RCS Individual Defendants were the gatekeepers of last resort as to the UDF IV offerings. Given that they evaluated and selected the UDF products for distribution through RCS' "multi-product platform" and that they helped structure the UDF IV offerings, recruited retail broker-dealers to assist with the offerings and supervised and compensated such retail broker-dealers for their roles, and oversaw and managed RCS' distribution, offering and sales of UDF IV securities to the public, the RCS Individual Defendants had the ability to stop those fraudulent offerings from reaching the investing public.

294.    The RCS Individual Defendants are therefore jointly and severally liable with Non-Defendant RCS for their violation of the TSA.

**Count VI**
**Texas Securities Act, Tex. Rev. Civ. Art. 581-33-F(2)**
**Materially Aiding Fraudulent Sale**
**RCS Individual Defendants**

295.    Plaintiff repeats and realleges the foregoing paragraphs as if stated in full.

296.    The Texas Securities Act ("TSA"), Tex. Rev. Stat. Art. 581-33-F, further provides, in pertinent part:

**F. Liability of Control Persons and Aiders.**

(2) A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

297.    Under the TSA, an aider may be held liable where it rendered assistance "in the face of a perceived risk" and must possess "a general awareness that his role was part of an overall activity that is improper."

298.    As alleged herein, RCS Individual Defendants, by virtue of their role as broker/dealers and underwriters of UDF IV shares, rendered assistance in the face of a perceived risk that UDF IV was  issuing securities to Plaintiff and the Proposed Class in violation of the TSA and Texas common law, and possessed a general awareness that their role was part of an overall activity that was improper.

299.    In particular, Defendants Schorsch and Kahane, as the driving factor behind RCS' underwriting, offering, and selling of UDF IV securities, knowingly or recklessly played a key role in facilitating and overseeing the offering and sale of UDF IV securities to Plaintiff and the investing public.

300.    RCS Individual Defendants are liable to Plaintiff and the Proposed Class for materially aiding the fraudulent sale of UDF IV shares during the Class Period.

301.    The RCS Individual Defendants' misconduct was the proximate cause of the Class Members' losses, because they directly and proximately resulted in the Class Members' investments in UDF IV.

302.    As a direct and proximate consequence of the RCS Individual Defendants' misconduct as described above and throughout this Complaint, Plaintiff and the Class Members have lost a substantial portion of the money they invested in UDF IV, in an amount to be determined at trial but well in excess of $5,000,000.

**Count VII**
**Texas Securities Act, Tex. Rev. Civ. Art. 581-33-F(2)**
**Materially Aiding Fraudulent Sale**
**Centurion and Moayedi**

303.    Plaintiff repeats and realleges the foregoing paragraphs as if stated in full.

304.    The Texas Securities Act ("TSA"), Tex. Rev. Stat. Art. 581-33-F, provides, in pertinent part:

**F. Liability of Control Persons and Aiders.**

(2) A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

305.    Under the TSA, an aider may be held liable where it rendered assistance "in the face of a perceived risk" and must possess "a general awareness that his role was part of an overall activity that is improper."

306.    Defendants Centurion and Moayedi by the actions described herein, directly and indirectly, with intent to deceive or defraud or with reckless disregard for the truth or the law,

73

materially aided UDF IV and the RCS Individual Defendants in creating and publishing false and misleading financial statements, registration statements and prospectuses in connection with the offerings of UDF IV shares.

307.    Moayedi and Centurion are liable to Plaintiff for materially aiding the fraudulent sale of UDF IV shares during the Class Period.

308.    Defendants Centurion and Moayedi's misconduct was the proximate cause of the Class Members' losses, because they directly and proximately resulted in the Class Members' investments in UDF IV, in reliance upon such misleading financial statements, registration statements, and prospectuses in connection with the offering of UDF IV shares.

309.    As a direct and proximate consequence of Defendants Moayedi and Centurion's misconduct as described above and throughout this Complaint, Plaintiff and the Class Members have lost a substantial portion of the money they invested in UDF IV, in an amount to be determined at trial but well in excess of $5,000,000.

## Count VIII
### Negligence
### RCS Individual Defendants

310.    Plaintiff repeats and realleges the foregoing paragraphs as if stated in full.

311.    In its capacity as underwriter and managing broker/dealer for the UDF IV offerings, non-defendant RCS and the RCS Individual Defendants had a duty to Plaintiff and the Proposed Class to conduct adequate due diligence as to the UDF IV offerings before undertaking to promote them.  As noted herein, the RCS Individual Defendants frequently touted RCS' due diligence team and its adherence to best practices.

312.    To establish the applicable standard of care under the circumstances, the Court may examine professional standards of conduct in the industry.

313.    The RCS Individual Defendants owed Plaintiff and the Proposed Class the duty to act as a reasonable broker-dealer would do under the same or similar circumstances. The duties set forth herein arise from the regulations, customs and usage of the brokerage trade, including rules promulgated by the SEC and by FINRA, a self-regulatory organization to which non-Defendant RCS belonged and whose rules it was required to obey.

314.    The RCS Individual Defendants negligently breached their duties to Plaintiff and the Proposed Class by, *inter alia*:

   a.   failing to perform adequate due diligence regarding the UDF IV Offerings and failing to obtain reliable information as to those offerings before underwriting them and distributing or directing and overseeing the distribution of the Prospectuses to Plaintiff and members of the Proposed Class; and

   b.   failing to warn Plaintiff and the Proposed Class that RCS did not have a reasonable basis to offer and promote and had not adequately vetted the UDF IV Offerings.

315.    The negligence of the RCS Individual Defendants was the proximate cause of injury to Plaintiff and the Proposed Class.

316.    Plaintiff and the Proposed Class suffered damages.

**Count IX**
**Negligence**
**Defendant Whitley Penn**

317.    Plaintiff repeats and realleges the foregoing paragraphs as if stated in full.

318.    In its capacity as independent public accountant for UDF IV during the Class Period, Defendant Whitley Penn had a duty to Plaintiff and the Proposed Class to conduct its annual audits of UDF IV according to applicable professional standards for an independent public accountant.

319.    To establish the applicable standard of care for an independent public accountant under the circumstances, the Court may examine professional standards of conduct in the public accounting industry.

320.    Defendant Whitley Penn owed Plaintiff and the Proposed Class the duty to act as a reasonable independent public accountant would do under the same or similar circumstances. The duties set forth herein arise from the auditing and accounting standards of the accounting industry, including generally accepted audit standards and generally accepted accounting principles.

321.    Defendant Whitley Penn negligently breached its duties to Plaintiff and the Proposed Class by, *inter alia*:

    c.    failing to design and perform its annual audits of UDF IV in accordance with GAAS, prior to issuing opinions that UDF IV's financial statements were prepared in conformity with GAAP.

    d.    failing to warn Plaintiff and the Proposed Class that UDF IV's financial statements were materially false and misleading.

322.    Whitley Penn's negligence was the proximate cause of injury to Plaintiff and the Proposed Class.

323.    Plaintiff and the Proposed Class suffered damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on his own behalf and on behalf of the Proposed Class, prays for judgment as follows:

(a) Certifying this action as a class action pursuant to Fed. R. Civ. Proc. Rule 23(b)(3);

(b) Certifying Plaintiff as class representative and appointing the under-signed counsel as class counsel;

(c) Awarding rescission and/or rescissory damages against the UDF and RCS Individual Defendants, in favor of Plaintiff and the members of the Proposed Class, including interest;

(d) Awarding compensatory damages in favor of Plaintiff and the members of the Proposed Class against all Defendants, in favor of Plaintiff and the members of the Class, including interest;

(e) Awarding punitive damages in favor of Plaintiff and the members of the Proposed Class against all Defendants;

(f) Awarding Plaintiff his reasonable attorneys' fees and costs; and

(h) Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues triable thereby.


Date: March 8, 2016                                     Respectfully submitted,


                                                        */s/ Richard A. Lewins*_____
                                                        Richard A. Lewins, Esq., TX Bar No.
                                                        794163
                                                        **LEWINS LAW**
                                                        7920 Belt Line Road, Suite 650
                                                        Dallas, Texas 75254
                                                        Telephone: (972) 934-1313
                                                        Facsimile: (972) 231-3983
                                                        E-mail: rlewins@lewinslaw.com

                                                        Alan L. Rosca, Esq. (*Pro Hac Vice* Pending)
                                                        Colin R. Ray, Esq. (*Pro Hac Vice* Pending)
                                                        **PEIFFER, ROSCA, WOLF,
                                                        ABDULLAH, CARR & KANE,
                                                        A PROFESSIONAL LAW
                                                        CORPORATION**
                                                        1422 Euclid Avenue, Suite 1610
                                                        Cleveland, Ohio 44114
                                                        Telephone: (216) 589-9280
                                                        Facsimile: (888) 411-0038

E-mail: arosca@prwlegal.com
E-mail: cray@prwlegal.com

John A. Kehoe, Esq. (*Pro Hac Vice*
Pending)
Benjamin J. Hinerfeld, Esq. (*Pro Hac Vice*
Pending)
**THE KEHOE LAW FIRM**
2 Penn Center, Suite 1020
1500 JFK Blvd.
Philadelphia, PA 19102
Telephone: (215) 792-6676
E-mail: jkehoe@kehoelawfirm.com
E-mail: ben@kehoelawfirm.com

*Attorneys for Plaintiff*