# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF TEXAS

| | CASE No. 4:16-cv-00188-O |
|---|---|
| Mark Hay and Paul Brown, individually and on behalf of all others similarly situated,<br><br>  Plaintiffs,<br> vs.<br><br>United Development Funding IV, United Development Funding V, UMT Services, Inc., UMTH General Services, L.P., UMTH Land Development, L.P., UMT Holdings, L.P., UMT Services, Inc., UDF Holdings, L.P., UDF General Services, L.P., UDFH Land Development, L.P.,<br><br>Hollis M. Greenlaw, Todd Etter, Cara D. Obert, David A. Hanson, Scot W. O'Brien, Phillip K. Marshall, J. Heath Malone, Steven J. Finkle, Michael K. Wilson, Ben L. Wissink, Eustace W. Mita, Melissa H. Youngblood, J. Brandon Jester,<br><br>AR Capital, LLC, American Realty Capital Residential Advisors, LLC<br><br>Nicholas S. Schorsch, William Kahane, Louisa H. Quarto, Kamal Jafarnia, Brian S. Block, Peter M. Budko, Edward M. Weil Jr.,<br><br>Centurion American Development Group, Mehrdad Moayedi, and<br><br>Whitley Penn LLP<br>   Defendants. | **AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

1

Mark Hay and Paul Brown ("Plaintiffs"), by and through undersigned counsel, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by United Development Funding IV ("UDF IV"), United Development Funding V ("UDF V") and other United Development Fund-sponsored investment programs ("UDF Programs") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by UDF IV, UDF V and other UDF Programs; (c) media reports concerning UDF IV, UDF V and other UDF Programs; and (d) review of other publicly available information concerning UDF IV, UDF V and UDF Programs.

Plaintiffs bring this class action under the Texas Securities Act on behalf of (1) all persons or entities who purchased or otherwise acquired non-listed shares of UDF IV, a Texas-based real estate investment trust ("REIT"), from March 8, 2011 until June 3, 2014, inclusive (the "UDF IV Class Period"), and (2) all persons or entities who purchased or otherwise acquired shares of UDF V, a Texas-based REIT, between July 25, 2014 and March 8, 2016, inclusive (the "UDF V Class Period").

## I.    NATURE AND SUMMARY OF THE ACTION

1.    This action arises out of a Ponzi-like scheme in which the UDF Defendants[1], with assistance from the other Defendants, raised money from investors for new REITs to prop up older,

---

[1] The UDF Defendants are United Development Funding IV, United Development Funding V, UMT Services, Inc., UMTH General Services, L.P., UMTH Land Development, L.P., UMT Holdings, L.P., UMT Services, Inc., UDF Holdings, L.P., UDF General Services, L.P., UDFH Land Development, L.P., Hollis M. Greenlaw, Todd Etter, Cara D. Obert, David A. Hanson, Scot

failing REITs. The UDF Defendants, with help from the other Defendants, used a complex network of related entities, all of which they controlled, to carry out their scheme. In the simplest of terms, the UDF Defendants, with assistance from the other Defendants, took money from new investors to pay their earlier investors and thereby create the appearance of a successful investment history all in an effort to continue to entice the new investors in UDF IV and UDF V and prevent the collapse of their Ponzi-like operation.

2.       Several UDF REITs preceded UDF IV and UDF V, including United Mortgage Trust ("UMT"), United Development Fund I LP ("UDF I"), United Development Fund II LP ("UDF II") and United Development Fund III ("UDF III"). These REITs, all of which the UDF Defendants controlled, issued tens of millions of dollars in high-interest loans not only to fund high risk real estate developments, but also to support each other, both directly and indirectly, and to maintain the illusion of each other's success, solvency, and creditworthiness.

3.       By 2008, the various UDF REITs were struggling under the weight of the declining real estate market.

4.       UDF III, predecessor to UDF IV and UDF V, was itself experiencing a liquidity crisis. By July 8, 2009, its cash level was so low that it severely limited its investors' rights to redeem their investments. That September, to obtain desperately needed cash, UDF III paid a large origination fee and pledged <u>all of its assets</u> as security for a $15 million line of credit. UDF III then immediately exhausted this entire line of credit.

---

W. O'Brien, Phillip K. Marshall, J. Heath Malone, Steven J. Finkle, Michael K. Wilson, Ben L. Wissink,  Eustace W. Mita Melissa H. Youngblood, J. Brandon Jester.

5.    At about the same time, the UDF Defendants began to sell shares in UDF IV, the latest in their series of REITs, through the retail brokerage network of its broker-dealer underwriter, RCS Capital, an entity controlled by the RCS Defendants[2].

6.    RCS Capital billed the UDF funds as part of its unique and successful "family" of REITs. RCS tapped into its established retail network to obtain investor money. The UDF Defendants and the RCS Defendants emphasized the UDF management's expertise in identifying and executing real estate related loans.

7.    Unfortunately, the UDF IV and then eventually the UDF V prospectuses, registration statements and periodic filings omitted the underlying financial problems at UDF IV's and UDF V's predecessor REITs and their affiliates. These problems included, but were not limited to, material loan defaults, a significant liquidity crisis, and the fact that new investor money, intended to be invested in UDF IV or V, was being misused to prop up earlier, failing UDF programs.

8.    The UDF IV and UDF V offering documents also failed to disclose that the various UDF funds' portfolio loan assets were precariously concentrated with entities controlled directly or indirectly by Defendant Mehrdad Moayedi which created the undisclosed risk of cascading defaults. UDF IV investors were also not told that many loans to Moayedi were unlikely to be repaid.

9.    After raising sufficient money from investors to launch UDF IV and UDF V, the UDF Defendants immediately paid millions of dollars in "fees" to several affiliated entities—

_____

[2] The RCS Defendants are Nicholas S. Schorsch, William Kahane, Louisa H. Quarto, Kamal Jafarnia, Brian S. Block, Peter M. Budko, and Edward M. Weil Jr.

entities they owned and controlled—ostensibly in exchange for important offering related services those entities provided.

10.    However, unbeknownst to UDF IV and UDF V investors, these fees provided badly needed cash to these entities, many of whose assets served as collateral for other UDF entity loans and guarantees.

11.    UDF IV then itself and, indirectly, UDF V, started acquiring the aged, non-performing loans of its predecessor REITs. To new and potential investors in UDF IV, the UDF Defendants, with assistance from the RCS Defendants and, as to UDF V, the AR Capital Defendants[3], falsely touted these loans as unique and timely investment opportunities. In fact, by acquiring these non-performing loans, UDF IV reduced the earlier UDF REITs' exposure to them and, by doing so, created the misleading appearance of past success.

12.    This was the essence of the Ponzi-like scheme: the UDF Defendants, with assistance from the other Defendants, used UDF IV and UDF V money to prop up UDF III and its predecessors and affiliates.

13.    The UDF Defendants, with assistance from the other Defendants, also gave potential investors a false picture of good loan performance through complicated, improper and misleading accounting practices. Entities controlled by Moayedi were not repaying their loans, a development the UDF Defendants failed to disclose to investors. Rather than report these loans as impaired or non-performing, the UDF Defendants instead capitalized the unpaid interest so that the loans' principal balance increased. The UDF Defendants then recorded these larger principal

---

[3] The AR Capital Defendants are AR Capital, LLC and American Realty Capital Residential Advisors, LLC.

balances as current <u>assets</u>, treating them, from an accounting standpoint, as if they were likely to be repaid, while knowing that this was not going to happen.

14.    Elevating form over substance, the UDF Defendants, helped by the other Defendants, simultaneously used their complicated network of partnerships and entities to avoid recording losses on these non-performing loans. When a borrower could not repay a loan, one of several related entities in the UDF family would often step in to refinance or guarantee that loan. With that guarantee in place, the UDF Defendants would continue to report the loan as a current – rather than impaired – asset.

15.    Like traditional Ponzi schemes, the UDF Defendants always needed more cash to sustain their scheme. And to raise money they had to demonstrate past success. So they continued to make cash distribution payments to earlier investors, which bolstered new investors' confidence in their judgment and skill, but also drained cash. The UDF Defendants then used related entities to refinance each other's loans, creating the very misleading picture that aged and non-performing loans were actually performing.

16.    By summer 2014, with UDF IV money unable to continue to prop up the earlier REITs as well as its own REIT, Defendants needed a new influx of cash, and so they established UDF V and restarted the process of raising retail capital.

17.    UDF V's offering documents listed specific loans by UDF IV and its predecessors as examples of successful investments. Unfortunately, several of the loans UDF V listed as performing had never been repaid, as the Defendants claimed. Instead, UDF IV had actually refinanced these loans, renamed them, and maintained them on its books.

18.    By 2014, the Ponzi-like scheme started to slowly unravel as the SEC began to investigate UDF, a fact the UDF Defendants only disclosed to investors when their misconduct

was exposed. Then, in November 2015, UDF IV publicly announced that Defendant Whitley Penn would not stand for reappointment as its independent auditor and that Defendant Kahane would resign as a trustee. Thereafter, investor Kyle Bass of Hayman Capital Management, L.P. published a series of articles detailing Defendants' Ponzi-like scheme.

19.     The federal law enforcement authorities then became involved in February 2016, when pursuant to a search warrant issued by a Magistrate Judge of the United District Court for the Northern District of Texas, the FBI searched the UDF offices and seized records and computer hard drives. Also in February 2016 the FBI served grand jury subpoenas to several UDF principals, seeking the production of documents related to UDF's operations.

20.     On March 4, 2016, another trustee jumped ship when Defendant Mita resigned his position as a trustee of UDF V. Also on March 4, 2016, UDF V announced that it was prematurely terminating its securities offering, with only a fraction of the offered shares sold to the public.

21.     On March 23, 2016, UDF III wrote to its investors to say that it was suspending its cash distributions to preserve capital.

22.     On May 23, 2016, UDF IV belatedly disclosed that on or about March 4, 2016 it defaulted on a $35 million loan. UDF IV further disclosed that it had entered into a forbearance agreement with its lenders, and that such forbearance agreement required it to pay substantial interest rates and prohibited it from paying distributions to its investors, originate new mortgage loans, incur additional debt, grant additional or substitute collateral to any other lender, or dispose of assets without first obtaining the consent of the lenders, during the forbearance period.

23.     On May 26, 2016, UDF IV received a determination letter from NASDAQ, stating that NASDAQ had determined to deny the Trust's request for continued listing on Nasdaq due to UDF IV's continued failure to file its audited financial statements and report for 2015.

24.     Since November, 2015 through the date of this Amended Complaint, neither UDF IV nor UDF V have filed their mandated periodic reporting with the Securities and Exchange Commission, nor otherwise publicly disclosed their financial situation to their shareholders as required by law. Defendants UDF IV and UDF V contended that their failures to file such mandatory reports over the past seven months is the result of their inability to engage a new auditor, replacing Defendant Whitley Penn.

25.     Numerous individuals and entities participated and assisted in, or facilitated this scheme. In particular, independent public accountant, Whitley Penn LLP, audited not only the financial statements of UDF I, UDF III, UDF IV and UDF V, but also those of affiliated entities whose investors and creditors benefitted directly and indirectly from UDF IV and UDF V capital.

26.     In summary, and as explained more fully herein, the UDF Defendants, with assistance from the other Defendants, collaborated to obtain cash from UDF IV and UDF V class members under the false pretense that they were operating and had long operated a successful real estate investment business. In fact, they were using investors' money to conceal their past failures and to enrich themselves. When the fact and extent of their misstatements and omissions became known, the value of UDF IV and UDF V shares dropped substantially.

## II.    **PARTIES**

### a.    **Plaintiffs**

27.     Plaintiff Mark Hay is a resident of Houston, Texas. On July 5, 2011, Mark Hay purchased 2,500 common shares of UDF IV in the Offering for a total of $50,000. On May 7, 2013, Mark Hay purchased 2,000 common shares of UDF IV in the Offering in his Roth IRA account for a total of $40,000.

28.    Plaintiff Paul Brown resides in St. Louis, Missouri. On February 19, 2015, he purchased 1,250 shares of UDF V in the UDF V Offering at $20 per share, for a total of $25,000.

**b.  Defendants**

**The UDF Entity Defendants**

29.    Defendant UDF IV is a Maryland real estate investment trust ("REIT") organized on May 28, 2008, with its principal executive offices located at 1301 Municipal Way, Suite 100, Grapevine, Texas 76051.

30.    Defendant UMT Services, Inc. ("UMTS"), is the General Partner of Defendant UMT Holdings, L.P., Defendant UMTH General Services, L.P., and Defendant UMTH Land Development, L.P.

31.    Defendant UMT Holdings, L.P. ("UMTH") is the Limited Partner for both Defendant UMTH General Services, L.P. and Defendant UMTH Land Development, L.P.

32.    Defendant UMTH General Services, L.P. ("UMTHGS") is a Delaware Limited Partnership and the General Partner of Defendant UDF IV. UMTHGS was the advisor to UDF IV during the UDF IV Class Period, as well as the advisor to UDF IV affiliate UMT and is "responsible for managing the Trust's affairs on a day-to-day basis."

33.    Defendant UMTH LD served as UDF IV's asset manager during the UDF IV Class Period. Its role was to "identify and underwrite real estate professionals in each region or, in some cases, each sub-market in which [UDF IV] invest[ed], and… utilize these proprietary strategic partner relationships to actively manage each loan or investment."

34.    UDF V is a Maryland REIT organized on October 1, 2013, with its principal executive offices located at 1301 Municipal Way, Suite 100, Grapevine, Texas 76051.

35.     UDF Holdings, L.P. ("UDFH") is a Delaware limited partnership that owns 100% of the limited partnership interests of UDFH General Services, L.P. and UDFH Land Development, L.P.

36.     UDFH General Services, L.P. is ("UDFHGS") is a Delaware limited partnership and sub-advisor to UDF V.

37.     UDFH Land Development, L.P. ("UDFHLD") is a Delaware limited partnership that serves as UDF V's asset manager.

38.     UMTS, UMTHGS, UMTLD, UMTH, UDFH, UDFHGS and UDFHLD are referred to herein as the "UDF Entity Defendants." The UDF Entity Defendants shared a common group of equity holders, directors, officers and executives (*i.e.*, the UDF Individual Defendants, defined *infra*), headed in particular (but not solely) by Defendants Greenlaw, Etter and Obert. As alleged more fully herein, the UDF Entity Defendants were individually and collectively instrumental in the creation of UDF IV's and UDF V's false and misleading financial statements.

**The UDF Individual Defendants**

39.     Defendant Hollis M. Greenlaw ("Greenlaw") was, at all relevant times during the two Class Periods, CEO and Chairman of the Board of Trustees for UDF IV and UDF V. Greenlaw signed the UDF IV and UDF V Shelf Registration Statements (defined herein) as well as numerous additional UDF IV and UDF V prospectuses and SEC filings. According to UDF IV's website, Greenlaw has been personally involved not only in all aspects of UDF IV's operations and management, but with numerous UDF IV predecessors and affiliates (*i.e.*, the "family" of UDF funds) as well.

40.     Defendant Todd Etter ("Etter") was, at all relevant times during the UDF IV Class Period Executive Vice President of UMTHLD, Director and Chairman of UMTS, its general

partner, and Chairman of UMTH. According to UDF IV's website, Etter has been involved not only with UDF IV, but with each of its predecessor funds and numerous other UDF affiliate entities.

41.    Defendant Cara D. Obert ("Obert") was, at all relevant times during the two Class Periods, CFO of UMTHLD, and CFO and Treasurer of both UDF IV and UDF V. Obert signed the Shelf Registration statements, and numerous other UDF IV and UDF V prospectuses and SEC filings. According to UDF IV's website, not only has Obert long been involved in the management of UDF's predecessors and affiliates, but she has special expertise in financial accounting systems.

42.    Defendant Michael K. Wilson ("Wilson") is listed as President of UMTH FS and Executive Vice President and Director of UMTS. He is listed among "Key Personnel" of UDF IV.

43.    Defendant Ben L. Wissink ("Wissink") was the Chief Operating Officer of UMTHLD, as well as COO of UMTS. He served on the UDF IV Investment Committee. Wissink is listed among "Key Personnel" of UDF IV. According to UDF IV's website, Wissink has been involved with UDF since 2005 and was personally involved in the management of UDF loans.

44.    Defendant David Hanson ("Hanson") is listed as COO and Chief Accounting Officer of UMTH, President of UMTHGS, and CFO of UMTS. Hanson was a trustee of UDF IV and signed the Shelf Registration as well as numerous additional UDF IV and UDF V prospectuses and SEC filings. Hanson is also listed among "Key Personnel" of UDF IV. According to UDF IV's website, not only was Hanson deeply involved in the accounting for UDF IV, but he has special expertise in accounting for off-balance sheet financing.

45.    Defendant Scot W. O'Brien ("O'Brien") was a trustee of UDF IV and signed the Shelf Registration as well as numerous additional UDF IV prospectuses and SEC filings.

46.    Defendant Phillip K. Marshall ("Marshall") was a trustee of UDF IV and signed the Shelf Registration as well as numerous additional UDF IV and UDF V prospectuses and SEC filings.  He was also a trustee for UMT and Chairman of its Audit Committee, giving him unique access to the financial operations not only of UDF IV, but also to UMT. Marshall is a CPA, who from 2001 to 2003 was a principal with Defendant Whitley Penn, independent auditor for UDF IV and UDF V.

47.    Defendant J. Heath Malone ("Malone") was a trustee of UDF IV and signed the Shelf Registration as well as numerous additional UDF IV prospectuses and SEC filings.

48.    Defendant Steven J. Finkle ("Finkle") was an independent trustee of UDF IV and UDF V and signed the Shelf Registration as well as numerous additional UDF IV and UDF V prospectuses and SEC filings.

49.    Defendant Eustace W. Mita ("Mita") is an independent trustee and control person of UDF V.

50.    Defendant Melissa H. Youngblood ("Youngblood") has served as COO of UMTHLD since July 2011. The UDF IV and UDF V filings and prospectuses list her among the key personnel upon whose expertise in "the selection, acquisition, structuring and monitoring of our lending and investment activities" the UDF IV and UDF V offerings would depend.

51.    Defendant J. Brandon Jester ("Jester") serves as UDF IV's Director of Asset Management where "*he oversees the department and the transaction process in every UDF market.*" The UDF V prospectus lists him among the key personnel whose expertise the offering would depend.

52.    Defendants Greenlaw, Etter, Obert, Wilson, Hanson, Wissink, O'Brien, Marshall, Malone, Finkle, Mita, Weil, Youngblood, and Jester (the "UDF Individual  Defendants"), because

12

of their positions at UDF IV and UDF V, as well as their senior positions with numerous UDF affiliates, possessed the power and authority to control and did control the content and form of UDF IV's and UDF V's prospectuses, annual reports, quarterly reports, press releases and other materials provided to the SEC, securities analysts, money and portfolio managers and investors. The UDF Individual Defendants authorized the publication of the documents and materials alleged herein to be misleading prior to their issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions with UDF IV and UDF V, as well as their senior positions with numerous UDF affiliates, they had access to material non-public information, and they knew, or recklessly or negligently failed to know, that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading.

## Centurion American Defendants

53.     Defendant Centurion American Development Group ("Centurion") was founded by Mehrdad Moayedi in 1990. Centurion is located at 1800 Valley View Lane, Suite 300, Farmers Branch, Texas 75234.

54.     Defendant Mehrdad Moayedi ("Moayedi") is the Chairman and CEO of Centurion.

55.     Moayedi and Centurion, and entities they own and/or control, are collectively the largest borrower from UDF IV, UDF V and their affiliates, accounting for over half of all amounts loaned by UDF IV.

## AR Capital Defendants

56.     Defendant AR Capital, LLC, ("AR Capital") served as Co-Sponsor with UDFH to the UDF V Offering. AR Capital is a Boston, Massachusetts based Delaware limited liability company, formed on December 27, 2012. AR Capital was directly or indirectly controlled by

Defendants Schorsch and Kahane. Its principals are Defendants Schorsch, Kahane, Budko, Weil and Block.

57.    Defendant American Realty Capital Residential Advisors, LLC ("ARCR Advisors") is a Delaware limited liability company formed in September 2013, which served as advisor to UDF V during the UDF V Class Period. ARCR Advisors is indirectly majority-owned and controlled by Defendants Schorsch and Kahane. The UDF V Board of Trustees appointed ARCR Advisors as its advisor for UDF V. ARCR Advisors then hired UDFHGS as its sub-advisor for UDF V.

58.    AR Capital and ARCR Advisors were under common control with the non-Defendant RCS Entities. On information and belief, at the time of the filing of this Complaint, neither AR Capital nor ARCR Advisors had filed for protection under the United States Bankruptcy Code.

**RCS Entities and Defendants**

59.    Non-defendant Realty Capital Securities LLC ("RCS") is a New York City-based brokerage firm owned by RCS Capital Holdings, LLC. According to its FINRA brokerage registration, RCS was indirectly owned by RCS Capital Corporation or its corporate predecessors (together, "RCAP") through RCS Capital Holdings, LLC ("RCSC Holdings"). RCAP "directs the management or policies of" of RCS through RCSC Holdings. RCS was founded by Defendants Schorsch, Kahane, Weil and several others in 2008. RCS, RCAP and RCSC are not Defendants in this action due to their recent petitions for relief under Chapter 11 of the United States Bankruptcy Code, as discussed, *infra*.

60.    According to the website SeekingAlpha.com, "UDF commenced its capital formation as a non-traded REIT, one of 6 public REIT products incubated on RCS Capital's

[RCAP] wholesale/retail broker-dealer platform." In a January 2010 interview with blackswanzine.com, Schorsch referred to UDF IV as "our mortgage REIT," and noted that "it is more of a yield play that's very stable." He touted the fact that his REITs do not charge "internalization fees," that his advisors waive their fees to cover dividends, and that his advisors–

> —lower the fees – reduce acquisition fees, reduce financing fees, reduce asset management fees – to make them more 'institutional' in their cost structure. We're seeing it in our own platform – all of our fees have been lowered. All of our fees look more institutional – for example, 1% acquisition fees instead of 2-3%.

61. RCS served as the managing broker-dealer and underwriter for each of UDF IV's offerings during the UDF IV Class Period, helping structure the offering and prepare the offering documents, organizing, overseeing and compensating the syndicate of retail broker-dealers, and offering and selling UDF IV shares to investors through best efforts.

62. RCAP, RCS' parent company, is a holding company that does not have its independent business or operations. Rather, according to its Prospectus dated June 5, 2013 (the "2013 RCAP Prospectus," RCAP is comprised of four "operating subsidiaries," one of which is RCS, and its activity consists of operating and managing such operating subsidiaries, including RCS. There is no substantive separation between the business of RCAP and the business of RCS, because RCAP does not have a standalone business. Rather, RCS' business is part of RCAP's business. All lines of business at RCS and RCAP were led by the same "highly experienced executive management team," with Defendants Schorsch and Kahane as the executives at the team's helm.

63. Defendant Edward Michael Weil, Jr. ("Weil") was the Co-Founder, Chairman, Chief Executive Officer, and Chief Operating Officer of RCS during the two Class Periods. During the two Class Periods, Mr. Weil also served as an executive officer of RCAP, RCS' corporate parent and control person. Weil was also as a trustee of UDF V until October 8, 2014, when he

voluntarily resigned and was replaced by Defendant Kahane. He is also listed as the President, COO, Treasurer and Secretary to Defendant ARCR Advisors.

64.    Defendant Nicholas S. Schorsch ("Schorsch") was the Co-Founder and Chief Executive Officer of RCS, Director of RCS during the Class Period, and also RCAP's Co-Founder and principal during the Class Period. Defendant Schorsch was the main driving force and decision maker behind both RCS and RCAP. He is also listed as the CEO of Defendant ARCR Advisors, the advisor to UDF V.

65.    Defendant William M. Kahane ("Kahane") was the Co-Founder of RCS and also RCAP's Co-Founder and principal. He served as a trustee for UDF V, a successor fund to UDF IV. Kahane resigned as a trustee on November 24, 2015.

66.    Defendants Schorsch and Kahane in particular were the control persons of RCS at all relevant times, with "the ability to control all matters affecting [RCS and RCAP]" according to the RCAP 2014 Prospectus.

67.    Defendant Louisa Quarto ("Quarto") served as RCS' President and Chief Compliance Officer during the UDF IV Class Period.

68.    Defendant Kamal Jafarnia ("Jafarnia") served as RCS' Chief Compliance Officer during the UDF IV Class Period.

69.    Defendant Brian S. Block ("Block") served as Chief Financial Officer of RCS during the Class Period.

70.    Defendant Peter M. Budko ("Budko") is listed among those who directly or indirectly control AR Capital, the co-sponsor of UDF V's offering. He is listed as the Executive Vice President and CIO of ARCR Advisors, advisor to UDF V.

71.     Defendants, Weil, Schorsch, Kahane, Quarto, Jafarnia, Block, and Budko are referred to herein as the "RCS Individual Defendants."

72.     The RCS Individual Defendants, because of their positions at RCS, which was the underwriter for UDF IV, possessed the power and authority to control the content and form of UDF IV's and UDF V's prospectuses, annual reports, quarterly reports, press releases and other materials provided to the SEC, securities analysts, money and portfolio managers and investors. The RCS Individual Defendants authorized and/or allowed the publication of the documents and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions with RCS, they had access to material non-public information, and they knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading.

**Defendant Whitley Penn**

73.     Defendant Whitley Penn, LLP served as UDF IV's and UDF V's independent public accountant throughout the two Class Periods.  It also served as the independent public accountant for United Mortgage Trust ("UMT"), UDF III and UDF V, all of which share a management team and are located in the same principal place of business. Because it served as the independent public accountant for numerous UDF IV and UDF V affiliates, Defendant Whitley Penn was uniquely privy to related-party transactions that involved UDF IV, UDF V and their affiliates. Defendant Whitley Penn was also uniquely privy to related-party transactions that involved UDF IV, UDF V, and their officers and trustees. Defendant Whitley Penn was in a unique position to be aware of undisclosed exposure to Centurion across the entire UDF family of funds and entities. It was also in a unique position to be aware of the material misstatements and

17

omissions in UDF IV's and UDF V's prospectuses and incorporated SEC filings. Even while knowing about the above perceived improprieties and risks, Whitley Penn allowed and assisted the UDF Defendants in engaging in illegal activity and disseminating false and misleading statements to investors.

### III.    JURISDICTION AND VENUE

74.    Defendants UDF IV and UDF V share a principal place of business in Grapevine, Tarrant County, Texas, which is located in this judicial district. Venue is therefore proper in this District.

75.    This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C §1332, because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs, and on information and belief, between 1/3 and 2/3 of UDF IV and UDF V shareholders are residents of states other than Texas.

### IV.     SUBSTANTIVE ALLEGATIONS

#### a.   The RCS / UDF Scheme

76.    The UDF Individual Defendants formed UDF IV on May 28, 2008 and UDF V in 2013, following the creation of several processor funds: UDF I (2003), UDF II (2004) and UDF III (Offering May 15, 2006).

77.    According to the UDF website's corporate overview, the UDF funds operate as part of a group or 'family': "UDF invests in the development and construction of new, affordable, single-family homes *through a family of public and private funds*, which direct investor capital towards the financing of homebuilders and land developers." http://www.udfonline.com/corporate-overview. (Visited May 30, 2016) (*emphasis added*).

78.    Through a number of complicated, opaque and undisclosed financial maneuvers and accounting practices, the UDF Defendants concealed the financial instability of their entire family of funds.  Their efforts to mislead investors were aided by spreading information about such financial maneuvers and practices amongst the filings of the different funds, making it impossible for an ordinary investor in any one fund to put all the pieces together.

### i.  Overview of Ponzi-like Loan Practices

79.    The UDF Defendants, with assistance from the other Defendants, used the UDF family of funds to engage in Ponzi-like loan practices in order to deceive UDF IV and UDF V investors into believing that the funds were able to maintain consistent dividends. The gist of the scheme is that Defendants used new capital raised through the UDF IV and UDF V offerings to pay investors in their earlier UDF funds, thereby creating the illusion that these earlier funds and by extension the entire UDF operation were successful and prospering. This illusion set up the framework for the Defendants to convince class members to invest in UDF IV and V.

80.    For example, UDF III owned underperforming and non-performing, under-secured loans.  Rather than realize those loans as impaired and record operating losses for UDF III, which would disappoint UDF III investors and undermine the UDF Defendants' appearance of success, the UDF Defendants instead caused UDF IV to acquire the loans with new retail investor funds. UDF III investors were therefore paid with funds from later, UDF IV investors. Moreover, the UDF Defendants were able to tout UDF III's continued performance, while concealing UDF III's (and UDF Defendants' other funds') true financial health and material risks.

81.    Similarly, UDF III issued a loan to a subsidiary of UDF I, which later found itself unable to repay the loan.  Rather than have UDF III record the loan to its affiliate as impaired, the UDF Defendants caused UDF IV to make a new loan to the UDF I subsidiary so that it could repay

UDF III. Again, UDF III investors were paid with funds from UDF IV investors, while Defendants concealed UDF III's true financial health, and the financial wherewithal of their family of funds and entities, including UDF IV.

82.    Similarly, UDF III lent money to an entity affiliated with one of UDF's largest borrowers, controlled by and affiliated with Defendants Moayedi and Centurion, which had undisclosed business relationships with the UDF Defendants. When that borrower was unable to repay UDF III, UDF V lent money to the borrower, which in turn repaid UDF III. UDF V funds were funneled to UDF III investors, and the UDF Defendants continued to conceal the true financial picture of UDF III and their family of funds and entities, including UDF IV and UDF V.

83.    UDF IV and UDF V also engaged in classic Ponzi-like behavior by using capital raised in an offering to fund distributions to investors in its own earlier offerings. UDF IV also pledged its own collateral in exchange for bank loans, which it then distributed to investors. This practice allowed UDF IV and UDF V to maintain the illusion that they were healthy enough to sustain regular distribution payments, which, in turn, allowed the funds to raise additional retail capital.

84.    Specific examples of the of the Ponzi-like activity are illustrated below:

**1.  The "Northpointe" Participation Loans**

85.    The UDF Defendants diverted UDF IV investors' cash directly to UDF III and earlier funds in the guise of two "participation" loans to "Northpointe" entities, ultimately benefitting related parties.

86.    By way of background, on June 11, 2012, UDF IV entered into a loan participation agreement with UDF III, its predecessor trust. UDF IV's August 22, 2012 prospects disclosed this loan arrangement, in pertinent part, as follows:

> On June 11, 2012, we entered into a participation agreement…with UDF III pursuant to which we purchased a participation interest in UDF III's loan to UDF Northpointe, LLC, an unaffiliated Texas limited liability company … The Northpointe Loan was initially secured by approximately 301 lots located in Collin County, Tarrant County and Kaufman County, Texas...

> The Northpointe Participation Agreement gives us the right to receive payment from UDF III of principal and accrued interest relating to amounts funded by us under the Northpointe Participation Agreement. The interest rate under the Northpointe Loan is the lower of 12% or the highest rate allowed by law. Our interest will be repaid as Northpointe repays the Northpointe Loan. Northpointe is required to pay interest monthly and to repay a portion of principal upon the sale of lots covered by the deed of trust. The Northpointe Participation Agreement matures on December 4, 2012, in connection with the maturity of the Northpointe Loan.… As of June 30, 2012, approximately $1.7 million is included in loan participation interest – related parties related to the Northpointe Participation Agreement.

> For the three and six months ended June 30, 2012, we recognized approximately $11,000 of interest income – related parties related to the Northpointe Participation Agreement. Approximately $11,000 is included in accrued receivable – related parties as of June 30, 2012 for interest associated with the Northpointe Participation Agreement.

87.    The immediate effect of this "participation" loan was that $1.7 million was paid by UDF IV directly to UDF III.  UDF III's balance sheet correspondingly reflected a reduction in its loan.

88.    Almost immediately upon lending UDF III $1.7 million, UDF IV was receiving only 50% of its interest in cash, the rest – *i.e.* unpaid interest – being recorded on UDF IV's balance sheets as "accrued receivables," an <u>asset</u>.

89.    Similarly, on May 2, 2013, just a day before UDF IV issued its final prospectus, UDF IV entered into a second "Northpointe" loan participation agreement with UDF III.  The May 3, 2013 prospectus did not disclose this loan. However, in its August 2013 10-Q, UDF IV disclosed, in pertinent part, the following:

> On May 2, 2013, we entered into a participation agreement… with UDF III pursuant to which we purchased a participation interest in UDF III's loan

… to UDF Northpointe II, LLC ("Northpointe II")…. The Northpointe II Loan is evidenced by two secured promissory notes and was initially secured by second lien deeds of trust on approximately 251 finished lots and 110 acres of land in Texas.

The Northpointe II Participation Agreement gives us the right to receive payment from UDF III of principal and accrued interest relating to amounts funded by us under the Northpointe II Participation Agreement. The interest rate under the Northpointe II Loan is the lower of 12% or the highest rate allowed by law. Our interest will be repaid as Northpointe II repays the Northpointe II Loan. Northpointe II is required to pay interest monthly and to repay a portion of principal upon the sale of lots covered by the deed of trust. The Northpointe II Loan and our participation in this loan are due and payable in full on December 28, 2013.

As of June 30, 2013, approximately $3.3 million is included in loan participation interest – related parties related to the Northpointe II Participation Agreement. For both the three and six months ended June 30, 2013, we recognized approximately $44,000 of interest income – related parties related to the Northpointe II Participation Agreement. As of June 30, 2013, there is no accrued interest included in accrued receivable – related parties associated with the Northpointe II Participation Agreement.

90.    Thus, as of May 2, 2013, UDF IV had apparently lent several million dollars to UDF III in two participation loans. The ostensible purpose of these loans was for UDF IV investors to take advantage of high-yield 12+% interest loans from which UDF III investors were benefitting.

91.    Unfortunately for UDF IV investors, Defendants did not disclose the troubling history of these two "Northpointe" loans, including that UDF III and UDF I had actually originated them to entities controlled by Defendants Moayedi and Centurion several years earlier, that their maturities had been repeatedly extended, and that there was great uncertainty as to whether they would or could ever be repaid in full. Rather than giving UDF IV investors the opportunity to "participate" in unique high-yield loan opportunities, Defendants were, in actuality, using UDF IV cash to shore up the balance sheets of UDF III and its predecessor funds.

92.     More specifically, the UDF Defendants failed to disclose to investors that the two Northpointe loans were originated in 2007 and 2008 as loans from UDF III to an entity owned by UDF I, which was subsequently acquired by Defendants Moayedi and Centurion.

93.     Between 2007 and 2011, the maturity date on these loans had been repeatedly extended, even raising the concern of the SEC, which, on September 27, 2011, asked UDF III why it had not recorded or reported these loans as being in "non-accrual" status.

94.     In its response to the SEC, dated November 14, 2011, the UDF Defendants wrote:

> With respect to the Staff's comment that certain loans are on nonaccrual status, the Partnership respectfully submits that <u>all related party loans are on an accrual basis</u>. The reason that there is no balance in accrued interest receivable as of a certain date (such as the UDF LOF loan referenced in the Staff's comment) is due to a <u>lack of any outstanding balance on the loan as of the referenced date</u>. Nevertheless, the Partnership hereby undertakes to include in its future filings pursuant to the Exchange Act, as required by such act, additional information ***to allow an investor to fully understand the facts and circumstances related to situations where an unusual or irregular credit situation appears to have occurred*** (such as the transactions referenced in the Staff's comment), ***and to provide a higher level of detail for more material and/or higher risk situations***. (*emphases supplied*).

95.     However, in the same letter, Defendants stated that the Northpointe loan—

> ***––was payable on December 28, 2010, but remains outstanding and is past due as of December 31, 2010***. Pursuant to a modification agreement effective June 30, 2011, this loan was extended to December 28, 2013, and the principal was increased to $15 million, pursuant to a second secured promissory note in the principal amount of $9 million. (*emphasis supplied*).

96.     Thus, UDF III could only claim that the Northpointe loan was, technically, on an accrual basis – *i.e.*, in active repayment – because it had recently entered into a loan modification whereby the unpaid interest (noted by the SEC) was converted into principal, with an extended maturity date. However, the real fact was that the Northpointe loan was not being repaid, a fact concealed from UDF IV and UDF V shareholders.

97.     Shortly after the SEC's inquiry into UDF III's accounting for Northpointe, Defendants used cash from UDF IV to reduce UDF III's exposure to the Northpointe loans.

98.     The history of these loans, which was necessary to understand their risk of default, was hidden from UDF IV investors.

### 2.   The CTMGT Williamsburg Loan

99.     Another, similar effort by the UDF Defendants to funnel money from UDF IV shareholders to earlier UDF investors involves loans made with the assistance of Defendant Moayedi's company, Defendant Centurion.

100.    On January 25, 2007, MU Williamsburg LLC, a company 50% owned by UDF I – and 50% owned by Meritage Homes of Texas ("Meritage"), a company where Defendant Hanson was Director of Land Finance for the Central/Eastern Region – borrowed approximately $27.8 million from Premier Bank, through two loans, to acquire and develop a 436-acre tract in Fate, Texas.

101.    Around the time of the 2008 Great Recession, MU Williamsburg defaulted on the two loans from Premier Bank.

102.    On December 31, 2009, after the real estate market had collapsed, Meritage assigned its 50% interest in MU Williamsburg to UDF I, which thus owned 100% of MU Williamsburg.

103.    On September 27, 2011, the UDF Defendants caused UDF IV to lend $16,407,805 to CTMGT Williamsburg, a company owned by Defendant Moayedi.

104.    On November 1, 2011, CTMGT Williamsburg acquired the two defaulted loans (the aforementioned $27.8 million loans from Premier Bank to MU Williamsburg) at the discounted price of approximately $12.1 million.

105.    Also on November 1, 2011, Defendant Moayedi's CTMGT Williamsburg entered into a "profits interest agreement" that would pay UDF I $8 million for "advisory services" in connection with the MU Williamsburg properties.

106.    Ultimately, UDF I recorded its MU Williamsburg properties as impaired real estate owned, and recorded a loss of $17.2 million, while simultaneously recording a gain through cancellation of debt of approximately $10.57 million.  Thus, MU Williamsburg (UDF I) lost approximately $6.6 million in this real estate deal. However, because it was paid $8 million in advisory fees by the Moayedi-controlled CGMGT Williamsburg, UDF I wound up booking a net profit on this deal.

107.    The Ponzi-like nature of the transaction is that the money used to pay UDF I the $8 million fee actually came directly from UDF IV shareholders. There was no sound business reason for UDF I to have earned any fee, given that UDF I and UDF IV were both managed by the UDF Defendants, other than to improperly transfer money from UDF IV to UDF I and continue to engage in the Ponzi-like scheme described herein.

108.    By December 31, 2012, UDF IV listed the outstanding balance on these two Williamsburg loans as approximately $25.6 million ($21.732 million plus $3.92 million), approximately $14.5 million more than the 2011 discounted acquisition price of the loans.

109.    In the October 19, 2012 S-11 for UDF IV, the UDF Defendants, touting their past successes, misrepresented that UDF I's MU Williamsburg had recouped $31.15 million of a $31.74 million investment as of December 31, 2011. This misrepresentation omitted that any recoupment of this loan had been enabled by UDF IV shareholder money, and that UDF had actually written off $17.2 million of its original $31.7 million investment.

### 3.    Extension of the Ponzi-like Scheme to UDF V: False Reporting of the Williamsburg, Buckingham and Bratton Loans

110.    UDF's Ponzi-like scheme and false reporting are further illustrated through the performance of UDF IV past projects and loans, misrepresented in UDF V's initial prospectus.

111.    Because UDF V had no operating history, it presented on the very last page of its July 25, 2014 prospectus to investors the following summary table of UDF IV's lending history to programs with investment objectives it claimed were similar to those of UDF V:

| UNITED DEVELOPMENT FUNDING IV | | | | | |
|---|---|---|---|---|---|
| Loan or Equity Investment | Date Funded[(1)] | Date of Final Repayment[(2)] | Payments Received | Original Loan and Funds Advanced Net of Interest | Amount of Loan Repaid & Interest Earned or Equity & Profit Returned[(3)] | Interest Earned[(4)] |
| Frisco Hills, LP | August 20, 2010 | October 5, 2010 | $ 11,000,709 | $ 10,954,230 | $ 11,000,709 | $ 46,479 |
| United Development Funding III, L.P. | January 8, 2010 | October 28, 2010 | 5,814,502 | 5,435,844 | 5,814,502 | 378,658 |
| United Development Funding III, L.P. | March 24, 2010 | August 12, 2011 | 468,734 | 461,800 | 468,734 | 6,934 |
| BHM Highpointe, LTD | November 16, 2010 | September 22, 2011 | 4,386,444 | 4,191,878 | 4,386,444 | 194,566 |
| Buffington Land, LTD | December 13, 2010 | September 29, 2011 | — | — | — | — |
| 165 Howe, LP | April 19, 2010 | October 4, 2011 | 3,079,310 | 2,763,410 | 3,079,310 | 315,900 |
| Andrew C. Befumo, Inc. | May 16, 2011 | October 5, 2011 | 1,195,133 | 1,138,450 | 1,195,133 | 56,683 |
| Buffington Signature Homes, LLC | April 20, 2010 | October 28, 2011 | 1,375,306 | 1,261,435 | 1,375,306 | 113,871 |
| BHM Highpointe, LTD | May 25, 2011 | December 21, 2011 | 3,303,798 | 3,093,185 | 3,303,798 | 210,613 |
| CTMGT Williamsburg, LLC | September 27, 2011 | February 7, 2012 | 17,318,863 | 17,042,225 | 17,318,863 | 276,638 |
| Cheldan MM, LLC | April 26, 2010 | January 25, 2012 | 3,196,639 | 2,968,702 | 3,196,639 | 227,937 |
| Pine Trace Village, LLC | March 29, 2010 | May 31, 2012 | 6,475,329 | 5,091,906 | 6,475,329 | 1,383,423 |
| Buffington Brushy Creek, LTD | September 21, 2010 | June 1, 2012 | 2,090,526 | 1,980,860 | 2,090,526 | 109,666 |
| Buffington Brushy Creek, LTD | July 20, 2011 | June 1, 2012 | 2,435,251 | 2,269,622 | 2,435,251 | 165,629 |
| UMT Home Finance II, LP | October 26, 2011 | October 26, 2012 | — | — | — | — |
| Mehrad Moayedi | August 10, 2012 | December 20, 2012 | 892,560 | 852,192 | 892,560 | 40,368 |
| One Prairie Meadows, Ltd. | May 28, 2010 | January 25, 2013 | 4,662,767 | 4,277,826 | 4,662,767 | 384,941 |
| HLL Land Acquisitions of Texas, LP | January 18, 2010 | May 6, 2013 | 5,216,424 | 4,816,809 | 5,216,424 | 399,615 |
| UMT Home Finance III, LP | June 10, 2011 | June 3, 2013 | 3,544,101 | 3,206,611 | 3,544,101 | 337,490 |
| Len-Buff Land Acquisitions of Texas, LP | October 28, 2010 | June 5, 2013 | 3,556,004 | 3,244,165 | 3,556,004 | 311,839 |
| 165 Howe, LP | July 29, 2011 | July 26, 2013 | 8,091,081 | 7,285,756 | 8,091,081 | 805,325 |
| UMT Home Finance III, LP | October 4, 2011 | November 6, 2013 | 3,156,815 | 2,843,689 | 3,156,815 | 313,126 |
| CTMGT Buckingham, LLC | June 28, 2013 | December 16, 2013 | 1,492,628 | 1,409,383 | 1,492,628 | 83,245 |
| BLD Bratton Hill, LLC | July 31, 2013 | December 16, 2013 | 1,242,473 | 1,184,193 | 1,242,473 | 58,280 |
| | | | $ 93,995,397 | $ 87,774,170 | $ 93,995,397 | $ 6,221,227 |

112.    UDF V's prospectus offered little context and explanation for this table of 24 loans. The prospectus stated only that the table "presents summary information on the results of the repayment of loans and equity investments since November 2009 (the inception of UDF IV) by Prior Real Estate Programs having investment objectives similar or identical to ours" and that "[t]he table below reflects the performance of the portfolio in terms of loans made, loans repaid and interest income received on loans."

113.     The table itself and the explanation that accompanies it indicate that the entities that borrowed money from UDF IV fully repaid their loans as of December 31, 2013, and that UDF IV earned $6,221,227 in interest from these loans.

114.     Based on the summary table and explanations, a prospective investor in UDF V would have been wholly justified in believing that borrowers listed in that table repaid in full their loans to UDF IV, and UDF IV made a profit on those loans, as of December 31, 2013.

115.     Specifically, a prospective UDF V investor would have been wholly justified in believing that UDF IV's loans to CTMGT Williamsburg were fully repaid as of February 7, 2012. Additionally, given that the chart lists more than one loan for some of the entities mentioned therein – such as United Development Fund III, BHM Highpointe, Buffington Brushy Creek and UMT Home Finance III – but only one loan to CTMGT Williamsburg, a prospective investor would have been wholly justified in believing that UDF IV only gave one loan to CTMGT Williamsburg during the time window captured in that chart: the loan mentioned in the chart as fully repaid.

116.     However, quite to the contrary, UDF IV's own SEC filings materially contradict UDF V's representations.

117.     *First*, the above chart in the UDF V prospectus states that the CGMGT Williamsburg loans, originated by UDF IV in September 2011, had been repaid in full with interest by February 7, 2012, but fails to disclose that in reality a considerable portion of that loan – as much as $4 million – had been effectively rolled over into a new loan on that same date, February 7, 2012.

118.     *Second,* the chart also omits to disclose that a fully owned UDF IV investment vehicle, UDF IV Finance II, LP ("UDF IV FII") had made an additional loan to CGMGT

Williamsburg of as much as approximately $22 million – significantly more than the disclosed CGMGT Williamsburg loan – on November 30, 2011, only a month after the loan disclosed in the chart, and that as of December 31, 2013 that other loan had not been repaid. In fact, according to UDF IV's 10-K, these two loans had outstanding balances in excess of $25 million as of December 31, 2012. By December 31, 2012, those balances had <u>increased</u> to $28.2 million according to <u>UDF IV</u>'s 10-K for the year ending December 31, 2013. Loans to CTMGT Williamsburg were so substantial – thus material to an investor's decision whether or not to invest – that UDF IV's 10-Q for the quarter ending March 31, 2012 reported that they represented more than 11% of the Fund's portfolio (a figure increased to 12% in the following quarter).

119.    The UDF Defendants' chart and explanation misleadingly lead a prospective UDF V investor to believe that the CGMGT Williamsburg loans had been paid in full with interest. The UDF Defendants, assisted by other Defendants and especially Defendant Whitley Penn, which audited UDF IV's financial statements, allowed this blatant – and material – misstatement and omission to find its way into the UDF V prospectus distributed to prospective investors.

120.    Similarly, according to UDF IV's annual report filed with the SEC on form 10-K on December 31, 2013, two other loans listed as repaid in the UDF V prospectus were not repaid in full on December 16, 2013. Rather, UDF IV repackaged them and reported them as different loans.

121.    According to the table above, UDF IV lent $1,409,383 to CTMGT Buckingham, LLC on June 28, 2013, and was repaid with interest on December 16, 2013 in the amount of $1,492,628 – for a profit of $83,245 (the "Buckingham Loan").

122.    Similarly, according to the table above, UDF IV lent $1,184,193 to BLD Bratton Hill, LLC on July 31, 2013, and was repaid with interest also on December 16, 2013 in the amount of $1,242,473 -- for a profit of $58,280 (the "Bratton Loan").

123.    However, UDF IV's 10-K, filed the same day, makes it clear that said loans had not been repaid. It states the following about these loans:

*URHF Buckingham Participation*

On December 16, 2013, we entered into a participation agreement (the "URHF Buckingham Participation") with URHF pursuant to which we purchased a participation interest in URHF's $4.9 million loan (the "URHF Buckingham Loan") to CTMGT Buckingham, LLC ("Buckingham"), a Texas limited liability company. Our Advisor also serves as the advisor for UMT, which owns 100% of the interests in URHF. The URHF Buckingham Loan provides financing to Buckingham to acquire and develop 81 paper lots located in Texas. The URHF Buckingham Loan is evidenced by a secured promissory note and secured by a first lien deed of trust on the lots and is guaranteed by principals of the borrower.

The URHF Buckingham Participation gives us the right to receive payment from URHF of principal and accrued interest relating to amounts funded by us under the URHF Buckingham Participation. The interest rate under the URHF Buckingham Loan is the lower of 13% or the highest rate allowed by law. ***Our interest will be repaid as Buckingham repays the URHF Buckingham Loan. Buckingham is required to make loan payments upon the sale of lots covered by the deed of trust. The URHF Buckingham Loan and our participation in this loan are due and payable in full on June 28, 2016.***

*URHF Bratton Hill Participation*

On December 16, 2013, we entered into a participation agreement (the "URHF Bratton Hill Participation") with URHF pursuant to which we purchased a participation interest in URHF's $3.0 million loan (the "URHF Bratton Hill Loan") to BLD Bratton Hill, LLC ("Bratton Hill"), a Texas limited liability company. Our Advisor also serves as the advisor for UMT, which owns 100% of the interests in URHF. The URHF Bratton Hill Loan provides financing to Bratton Hill to acquire and develop 52 paper lots located in Texas. The URHF Bratton Hill Loan is evidenced by a secured promissory note and secured by a first lien deed of trust on the lots and is guaranteed by principals of the borrower.

The URHF Buckingham Participation gives us the right to receive payment from URHF of principal and accrued interest relating to amounts funded by us under the URHF Bratton Hill Participation. The interest rate under the URHF Bratton Hill

Loan is the lower of 13% or the highest rate allowed by law. ***Our interest will be repaid as Bratton Hill repays the URHF Bratton Hill Loan. Braxton Hill is required to pay make loan payments upon the sale of lots covered by the deed of trust. The URHF Bratton Hill Loan and our participation in this loan are due and payable in full on July 31, 2016.***

UDF IV 2013 10-K at p.101 (*emphases supplied*).

124.    Unlike the UDF V table, which represents that the Buckingham and Bratton loans were retired with interest, UDF IV's 10-K includes a table that shows outstanding balances for these two loans, which are approximately the same amounts as the original loan balance:

| Loan Name | December 31, 2013 | December 31, 2012 |
|---|---|---|
| Buffington Participation Agreements | $    2,826,000 | $    7,203,000 |
| Buffington Lot Participation Agreements | 279,000 | 499,000 |
| TR Finished Lot Participation | 3,346,000 | 3,560,000 |
| TR Paper Lot Participation | 12,617,000 | 10,620,000 |
| Carrollton Participation Agreement | - | 817,000 |
| 165 Howe Participation Agreement | - | 1,289,000 |
| Pine Trace Participation Agreement | 6,646,000 | 5,193,000 |
| Northpointe Participation Agreement | 1,585,000 | 212,000 |
| Northpointe II Participation Agreement | 3,000,000 | - |
| UMTHF Megatel Participation | - | - |
| URHF Buckingham Participation | 1,425,000 | - |
| URHF Bratton Hill Participation | 1,186,000 | - |
| Total | $    32,910,000 | $    29,393,000 |

UDF IV 2013 10-K at 102.

125.    The 10-K also includes the "approximate accrued interest in accrued receivable – related parties" for these two loans:

| Loan Name | December 31, 2013 | December 31, 2012 |
|---|---|---|
| Buffington Participation Agreements | $    47,000 | $    - |
| Buffington Lot Participation Agreements | 16,000 | 20,000 |
| TR Finished Lot Participation | 66,000 | 175,000 |
| TR Paper Lot Participation | 197,000 | 401,000 |
| Carrollton Participation Agreement | - | 4,000 |
| 165 Howe Participation Agreement | - | 21,000 |
| Pine Trace Participation Agreement | 562,000 | 134,000 |
| Northpointe Participation Agreement | - | - |
| Northpointe II Participation Agreement | - | - |
| UMTHF Megatel Participation | - | - |
| URHF Buckingham Participation | 91,000 | - |
| URHF Bratton Hill Participation | 64,000 | - |
| Total | $    1,043,000 | $    755,000 |

*Id.*

126.    UDF IV therefore recorded, as assets, outstanding balances and interest receivables (as opposed to cash) of $1,516,000 ($1,425,000 + $91,000) for the Buckingham Loan, and $1,250,000 ($1,186,000 + $64,000) for the Bratton Loan, on the exact same day that it purported to retire the Buckingham and Bratton Loans.

127.    Moreover, the complicated manner in which the Buckingham and Bratton loans were "retired" was not disclosed to UDF V shareholders. According to the UDF IV 10-K, UDF affiliate, United Residential Home Finance, L.P. ("URHF"), which is owned by UMT, made a $4.9 million loan to CTMGT Buckingham LLC (a company owned and controlled by Defendants Moayedi and Centurion). That loan is secured by a promissory note and is guaranteed by "principals of the borrower," *i.e.*, Defendant Moayedi. As described, *supra*, UDF IV's 10-K "participation" in this loan gives it the right to payments, not from Buckingham, but instead from URHF when it is repaid by Buckingham. Moreover, this loan is due and payable in full on June 28, 2016, exactly three years after the date of the original Buckingham loan, *see supra* ¶74, not the date of the participation loan.

128.    The Bratton Loan was similarly repackaged, rather than retired, with URHF lending to BLD Bratton Hill, with a lien and guarantee from Bratton's principal. UDF IV's participation gave it the right to be paid by URHF as Bratton repaid URHF. Just as with the Buckingham Loan, this loan is due and payable on July 31, 2016, three years after the original Bratton Hill loan *see supra* ¶74, not the date of the participation loan.

129.    A prospective UDF V investor reading the UDF IV summary table in the UDF V prospectus had no way of knowing that UDF IV had almost the exact same exposure to the Moayedi-controlled Buckingham and the Bratton borrowers before and after December 16, 2013.

Again, it was just another way for the UDF Defendants, with assistance from the other Defendants, to manipulate the investments, and thus, not have to show the faltering conditions of the Funds.

130.    By contrast, the other Defendants, by virtue of their close relationship with UDF IV – the RCS Defendants in their capacity of underwriters of UDF IV; the Moayedi and Centurion Defendants as direct participants to some of the operations described above; and, most egregiously, Defendant Whitley Penn in its capacity of auditor of both UDF IV and UDF V – were certainly aware of the stark contrast between the representations to prospective UDF IV and UDF V investors and the real facts surrounding the UDF IV loans described above.

### ii.   Misleading Debt Obligation Assets

131.    The UDF and RCS Defendants touted to the UDF IV and UDF V investors the prior performance of the UDF Defendants and of other UDF programs – including UMT's prior performance – but failed to disclose the improper, Ponzi-like affiliate transactions and accounting practices at UMT.

132.    Prior to the formation of UDF IV, the UDF Defendants' entities incurred losses on bad loans originated before the financial crisis of late 2000s. After foreclosing on and disposing of the collateral for these bad loans, the UDF Defendants did not recoup the amounts outstanding on the loans. Rather than recognize these losses on the financial statements of UMT, which carried the loans on its balance sheets, the UDF Defendants instead created instruments, which appeared to be valuable assets, to conceal their loan losses. Rather than record loan losses, UMT recorded as valuable assets official sounding "**deficiency notes**" and "**recourse obligations,**" that UMT Holdings, UDF I, and other UDF affiliates issued.

32

133.    In UMT's 2012 annual report filed on Form 10-K with the SEC, audited by Defendant Whitley Penn, it described its deficiency note and recourse obligation arrangement with its affiliates as follows:

> **Related Parties Foreclosed Properties.** We do not reclassify foreclosed loans that have been pledged to us as collateral (an "underlying loan") for recourse loans we have made to affiliates of our Advisor, because our related parties are obligated to perform under the term of those recourse loans with us ("related parties loans"). If the borrower on an underlying loan defaults, the affiliate has the option to accrue interest payable to us while they bring the underlying loan current in its payments. ***We, in turn, accrue an interest receivable on the recourse loan.*** When the underlying loan becomes a paying loan again, the related party resumes paying us interest on the recourse loan. If the underlying loan is foreclosed and the real estate sells, our related party pays us all accrued interest and principal from the proceeds from the sale of the property. ***Any deficiency is reclassified to Recourse Obligations, related parties or Deficiency Notes, related parties***. (UMT 10-K at p.34) (emphases added).

134.    In other words, when a UMT loan fails, rather than write it off, a UMT affiliate assumes the obligation to pay the loan, and the loan continues to accrue interest.  UMT maintains the failed loan on its balance sheet as a (non-impaired) asset until the affiliate pays interest or it is foreclosed.   If the foreclosure leaves a balance unpaid, then that balance is still not written off by UMT.  Rather, it is maintained as a recourse obligation or deficiency note guaranteed by the UMT affiliate.

135.    UMT's 2012 annual report also disclosed to its investors – *but this crucial information was not adequately disclosed to UDF IV or UDF V investors* – its heavy reliance on the performance of related parties:

> A significant portion of our entire mortgage loan portfolio is comprised of loans we have made to related entities. Although we regularly conduct collectability analyses of these related entities, including UDF, the obligors under the recourse notes, UMT Holdings, L.P. and UMTHGS, because the security we hold for payment of a number of these obligations consists ***in significant part of receivables of these affiliates from other affiliates*** as well as from unaffiliated third parties and because ***our ultimate ability to collect on these obligations is dependent to a large extent upon the continued financial performance of those related parties we are exposed***

33

*to a concentrated credit risk*. In the event of a failure by those related parties to perform financially as they have regularly done in the past, our ability to collect on those obligations could be severely impaired or precluded. In such case, our earnings could be negatively impacted which in turn may limit distributions that we are able to pay to our shareholders.

(UMT 10-K p.11) (*emphasis added*).

136.    The security UMT receives from UMTH and UMTHGS is actually an interest in the fees those parties hope to receive from their advisory work—that is, the exorbitant fees they charge for managing and advising UDF IV and UDF V.

137.    This key arrangement, in which new investors' funds (and fees charged to new investors) are used to shore up the balance sheets of funds serving prior investors, is not sufficiently disclosed to UDF IV and UDF V shareholders. In fact, terms such as "deficiency note" and "recourse obligation" do not appear in UDF IV's or UDF V's prospectuses or annual reports.

138.    UMTH is owned by Defendants Greenlaw, Etter, Obert, Wilson and several others. These UMT instruments were, in both purpose and effect, IOUs to UMT that were never reasonably likely to be repaid. And they were issued at artificially low interest rates of 1.75%, when comparable notes and obligations to unaffiliated third-party borrowers bore far higher interest rates of approximately 14%. UMT concealed its true financial picture by keeping these inflated assets on its balance sheets.

139.    UMTH records these notes as liabilities (notes payable) on its own balance sheets. To remain solvent, UMTH itself needed assets. UMTH's primary assets were accounts receivable from related parties, which were actually management fees improperly earned from UDF III and UDF IV.

140.    Prospective UDF IV and UDF V investors were never adequately made aware of such serious problems, in the offering documents circulated to them by the UDF and RCS Defendants, and reviewed by Defendant Whitley Penn.

### iii.    Undisclosed High Concentration of Loans to Risky Borrower: Centurion

141.    Unbeknownst to the UDF IV and UDF V investors, the largest single borrower from the family of UDF funds and entities – not just from UDF IV or UDF V – was a group of affiliated companies operated by Defendant Mehrdad Moayedi. These companies were listed in UDF IV's SEC filings under various names, including Centurion, CTMTH, and many others (hereafter referred to collectively as "Centurion"). Defendant Moayedi is the President and CEO of Defendant Centurion.

142.    Undisclosed to Plaintiffs and other UDF IV and UDF V investors, Defendant Moayedi and Defendant Greenlaw have had extensive business ties outside of the UDF web, including joint ownership of a private jet.  In addition, Centurion and a private UDF affiliate reportedly co-owned a Dallas high-rise condo building, and Centurion and a private subsidiary of UDF I shared a 50/50 partnership to purchase and sell residential lots near Austin, Texas.

143.    Such undisclosed and extensive business ties created conflicts of interests between the UDF funds, including UDF IV and UDF V, and their management, on one side, and the largest borrower, Defendants Centurion and Moayedi, on the other side, given that the UDF funds provided capital to Defendants Moayedi and Centurion, and Defendants Moayedi and Centurion's ongoing solvency and financial well-being were crucial to the success of the undisclosed businesses and ventures between the UDF entities and their management. Such conflicts of interests were never disclosed to the UDF IV and UDF V investors.

144.    Approximately sixty-seven percent (67%) of UDF IV's loans have gone to Centurion. Moreover, on information and belief, UDF III, UDF IV and UDF V have collectively lent Centurion approximately $615 million, or 57% of their total lending.

145.    Between May 21, 2010 and September 30, 2015, UDF IV made loans to entities controlled by Moayedi with a combined principal balance $380,716,016, which represents 73.12% of the combined principal balance of all UDF IV loans ($520,672,043). The average interest rate of loans to Centurion is 13%.

146.    UDF IV offering documents fail to disclose the high concentration of loans to Centurion, or that Defendant Greenlaw has a prior business relationship with Moayedi.

147.    While the UDF IV offering documents disclosed it had given multiple loans to "related entities," it failed to disclose that such entities were not merely "related" to each other but were all controlled by, and highly dependent financially on, a single person: Moayedi.

148.    The UDF IV and UDF V offering documents also failed to disclose to their investors that *other* UDF funds were similarly overexposed to Defendants Moayedi and Centurion, and that the risk of a default by a Moayedi or Centurion entity to any one UDF fund was likely to trigger cascading and debilitating defaults as to *all* UDF funds.

### iv.    Moayedi's and Centurion's Pre-Class Period Loan and Obligation Defaults

149.    UDF IV's and UDF V's failure to disclose their true exposure to Defendants Moayedi and Centurion is more significant in light of the fact that Moayedi and Centurion had defaulted on several loans and financial obligations prior to the UDF IV and UDF V offerings. Their defaults were red flags to any reasonably prudent loan underwriter, asset manager, securities issuer or independent auditor.

150.   In August 2008 Moayedi entered into a personal guaranty for a $696,000 loan to Villages of Sanger, Ltd ("Villages"). Moayedi was the President of Pars Investments, Inc. ("Pars"), which was Villages' general partner. On November 16, 2006, PARS and Centurion Acquisitions gave a secured promissory note for $5,272,250 to UDF III, backed by a security agreement pledging all of their assets.

151.   In May of 2009, Villages failed to make a $20,880 interest payment on the note. The balance of the note was $716,880, and it was deemed to be in default, with the entire principal and balance due and payable. The lender foreclosed on the real property that secured the note, but the property sold for only $487,200. The lenders demanded that Moayedi remit his guarantee, but Moayedi refused to do so. The lender sued Moayedi. *See Interstate 35/Chisam Road, L.P. and Malachi Dev. Corp. v. Mehrdad Moayedi*, No. DC-09-12666-A (Dallas County, Sept. 17, 2009). Ultimately, the Texas Supreme Court held that Moayedi was liable for the guaranty. *Moayedi v. Interstate 35/Chisam Road, L.P.*, 438 S.W. 3d 1 (2014).

152.   Despite the fact that Moayedi was the largest borrower from UDF IV and UDF V, none of the UDF IV or UDF V public filings disclosed Villages' default, Moayedi's refusal to honor his personal guaranty, and Moayedi's willingness to force his lenders to litigate to the Texas Supreme Court to collect their debt.

153.   Subsequently, in 2011, Citibank, N.A. sued Moayedi in this Court for failing to pay amounts due on a payment and performance guaranty into which he had entered in 2003 for an $8.8 million loan. *See Citibank, N.A. v. Mehrdad Moayedi*, No. 4:11-cv-00016 (N.D. Tex. Jan 6, 2011) (ECF No. 1). According to the Complaint, when the note matured on December 1, 2009, and all outstanding principal and interest immediately became due and payable, Moayedi failed to honor his guaranty, which was approximately $1.45 million.

154.    Moreover, numerous loans to Moayedi's Centurion and its affiliates were not current throughout the two Class Periods. Public records indicate that Centurion is, and has likely been for a period of years, including throughout the Class Period, unable to service financial obligations.  UDF IV and UDF V have taken few if any steps to protect themselves against Moayedi's or Centurion's default on these accrual loans, the funds' exposure to which is in the hundreds of millions of dollars.

155.    The RCS Individual Defendants and AR Capital, having performed due diligence in connection with the UDF IV and UDF V offerings, were aware or recklessly and/or negligently unaware of the undisclosed credit concentration risk that UDF IV and UDF V faced in light of their exposure to Moayedi and Centurion.

156.    Similarly, Defendant Whitley Penn, which audited the financial statements for UDF IV, UDF V, UMT and numerous other affiliated entities, was aware, or in the alternative recklessly and/or negligently unaware, of the of the undisclosed credit concentration risk that UDF IV and UDF V faced in light of their exposure to Moayedi and Centurion. Nevertheless, Whitley Penn signed "clean audit" reports for each of UDF IV's and UDF V's 10-K annual reports throughout the Class Periods.

157.    Centurion and Moayedi, who were the largest borrowers from UDF IV and UDF V, were also, by virtue of receiving loans and providing guarantees to UDF IV, UDF V and their affiliates, the main source of UDF IV and UDF V's undisclosed credit concentration risk, and were thus instrumental in the creation of UDF IV's and UDF V's materially false and misleading financial statements.

158.    Centurion's and Moayedi's repeated pre-Class Period defaults, as well as their Class Period delinquencies, inconsistent payments and non-payments, were material omissions

from UDF IV's and UDF V's public filings in light of the great exposure the two funds and the family of UDF funds had to Centurion and Moayedi.

### b.  **Defendants Moayedi and Centurion's Role in the UDF Scheme**

159.    Defendants Moayedi and Centurion knowingly acted as the conduit through which the UDF Defendants funneled funds deposited by new investors in UDF IV and V to prop up the UDF Defendants' earlier, financially distressed UDF investment programs.

160.    An example of one of the many instances where Defendants Moayedi and Centurion acted as conduits for the UDF Defendants' Ponzi-like activities is the Williamsburg transaction, described *supra*.

161.    As stated above, in or about 2011, Defendants Moayedi and Centurion formed CTMGT Williamsburg, a company that purchased the defaulted loan banks of MU Williamsburg, previously a 100%-owned UDF I subsidiary.

162.    On September 27, 2011, the UDF Defendants caused UDF IV to lend $16,407,805 to CTMGT Williamsburg, which used part of the funds to acquire, on November 1, 2011, the two defaulted loans at the discounted price of approximately $12.1 million.

163.    On that same date, November 1, 2011, Defendants Moayedi and Centurion caused CTMGT Williamsburg to enter into a "profits interest agreement" with UDF I.

164.    Pursuant to that agreement, CTMGT Williamsburg was to pay UDF I $8 million for "advisory services" in connection with the MU Williamsburg properties.

165.    The $8 million helped prop up the financially struggling UDF I, which ended up booking a net profit on formerly defaulted MU Williamsburg as a result of the $8 million payment.

166.    As Defendants Moayedi and Centurion well knew, the money used to pay UDF I the $8 million fee came directly from UDF IV investors, in Ponzi-like fashion.

167.    As Defendants Moayedi and Centurion knew, the $8 million payment lacked any reasonable economic basis and was a sham. Indeed, there was no sound business reason for UDF I to have earned the $8 million fee, given that UDF I and UDF IV were both managed by the UDF Defendants. As defendants Moayedi and Centurion knew, the reason for the transaction was to prop up the struggling UDF I program and improperly transfer money from UDF IV to UDF I in Ponzi-like fashion.

168.    Similarly, Defendants Moayedi and Centurion helped funnel money deposited by new investors in UDF V, to prop up earlier UDF programs.

169.    Between 2004 and 2014, the UDF Defendants caused UDF I and UDF III to extend loans to Shahan Prairie, LLC ("Shahan"), an entity controlled by Defendants Moayedi and Centurion.

170.    On June 9, 2015, the UDF Defendants caused UDF V to extend a $18.1 million development loan to Shahan. The $18.1 million loan was collateralized by the same property that served as collateral for the previous loans issued by UDF I and UDF III.

171.    On that same date, June 9, 2015, UDF V disbursed to Shahan a tranche of $2.3 million of the $18.1 million loan. Shortly thereafter, Defendants Moayedi and Centurion caused Shahan to transfer to UDF III at least $2 million of the $2.3 million lent to it by UDF V.

172.    Thus, Defendants Moayedi and Centurion immediately transferred to UDF III the majority of the money disbursed to their Shahan entity by UDF V, in effect serving as a conduit to transfer funds from UDF V to UDF III, in Ponzi-like fashion.

173.    In its offering documents, of which Defendants Moayedi and Centurion were aware, UDF V had specifically assured investors that it would not lend money to affiliates or participate in loans issued by affiliates.

40

174.    As Defendants Moayedi and Centurion well knew, the $2 million used to pay UDF III came directly from UDF V investors, in Ponzi-like fashion.

175.    As Defendants Moayedi and Centurion knew, the $2 million transfer, with Defendants serving as conduits, lacked any reasonable economic basis and was a sham. Its purpose was solely to improperly funnel money – through Defendants – UDF V to UDF III and prop up the struggling UDF III program.

176.    The aforementioned transactions were one of many Ponzi-like transfers of funds between UDF programs, that Defendants Moayedi and Centurion knowingly facilitated. Indeed, such transactions could not have taken place without Moayedi and Centurion's knowing assistance.

177.    Defendants Moayedi and Centurion had the motive and opportunity to facilitate UDF's Ponzi-like payments because the UDF Defendants provided them with a financial lifeline that allowed them to continue their operations, despite their financial condition. As described above, Defendants Moayedi and Centurion were the largest borrowers from the UDF programs and received favorable terms from the UDF Defendants. Such terms included frequent extensions upon the maturity of such loans, and lack of a requirement to actually make payments on such loans, many of which continued to accrue unpaid interest year after year without the UDF Defendants making any substantive effort to collect such interest from Defendants Moayedi and Centurion.

     **c.    RCS', the RCS Individual Defendants', and AR Capital's Controlling Role in the UDF Scheme**

178.    Non-Defendant RCS, the RCS Individual Defendants, and AR Capital played a controlling role in the UDF IV offerings as the underwriter, offeror, and sellers for UDF IV and UDF V shares. UDF IV's November 12, 2009 prospectus (the "November 2009 Prospectus") for

up to 35,000,000 common shares to the public, filed with the SEC on form e424b3, notes, *inter alia*, the following about the relationship between RCS and UDF IV:

> ***The shares are being offered by Realty Capital Securities, LLC***, the exclusive dealer manager for this offering, and select members of the Financial Industry Regulatory Authority (FINRA) ***on a reasonable best efforts basis***. The dealer manager and soliciting dealers are not required to sell or purchase any specific number or dollar amount of shares but will use their reasonable best efforts to sell the shares offered hereby.  (p. 3)

179.    According to an Amended and Restated Exclusive Dealer Manager Agreement dated November 10, 2009 (the "DM Agreement"), UDF IV appointed RCS "to act as the exclusive dealer manager for the Offering, and the Dealer Manager desires to accept such engagement."

180.    The DM Agreement also noted that UDF IV would enter into an escrow agreement through which RCS would control investors' subscription funds and would take the primary role in offering and selling UDF IV shares.

181.    With respect to RCS' compensation, the DM Agreement provided RCS would be compensated for, due diligence with respect to the offering.

182.    In May 2011, RCS announced that it had hired three new members of its due diligence team: Alan Calderon, Hazel "Hazy" Malcolmson and Anthony Bains. Defendant Schorsch stated: "Our comprehensive approach to due diligence relies on the depth and breadth of expertise across a diverse and skilled team…. The appointments of Alan, Hazel and Anthony will strengthen our efforts to provide enhanced transparency to the broker-dealer community on all dimensions of RCS platform product offerings."

183.    Unbeknownst to shareholders, non-Defendant RCS, the RCS Individual Defendants and AR Capital did not perform *bona fide* due diligence for any of the offerings during the Class Periods, and earned tens of millions of dollars in fees by intentionally disregarding, or

with deliberate indifference looking away from, the financial misdeeds and Ponzi-like activities taking place at UDF IV, UDF V and their affiliates.

184.    The RCS Individual Defendants, by virtue of their roles at RCS and RCAP as more fully described above, exercised general control over RCS' activities and management, and specifically exercised control over RCS' underwriting, offering, and sales of UDF IV and UDF V securities to the investing public. By virtue of their respective positions described above, the RCS Individual Defendants oversaw RCS' distribution activities as to the real estate investment programs RCS offered and sold, including UDF IV and V; helped select such real estate investment programs that RCS would agree to distribute, including UDF IV and V; and played a key role in the due diligence conducted by RCS as to such programs, including UDF IV and V.

185.    Defendants Schorsch and Kahane were the decision-makers with ultimate management control over RCS and AR Capital, and played a crucial role in selecting the UDF products to be added to RCS' "multi-product distribution platform," agreeing to distribute, offer, and sell the UDF IV and V securities to the investing public, and overseeing and controlling the distribution, offering, and sale of UDF IV and V securities.

186.    As stated above, Schorsch and Kahane were the leading executive members of the "executive management team" that managed RCS and RCAP's other "lines of business," and had "the ability to control all matters" affecting RCS and AR Capital.

187.    The closeness of the relationship between Defendants Schorsch and Kahane, on one side, and UDF, and the direct, hands-on involvement of both Schorsch and Kahane in the promotion of UDF IV and UDF V are illustrated by the fact that Schorsch and Kahane approved UDF IV as one of the very first programs to be offered through RCS' touted "multi-product distribution platform" that, according to them, differentiated RCS from its competitors and gave it

a crucial competitive advantage. Such close relationship and hands-on involvement by the two Defendants is further illustrated by the fact that Kahane agreed to serve as a board member of UDF V. Such close relationship and hands-on involvement with UDF by the two Defendants is further illustrated by the fact that a Schorsch and Kahane-controlled entity, Defendant AR Capital, acted as a co-sponsor of UDF V, while another Schorsch and Kahane-controlled entity, Defendant ARCR Advisors, acted as an external advisor of UDF V.

188.    Given their involvement in selecting the UDF programs to be sold by RCS, their personal involvement in the structuring of the UDF product distribution by RCS, and their oversight and management of the distribution, offering, and sales of UDF IV and V securities by RCS, the RCS Individual Defendants – and in particular Defendants Schorsch and Kahane – were in a position, and had ample and ongoing opportunities to prevent the UDF IV and V fraudulent securities offerings, and cannot sustain the burden of proof that they did not know and in the exercise of reasonable care could not have known of the misrepresentations and omissions in the UDF IV and V offering documents.

### d.    Whitley Penn's Role in the Ponzi-Like Scheme

189.    Defendant Whitley Penn served as UDF IV's independent public accounting firm from its S-11 Shelf Registration on August 5, 2008 through November 2015, when it declined to stand again as UDF IV's independent auditor.

190.    Defendant Whitley Penn also served as the independent auditor for UDF V from its inception until November 2015, and for numerous UDF-IV affiliates, including UMT and UDF III.

191.    Between August 5, 2008 and November 19, 2015, Defendant Whitney Penn issued Reports of Independent Registered Public Accounting Firm for every annual report on form 10-K UDF-IV filed with the SEC.

192.    In its reports attached to UDF IV's Forms 10-K for the years ending December 31, 2009, 2010, 2011, 2012 and 2013, Defendant Whitney Penn issued substantially the following statement:

> We have audited the accompanying balance sheets of United Development Funding IV (the "Trust") as of December 31, 2009 and 2008 and the related statements of operations, changes in shareholders' equity and cash flows for the year ended December 31, 2009 and for the period from May 28, 2008 (Inception) through December 31, 2008. These financial statements are the responsibility of the Trust's management. Our responsibility is to express an opinion on these financial statements based on our audits.
>
> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Trust is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. An audit includes consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Trust's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of United Development Funding IV as of December 31, 2009 and 2008, and the results of its operations and its cash flows for the year ended December 31, 2009 and for the period from May 28, 2008 (Inception) through December 31, 2008 in conformity with accounting principles generally accepted in the United States of America.
>
> /s/ Whitley Penn LLP
> Dallas, Texas
> March 31, 2010

193.   Because of its role as auditor of UMT and UDF IV, Defendant Whitley Penn was aware that UMT carried as assets deficiency notes and recourse obligations that were, in effect, IOUs from UMTHGS, which, in turn, were dependent upon UMTHGS's ability to exact exorbitant, unearned fees from UDF IV. Whitley Penn was also fully aware that this Ponzi-like arrangement, in which new investors' funds were used to pay prior investors, was not meaningfully disclosed to UDF IV investors in any prospectuses or incorporated SEC filings, all of which it had also audited.

194.   Whitley Penn was also aware that the various UDF affiliated entities, all of whose financial statements it audited, were collectively far more exposed to Moayedi/Centurion than was expressly revealed to UDF IV and UDF V investors. Thus, Whitley Penn was fully aware that the full risk accompanying the failure of Moayedi/Centurion was unreasonably high, and far higher than the risk reported piecemeal to potential UDF IV and UDF V share purchasers.

195.   Whitley Penn was also aware, by virtue of its auditing of UDF IV's financial statements along with those of its affiliate entities, that statements in UDF IV's prospectuses and incorporated SEC filings to the effect that UDF IV's loan portfolio was 100% collectible were materially false and misleading.

196.   Whitley Penn was also aware, by virtue of its auditing of UDF IV's financial statements along with those of its affiliate entities, that the fees earned by UDF IV's advisor and manager were artificially inflated—derived from materially false and misleading financial statements that inflated the financial metrics from which such fees were calculated.

197.   Whitley Penn was also aware, by virtue of its auditing of UDF IV's financial statements along with those of its affiliate entities, of the undisclosed management risk UDF IV

and UDF V investors faced due to the Ponzi-like practices, affecting all of the UDF affiliated entities, in which Defendants were engaging.

198.    In sum, Whitley Penn rendered assistance to the UDF Defendants by signing off on the company's financial statements in the face of perceived risks knowing that its assistance would facilitate (validate) the untruthful and illegal Ponzi-like activity that the UDF Defendants were engaging in.

## V.    UDF IV's False and Misleading Statements

### Pre-Class Period False Statements Incorporated into Class Period Statements

199.    UDF IV raised a total of $642.3 million through the sale of 32,115,232 shares (Including DRIP shares, registered alongside the shares to be publicly offered to new investors) as of December 31, 2013.

200.    On August 5, 2008, UDF IV filed a shelf registration statement with the SEC on Form S-11 (the "Shelf Registration"), indicating its intention to sell 35,000,000 common shares of beneficial interest for a proposed aggregate offering price of $700 million.

201.    In the Shelf Registration, UDF IV described its investment plan as raising capital to issue loans for real estate development of residential real estate, stating, in pertinent part:

> We intend to derive a significant portion of our income by originating, purchasing, participating in and holding for investment secured loans made directly by us or indirectly through our affiliates to persons and entities for the acquisition and development of parcels of real property as single-family residential lots, and the construction of model and new single-family homes, including development of mixed-use master planned residential communities, typically with the loan allocation for any single asset in the range of $2.5 million to $15 million…

> In addition to our investments in secured loans, we intend to make direct investments in land for development into single-family lots, model homes and finished lots and homes. When we acquire properties, we most often will do so through a special purpose entity formed for such purpose or a joint venture formed with a single-family residential developer, homebuilder, real estate developer or other real estate investor, with us providing equity and/or debt financing for the

47

newly-formed entity. In limited circumstances, and in accordance with the federal tax rules for REITs and the exemptions from registration under the Investment Company Act of 1940, as amended (Investment Company Act), we may make equity investments through special purpose entities in land for development into single-family lots, new and model homes and finished lots.

202.    This statement was materially false and misleading because Defendants omitted to state the material fact that UDF IV investment funds were always intended to flow directly or indirectly to other UDF entities that needed liquidity.

203.    The Shelf Registration made express – but false and misleading – assurances concerning the rigorous underwriting criteria for its loans:

> We will apply the same underwriting criteria and analysis of the underlying real property to all of our secured loans, regardless of how we decide to structure the secured loans.

**November 2009 Prospectus**

204.    UDF IV's November 16, 2009 Prospectus incorporates much of the same language as the Shelf Registration concerning the intended use of investor funds. It further states: "As of the date of this prospectus, we have neither made nor acquired any investments, ***nor have we identified any assets in which there is a reasonable probability that we will invest***." (*Emphasis added*). This statement was materially false and misleading because Defendants omitted to state the material fact that UDF IV investment funds were always intended to flow directly or indirectly to other UDF entities that needed liquidity.

205.    The November 2009 Prospectus lists numerous loans made by UDF I, UDF II and UDF III to Centurion entities, all of which – falsely – appear to have been profitable loans. The November 2009 Prospectus notes with respect to UDF III's loans:

> UDF III originated 49 loans during the period of May 2003 through December 31, 2008. Of the loans originated, approximately 28.6%, or 14 loans, have been repaid. No loans were foreclosed. UDF III's aggregate provision for loan losses through December 31, 2008 was approximately $318,000; **however, actual loan losses**

**after sales of foreclosed assets were $0**. All of the loans originated were residential real estate loans secured by residential lots or land designated for development into single-family or residential lots. The aggregate dollar amount of the loans originated by UDF III, as of December 31, 2008, was approximately $386 million.

*(Emphasis added).*

## 2009 and 2010 10-K Reports

206.    On March 31, 2010, UDF IV filed its annual report on Form 10-K with the SEC (the "2009 10-K"). On March 31, 2011, UDF IV filed its annual report on Form 10-K with the SEC (the "2010 10-K").

207.    The 2009 and 2010 10-K Reports were false and misleading because, as described more fully herein, they did not present a true financial picture of UDF IV's financial health.

## Class Period False Statements

208.    Throughout the Class Period, the UDF Defendants continued to make false and misleading statements through the issuance of numerous prospectuses for UDF IV, including the following:

- May 2, 2011 Prospectus;

- June 15, 2011 Prospectus;

- September 2, 2011 Prospectus;

- December 1, 2011 Prospectus;

- April 4, 2012 Prospectus;

- April 27, 2012 Prospectus;

- May 22, 2012 Prospectus;

- August 22, 2012 Prospectus;

- October 19, 2012 Prospectus; and

- November 29, 2012 Prospectus.

209.    Throughout the Class Period, the UDF Defendants also made false and misleading statements in numerous quarterly and annual reports for UDF IV, including the following:

- 2011 Q1 Report;

- 2011 Q2 Report;

- 2011 Q3 Report;

- 2011 10K Report;

- 2012 Q1 Report;

- 2012 Q2 Report; and

- 2012 Q3 Report.

210.    The above prospectuses and reports were materially false and misleading, because, *inter alia*:

- They failed to disclose that UDF IV was using new retail investor funds to pay distributions to investors in earlier UDF funds in Ponzi-like fashion.

- They materially misrepresented the non-collectability of loans through the misleading use of deficiency notes and recourse obligations to related parties, and in non-arm's length transactions.

- They materially misrepresented the non-collectability of loans through the misleading use of deficiency notes and recourse obligations to non-related parties.

- They materially misrepresented that Defendants applied the same underwriting criteria and analysis of the underlying real property to all secured loans, regardless of how UDF IV decided to structure the secured loans.

- They failed to disclose the fact of, and/or the degree to which, each of the UDF-affiliated funds was highly exposed to Centurion and its affiliate entities.

- They failed to disclose that Centurion was not repaying its loans upon maturity.

- They failed to disclose that Centurion and Moayedi had defaulted on several loans prior to the Class Periods.

- They failed to disclose that Centurion and Moayedi were financially struggling, as evidenced by the lawsuits against them, arising out of their alleged nonpayment of financial obligations.

50

- They failed to disclose that Centurion was not making payments on certain loans, and that Defendants were permitting Centurion to accrue the interest on its loans and capitalize that interest into the loan principal.

- They failed to disclose the material conflict of interest between Defendants Greenlaw and Moayedi, owner of Centurion.

- They failed to disclose that UDF IV and its affiliated funds were failing to accrue loan losses to Centurion and other borrowers.

- They failed to disclose that UDF IV and its affiliated funds were not recording reserves for impaired loans to Centurion and other borrowers.

- They materially misrepresented a 100% collectability level for UDF IV loans.

- They failed to note that neither RCS nor anyone else had performed *bona fide* due diligence in advance of the offering.

- They failed to disclose that UDF IV and its affiliated funds were reaping inflated management and other fees derived from UDF IV's false and misleading financial statements.

- They failed to disclose that the UDF Defendants required management fees from UDF IV to sustain the balance sheets and the credit of other UDF entities.

211.   Throughout the scheme, the material misstatements and omissions in the UDF IV and UDF V financial statements, registration statements and prospectuses grew more significant as the individual and collective exposure of UDF IV, UDF V and their affiliates to ever-growing unreported, non-performing assets increased. Moreover, as the funds took in additional investor money each year they paid themselves and their affiliates proportionally higher fees, which were, in turn, used directly and indirectly to prop up the entire scheme.

## VI.   UDF V's False and Misleading Statements

### July 25, 2014 UDF V Prospectus

212.   Throughout the Class Period, the UDF Defendants issued registration statements, prospectuses and supplements for UDF V, including the following:

- February 26, 2014 Registration Statement;

- June 6, 2014 Amendment to the February 26, 2014 Registration Statement;

- July 25, 2014 Prospectus;

- September 10, 2014 Supplement No. 1 to July 25, 2014 Prospectus;

- October 15, 2014 Supplement No. 2 to July 25, 2014 Prospectus;

- October 22, 2014 Supplement No. 3 to July 25, 2014 Prospectus;

- November 7, 2014 Supplement No. 4 to July 25, 2014 Prospectus;

- November 10, 2014 Supplement No. 5 to July 25, 2014 Prospectus;

- December 11, 2014 Supplement No. 6 to July 25, 2014 Prospectus;

- April 30, 2015 Prospectus;

- May 26, 2015 Supplement No. 1 to the April 30, 2015 Prospectus;

- July 13, 2015 Supplement No. 2 to the April 30, 2015 Prospectus;

- July 31, 2015 Supplement No. 3 to the April 30, 2015 Prospectus; and

- September 10, 2015 Supplement No. 4 to the April 30, 2015 Prospectus.

213.    Throughout the Class Period, the UDF Defendants also issued numerous quarterly and annual reports for UDF V, including the following:

- 2014 Q2 Report;

- 2014 Q3 Report;

- 2014 10K Report;

- 2015 Q1 Report;

- 2015 Q2 Report; and

- 2015 Q3 Report.

214.    The above prospectuses, supplements and reports were false and misleading for the following reasons, *inter alia*:

- They failed to disclose that UDF IV was using new retail investor funds to pay distributions to investors in earlier UDF funds in a Ponzi-like fashion.

- They materially misrepresented the non-collectability of loans through the misleading use of deficiency notes and recourse obligations to related parties, and in non-arm's length transactions.

- They materially misrepresented the non-collectability of loans through the misleading use of deficiency notes and recourse obligations to non-related parties.

- They materially misrepresented that Defendants applied the same underwriting criteria and analysis of the underlying real property to all secured loans, regardless of how UDF IV decided to structure the secured loans.

- They failed to disclose the fact of, and/or the degree to which, each of the UDF-affiliated funds was highly exposed to Centurion and its affiliate entities.

- They failed to disclose that Centurion was not repaying its loans upon maturity.

- They failed to disclose that Centurion and Moayedi had defaulted on several loans prior to the Class Periods.

- They failed to disclose that Centurion and Moayedi were financially struggling, as evidenced by the lawsuits against them, arising out of their alleged nonpayment of financial obligations.

- They failed to disclose that Centurion was not making payments on certain loans, and that Defendants were permitting Centurion to accrue the interest on its loans and capitalize that interest into the loan principal.

- They failed to disclose the material conflict of interest between Defendants Greenlaw and Moayedi, owner of Centurion.

- They failed to disclose that UDF IV and its affiliated funds were failing to accrue loan losses to Centurion and other borrowers.

- They failed to disclose that UDF IV and its affiliated funds were not recording reserves for impaired loans to Centurion and other borrowers.

- They materially misrepresented a 100% collectability level for UDF IV loans.

- They failed to note that neither RCS nor anyone else had performed *bona fide* due diligence in advance of the offering.

- They failed to disclose that UDF IV and its affiliated funds were reaping inflated management and other fees derived from UDF IV's false and misleading financial statements.

- They failed to disclose that the UDF Defendants required management fees from UDF IV to sustain the balance sheets and the credit of other UDF entities.

## VII.    POST CLASS PERIOD EVENTS: THE UDF SCHEME BEGINS TO UNRAVEL

### a.    Defendant Whitley Penn Terminates Relationship with UDF IV

215.    On November 24, 2015, UDF IV announced in a current report on SEC form 8-K that Defendant Whitley Penn had declined to stand for reappointment as its independent public accounting firm.

216.    On November 24, 2015, Defendant Whitley Penn submitted a letter to the SEC stating the following:

> November 24, 2015
>
> U.S. Securities & Exchange Commission
> Office of the Chief Accountant
> 100 F Street, N.E.
> Washington DC 20549-7561
>
> Re: United Development Funding Income Fund V
> File Number: 333-194162
>
> Dear Sir or Madam:
>
> We have read Item 4.01 in Form 8-K of United Development Funding Income Fund V, dated November 24, 2015, and agree with the statements concerning our firm contained therein.
>
> Very truly yours,
>
> /s/ Whitley Penn LLP

### b.    Defendant Kahane Resigns from UDF V's Board

217.    Also on November 24, 2015, Defendant Kahane voluntarily resigned as a member of the Board of Trustees for UDF V.

### c.    UDF Discloses Investigation by the Securities and Exchange Commission

218.    On December 10, 2015, Defendant UDF IV belatedly – and only after detailed allegations of misconduct were publicized by an institutional investor – disclosed to its investors

that it and UDF III have been investigated by the Securities and Exchange Commission since April 2014.

### d. FBI Officers Search UDF Offices, Seize Records, Serve Grand Jury Subpoena

219.    On February 18, 2016, law enforcement officers affiliated with the FBI searched the UDF Offices in Grapevine and seized numerous records and computer hard drives. The FBI officers conducted the search and seizure pursuant to a search warrant issued by a Magistrate Judge of the United District Court for the Northern District of Texas.

220.    On February 18, 2016, the UDF Defendants also disclosed that the law enforcement authorities "served executive officers of [UDF IV] and certain other employees of [UDF IV's] advisor and its affiliates with grand jury subpoenas seeking the production of documents related to the operations of [UDF IV]."

### e. UDF IV Stock Price Collapses, NASD Indefinitely Suspends UDF IV from Trading

221.    On February 18, 2016, following the news of the FBI raid to UDF's offices, UDF IV's stock price plummeted by over 50% to $3.20, from a high of approximately $19 per share in 2015.

222.    That same day, NASDAQ ordered an indefinite suspension of trading in UDF IV's stock, and initiated its own investigation of UDF IV.

223.    On May 26, 2016, UDF IV received a determination letter from NASDAQ, stating that NASDAQ had determined to deny the Trust's request for continued listing on Nasdaq due to UDF IV's continued failure to file its audited financial statements and annual report for 2015.

### f.   UDF V Prematurely Terminates Offering, De-Registers Shares

224.   On March 4, 2016, UDF V announced that its Board of Trustees decided to prematurely terminate the UDF V pending securities offering. UDF V also announced its plans to wind down its operations, repay any outstanding debt, and return capital to its shareholders.

225.   That same day, UDF V filed a Post-Effective Amendment with the SEC and de-registered its unsold common shares that had earlier been registered for public offering.  In its deregistration request, UDF V indicated that, as of March 4, 2016, it had sold a total of 2,952,526 shares pursuant to its registration statement, and sought to de-register the remaining 47,705,369 registered shares that remained unsold as of that date.

### g.  Defendant Mita Resigns from UDF V

226.   On March 4, 2016, UDF V also announced the resignation of one of its trustees, Defendant Eustice Mita.

### h.  UDF III Suspends Distributions

227.   On March 23, 2016, UDF III wrote to its investors to say that it was suspending its cash distributions to preserve capital.

### i.   UDF IV Discloses Default on $35 Million Loan, Forbearance Agreement, and Suspension of Distribution Payments

228.   On May 23, 2016, UDF IV filed a Form 8-K current report with the SEC in which it belatedly disclosed a default on a $35 million loan, that had occurred nearly three months earlier. UDF IV reported:

> As disclosed in a Current Report on Form 8-K filed with the Securities and Exchange Commission (the "SEC") on July 9, 2014, United Development Funding IV, a Maryland real estate investment trust (the "Trust"), entered into a loan agreement (the "Loan Agreement") on July 2, 2014 with Waterfall Finance 4, LLC, an unaffiliated entity, for a $35 million term loan (the "Loan"). On May 17, 2016, the Trust and Waterfall Eden Master Fund, Ltd., Waterfall Sandstone Fund, LP and HEDCO ABS, Ltd. (collectively,

the "Lenders"), as successors-in-interest to Waterfall Finance 4, LLC under the Loan Agreement, entered into a Forbearance Agreement effective as of March 4, 2016 pursuant to which the Trust acknowledged the occurrence of certain events of default and the Lenders agreed to forbear from exercising any of their default-related rights against the Trust until August 4, 2016 (the "Forbearance Period"). The Forbearance Period will earlier terminate if the loan is repaid, if an event of default occurs, or if the Trust fails to meet or maintain certain representations, warranties, terms, conditions or covenants contained in the Forbearance Agreement. On March 7, 2016, the Trust made a required payment of all accrued but unpaid interest and a portion of the principal on the Loan. ***During the Forbearance Period, interest accrues at the default interest rate of one-month LIBOR plus 11.5%, but the Trust is only required to pay interest at the non-default interest rate of one-month LIBOR plus 9.0%. The difference between the default interest rate and the non-default interest rate is added to the outstanding principal balance of the Loan and will be due and payable to the Lenders on January 5, 2017.*** The Trust is required to use a portion of its future available cash flow to pay transaction expenses, interest due under the Loan, and principal. ***The Trust has agreed to provide certain financial reporting to the Lenders and it has agreed to suspend distributions to its shareholders during the Forbearance Period. The Trust also agreed not to originate new mortgage loans, incur additional debt, grant additional or substitute collateral to any other lender, or dispose of assets without first obtaining the consent of the Lenders.*** The balance of the Loan as of May 23, 2016 is approximately $28.5 million.

(*emphasis supplied*).

### j.  UDF IV and UDF V Have Failed to File the Required Periodic Reports Disclosing Their Financial Situation for the Past Seven Months, Claim Inability to Find Auditor

229.    Since November, 2015 through the date of this Amended Complaint, neither UDF IV nor UDF V have filed their mandated periodic reporting with the SEC, nor otherwise publicly disclosed their financial situation to their shareholders as required by law.

230.    Defendants UDF IV and UDF V have contended in their filings with the SEC that their failures to file such mandatory reports over the past seven months is the result of their inability to engage a new auditor, following Defendant Whitley Penn's departure.

## CLASS ACTION ALLEGATIONS

231.    This action is brought by Plaintiffs, for themselves and on behalf of all others similarly situated, as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3).

## CLASS DEFINITION

232.    The Proposed UDF IV Class is defined as follows: All persons and entities that purchased or otherwise acquired UDF IV shares in or pursuant to an offering of UDF IV shares between March 8, 2011 and June 3, 2014.

233.    The Proposed UDF V Class is defined as follows: All persons and entities that purchased or otherwise acquired UDF V shares in or pursuant to an offering of UDF V shares from July 25, 2014 to March 8, 2016.

234.    Excluded from both classes are: (1) Any of the Defendants, their agents or employees; (2) any judge or judicial officer who may hear any aspect of this case and his or her law clerks; and (3) any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

## NUMEROSITY

235.    The members of the Proposed Class are so numerous and geographically dispersed that joinder of all members is impracticable. While the exact number of Proposed Class members remains unknown at this time, reports filed by UDF IV and UDF V with the Securities Exchange Commission indicate there are at least hundreds of members of the proposed class. The exact number of UDF IV and UDF V investors is within the knowledge of Defendants.

## TYPICALITY

236.    The claims of Plaintiffs are typical of the claims of all Class members. Plaintiffs are situated identically to all members of the Class with respect to the issues presented in this case,

as Plaintiffs and all members of the Class were investors in the UDF programs and suffered the exact same loss (in proportion to the amount of their investment). The claims of Plaintiffs are based on the same fundamental factual allegations and legal theories as the claims of all other members of the Class.

237.   All investors in UDF IV and UDF V, respectively, have been adversely affected by the wrongdoing of Defendants as described herein.

## COMMONALITY

238.   There are common questions of law and fact in this class action that relate to and affect the rights of each member of the Class including, *inter alia*:

   a.   Whether Defendants failed to disclose that UDF IV and UDF V were using new retail investor funds to pay distributions to investors in earlier UDF funds.

   b.   Whether Defendants failed to disclose that UDF IV was using new retail investor funds to pay distributions to earlier investors UDF IV.

   c.   Whether Defendants materially misrepresented the non-collectability of loans through the misleading use of deficiency notes and recourse obligations to related parties, and in non-arm's length transactions.

   d.   Whether Defendants materially misrepresented the non-collectability of loans through the misleading use of deficiency notes and recourse obligations to non-related parties.

   e.   Whether Defendants materially misrepresented that UDF IV applied the same underwriting criteria and analysis of the underlying real property to all of secured loans, regardless of how UDF IV decided to structure the secured loans.

   f.   Whether Defendants failed to disclose the fact of, and/or the degree to which, each of the UDF-affiliated funds was highly exposed to Centurion and its affiliate entities.

   g.   Whether Defendants failed to disclose that Centurion was not repaying its loans upon maturity.

   h.   Whether Defendants failed to disclose that Centurion and Moayedi were financially struggling.

   i.   Whether Defendants failed to disclose that Centurion was not making payments on its loans, and that UDF IV, UDF V and their affiliates were

permitting Centurion to accrue the interest on its loans and capitalize that interest into the loan principal.

j.  Whether Defendants failed to disclose the material conflict of interest between Defendant Greenlaw and Moayedi, owner of Centurion.

k.  Whether Defendants failed to disclose that UDF IV, UDF V and their affiliated funds were failing to accrue loan losses to Centurion, and other borrowers.

l.  Whether Defendants failed to disclose that UDF IV, UDF V and their affiliated funds were not recording reserves for impaired loans to Centurion, and other borrowers.

m.  Whether Defendants materially misrepresented a 100% collectability level for UDF IV loans.

n.  Whether Defendants failed to note that neither RCS nor anyone else had performed *bona fide* due diligence in advance of the UDF IV offerings.

o.  Whether Defendants failed to disclose that UDF IV, UDF V and their affiliated funds were reaping inflated management and other fees derived from UDF IV's and UDF V's false and misleading financial statements.

p.  Whether Defendants failed to disclose that Defendants required management fees from UDF IV and UDF V to sustain the balance sheets and the credit of other UDF entities.

q.  Whether the RCS Individual Defendants acted recklessly or negligently in connection with their role as broker/dealer and underwriter of the UDF IV offerings.

## **ADEQUACY**

239.    The representative parties and undersigned counsel will fairly and adequately protect the interests of the proposed class.

240.    Plaintiffs also satisfy Rule 23(b) of the Federal Rules of Civil Procedure because the questions of law or fact common to the members of the proposed class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

### Count I
### Texas Securities Act, Tex. Rev. Civ. Art. 581-33-A
### Fraudulent Sale
### UDF IV

241.    Plaintiffs repeat and reallege the foregoing paragraphs as if stated in full.

242.    The Texas Securities Act ("TSA"), Tex. Rev. Stat. Art. 581-33-A, provides, in

pertinent part:

> A. *Liability of Sellers*. (A)(2) *Untruth or Omission*. A person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security.

243.    As alleged herein, UDF IV offered or sold securities to Plaintiffs and the proposed

class by means of untrue statements of material fact and by its omission to state material facts

necessary in order to make the statements made, in the light of the circumstances under which they

were made, not misleading.

### Count II
### Texas Securities Act, Tex. Rev. Civ. Art. 581-33-A
### Fraudulent Sale
### UDF V, UDFH and AR Capital

244.    Plaintiffs repeat and reallege the foregoing paragraphs as if stated in full.

245.    The Texas Securities Act ("TSA"), Tex. Rev. Stat. Art. 581-33-A, provides, in

pertinent part:

> A. *Liability of Sellers*. (A)(2) *Untruth or Omission*. A person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security.

246.    As alleged herein, Defendants UDF V, UDFH and AR Capital offered or sold securities to Plaintiffs and the proposed class by means of untrue statements of material fact and by their omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

**Count III**
**Texas Securities Act, Tex. Rev. Civ. Art. 581-33-F(1)**
**Control Person Liability**
**UDF Individual Defendants**

247.    Plaintiffs repeat and reallege the foregoing paragraphs as if stated in full.

248.    The TSA, Tex. Rev. Stat. Art. 581-33-F(1), provides, in pertinent part:

**F. Liability of Control Persons and Aiders.**
(1) A person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer, unless the controlling person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

249.    A person is liable as a "control person" where he or she has the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Depending on the circumstances, a control person might include an employer, an officer or director, a large shareholder, a parent company, and a management company.

250.    As alleged herein, UDF IV and UDF V offered or sold securities to Plaintiffs and the proposed classes by means of untrue statements of material fact and by its omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

251.    The UDF Individual Defendants were all officers and directors of UDF IV and/or UDF V, and each directly or indirectly possessed the power to direct or cause the direction of the

62

management or policies of UDF IV and/or UDF V. In that capacity, the UDF Individual

Defendants directed and controlled UDF IV and/or UDF V's misconduct and knew or should have

known of such misconduct.

252.    The UDF Individual Defendants are jointly and severally liable with UDF IV for

UDF IV's violation of TSA.

253.    The UDF Individual Defendants are jointly and severally liable with UDF V for

UDF V's violation of TSA.

### Count IV
### Texas Securities Act, Tex. Rev. Civ. Art. 581-33-F(2)
### Materially Aiding Violations of the Texas Securities Act Art. 581-33(A)(2)
### UMTHGS, UMTHLD, ARCR Advisors, UDFHGS and UDFHLD

254.    Plaintiffs repeat and reallege the foregoing paragraphs as if stated in full.

255.    The TSA, Tex. Rev. Civ. Art. 581-33-F(2),  provides, in pertinent part:

**F. Liability of Control Persons and Aiders.**

(2) A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

256.    To establish liability for aiding fraud under TSA, a plaintiff must demonstrate:

(1) a primary violation of the securities laws occurred;

(2) the alleged aider had "general awareness" of its role in this violation;

(3) the actor rendered "substantial assistance" in this violation; and

(4) that the alleged aider either (a) intended to deceive the plaintiff or (b) acted with reckless disregard for the truth of the representations made by the primary violator.

257.    An aider may be held liable where it rendered assistance "in the face of a perceived

risk" and must possess "a general awareness that his role was part of an overall activity that is

improper."

63

258.    As alleged herein, UDF IV and UDF V committed primary violations by offering or selling securities to Plaintiffs and the proposed classes by means of untrue statements of material fact and by their omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

259.    Defendants UMTHGS, UMTHLD, ARCR Advisors, UDFHGS and UDFHLD had an identical mental state as the UDF Individual Defendants, who served individually and collectively as the equity owners, trustees, directors, officers and executives of these Defendants.

260.    As the advisors and asset managers to UDF IV and UDF V, Defendants UMTHGS, UMTHLD, ARCR Advisors, UDFHGS and UDFHLD intentionally and/or recklessly disregarded numerous red flags indicating that UDF IV's and UDF V's Class Period financial statements were materially false and misleading, and that UDF IV's and UDF V's offerings were therefore made in violation of TSA.

261.    UMTHGS, UMTHLD, ARCR Advisors, UDFHGS and UDFHLD provided substantial assistance to UDF IV, UDF V, and their co-defendants, by structuring loans and obligations that concealed UDF IV's and UDF V's true financial condition.

262.    UMTHGS, UMTHLD, ARCR Advisors, UDFHGS and UDFHLD are jointly and severally liable with UDF V for UDF V's violation of TSA.

263.    The misconduct of UMTHGS, UMTHLD, ARCR Advisors, UDFHGS and UDFHLD was the proximate cause of the Class Members' losses, because they directly and proximately resulted in the Class Members' investments in UDF IV and V.

264.    As a direct and proximate consequence of the misconduct of UMTHGS, UMTHLD, ARCR Advisors, UDFHGS and UDFHLD as described above and throughout this Complaint,

Plaintiff and the Class Members have lost a substantial portion of the money they invested in UDF

IV and/or V, in an amount to be determined at trial but well in excess of $5,000,000.

### Count V
### Texas Securities Act, Tex. Rev. Civ. Art. 581-33-F(2)
### Materially Aiding Violations of the Texas Securities Act Art. 581-33(A)(2)
### Whitley Penn

265.    Plaintiffs repeat and reallege the foregoing paragraphs as if stated in full.

266.    The TSA, Tex. Rev. Civ. Art. 581-33-F(2),  provides, in pertinent part:

**F. Liability of Control Persons and Aiders.**

(2) A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

267.    To establish liability for aiding fraud under TSA, a plaintiff must demonstrate:

(1) a primary violation of the securities laws occurred;

(2) the alleged aider had "general awareness" of its role in this violation;

(3) the actor rendered "substantial assistance" in this violation; and

(4) that the alleged aider either (a) intended to deceive the plaintiff or (b) acted with reckless disregard for the truth of the representations made by the primary violator.

268.    An aider may be held liable where it rendered assistance "in the face of a perceived

risk" and must possess "a general awareness that his role was part of an overall activity that is

improper."

269.    As alleged herein, UDF IV and UDF V committed primary violations by offering

or selling securities to Plaintiffs and the proposed classes by means of untrue statements of material

fact and by their omission to state material facts necessary in order to make the statements made,

in the light of the circumstances under which they were made, not misleading.

270.    As the independent auditor for UDF IV, UDF V and numerous of their affiliates, Whitley Penn recklessly or knowingly participated in the UDF Defendants' scheme, as discussed *supra*, while being aware that UDF IV's and UDF V's Class Period financial statements were materially false and misleading and that UDF IV's and UDF V's offerings were therefore made in violation of TSA.

271.    Whitley Penn provided substantial assistance to UDF IV, UDF V, and their co-defendants because its "clean audit" opinions were necessary for UDF IV, UDF V and their co-defendants to proceed with the Class Period offerings.  Furthermore, by signing off on the company's financial statements in the face of perceived risks knowing that its assistance would facilitate (validate) the untruthful and illegal Ponzi-like activity, Whitley Penn materially aided the UDF Defendants.

272.    Whitley Penn is jointly and severally liable with UDF IV for UDF IV's violation of TSA.

273.    Whitley Penn is jointly and severally liable with UDF V for UDF V's violation of TSA.

274.    Whitley Penn's misconduct was the proximate cause of the Class Members' losses, because they directly and proximately resulted in the Class Members' investments in UDF IV and V.

275.    As a direct and proximate consequence of Whitley Penn's misconduct as described above and throughout this Complaint, Plaintiff and the Class Members have lost a substantial portion of the money they invested in UDF IV and/or V, in an amount to be determined at trial but well in excess of $5,000,000.

<u>**Count VI**</u>
**Texas Securities Act, Tex. Rev. Civ. Art. 581-33-F(1)**
**Control Person Liability**
**RCS Individual Defendants**

276.    The TSA provides, in pertinent part:

A. *Liability of Sellers*. (A)(2) *Untruth or Omission*. A person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security.

277.    A "seller" under TSA can include '[a] person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner,' such as a broker." *Highland Cap. Mgmt. L.P. v. Ryder Scott Co*., 402 S.W. 3d 719, 742 (Ct. App. Tex. 2012).

278.    RCS is not a defendant in this action. However, as alleged herein, RCS served as the broker/dealer and underwriter of UDF IV and UDF V securities throughout the Class Periods, solicited Plaintiffs and the proposed classes to acquire UDF IV and UDF V shares motivated by a desire to serve its own financial interests, and is therefore a "seller" and "offeror" in privity with Plaintiffs and the proposed classes.

279.    As alleged herein, non-Defendant RCS and Defendant AR Capital (as co-sponsor of UDF V) offered or sold UDF IV and UDF V securities to Plaintiffs and the proposed classes by means of untrue statements of material fact and by omission to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

280.   The TSA, Tex. Rev. Stat. Art. 581-33-F(1), provides, in pertinent part:

**F. Liability of Control Persons and Aiders.**
(1) A person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer, unless the controlling person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

281.   A person is liable as a "control person" where he or she has the possession, direct or indirect, of the power to direct or cause the direction of the operations, management or policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Depending on the circumstances, a control person might include an employer, an officer or director, a large shareholder, a parent company, and a management company.

282.   The RCS Individual Defendants were, as described herein, all officers, directors, and otherwise control persons of RCS and/or AR Capital and each directly or indirectly possessed the power to direct or cause the direction of the operations, management or policies of RCS and/or AR Capital, whether through the ownership of its voting securities, by contract, or otherwise, and specifically controlled, oversaw, and managed RCS' and/or AR Capital's distribution, offering, and sales of UDF IV and V securities through misrepresentations and omissions.

283.   Indeed, the RCS Individual Defendants were the gatekeepers of last resort as to the UDF IV and V offerings. Given that they evaluated and selected the UDF products for distribution through RCS' "multi-product platform" and that they helped structure the UDF IV and V offerings, recruited retail broker-dealers to assist with the offerings and supervised and compensated such retail broker-dealers for their roles, and oversaw and managed RCS' distribution, offering and sales of UDF IV and V securities to the public, the RCS Individual Defendants had the ability to stop those fraudulent offerings from reaching the investing public.

284.    The RCS Individual Defendants are therefore jointly and severally liable with Non-Defendant RCS and Defendant AR Capital for their violations of TSA.

**Count VII**
**Texas Securities Act, Tex. Rev. Civ. Art. 581-33-F(2)**
**Materially Aiding Fraudulent Sale**
**RCS Individual Defendants**

285.    Plaintiffs repeat and reallege the foregoing paragraphs as if stated in full.

286.    The Texas Securities Act ("TSA"), Tex. Rev. Stat. Art. 581-33-F, further provides, in pertinent part:

**F. Liability of Control Persons and Aiders.**

(2) A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

287.    Under TSA, an aider may be held liable where it rendered assistance "in the face of a perceived risk" and must possess "a general awareness that his role was part of an overall activity that is improper."

288.    As alleged herein, RCS Individual Defendants, by virtue of their role as broker/dealers and underwriters of UDF IV and UDF V shares, rendered assistance in the face of a perceived risk that UDF IV and UDF V were issuing securities to Plaintiffs and the Proposed Class in violation of TSA and Texas common law, and possessed a general awareness that their role was part of an overall activity that was improper.

289.    In particular, Defendants Schorsch and Kahane, as the driving factor behind RCS' underwriting, offering, and selling of UDF IV of UDF V, knowingly or recklessly played a key role in facilitating and overseeing the offering and sale of UDF IV and UDF V securities to Plaintiffs and the investing public.

290.    RCS Individual Defendants are liable to Plaintiffs for materially aiding the fraudulent sale of UDF IV and UDF V shares during the Class Periods.

291.    The RCS Individual Defendants' misconduct was the proximate cause of the Class Members' losses, because they directly and proximately resulted in the Class Members' investments in UDF IV and V.

292.    As a direct and proximate consequence of the RCS Individual Defendants' misconduct as described above and throughout this Complaint, Plaintiff and the Class Members have lost a substantial portion of the money they invested in UDF IV and/or V, in an amount to be determined at trial but well in excess of $5,000,000.

**Count VIII**
**Texas Securities Act, Tex. Rev. Civ. Art. 581-33-F(2)**
**Materially Aiding Fraudulent Sale**
**Centurion and Moayedi**

293.    Plaintiffs repeat and reallege the foregoing paragraphs as if stated in full.

294.    The Texas Securities Act ("TSA"), Tex. Rev. Stat. Art. 581-33-F, provides, in pertinent part:

**F. Liability of Control Persons and Aiders.**

(2) A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

295.    Under TSA, an aider may be held liable where it rendered assistance "in the face of a perceived risk" and must possess "a general awareness that his role was part of an overall activity that is improper."

296.    Defendants Centurion and Moayedi by the actions described herein, directly and indirectly, with intent to deceive or defraud or with reckless disregard for the truth or the law,

materially aided UDF IV, UDF V and the RCS Individual Defendants in conducting Ponzi-like transfers of funds between various UDF entities, as more fully described *supra*, and in creating and publishing false and misleading financial statements, registration statements and prospectuses in connection with the offerings of UDF IV and UDF V shares, while being aware that their role was part of an overall activity that was improper.

297.    Moayedi and Centurion are liable to Plaintiffs for materially aiding the fraudulent sale of UDF IV and UDF V shares during the two Class Periods.

298.    Defendants Centurion and Moayedi's misconduct was the proximate cause of the Class Members' losses, because they directly and proximately resulted in the Class Members' investments in UDF IV and V, in reliance upon such misleading financial statements, registration statements, and prospectuses in connection with the offering of UDF IV and UDF V shares.

299.    As a direct and proximate consequence of Defendants Moayedi and Centurion's misconduct as described above and throughout this Complaint, Plaintiff and the Class Members have lost a substantial portion of the money they invested in UDF IV and/or V, in an amount to be determined at trial but well in excess of $5,000,000.

### Count IX
### Negligence
### RCS Individual Defendants

300.    Plaintiffs repeat and reallege the foregoing paragraphs as if stated in full.

301.    In its capacity as underwriter and managing broker/dealer for the UDF IV and UDF V offerings, non-defendant RCS and the RCS Individual Defendants had a duty to Plaintiffs and the Proposed Classes to conduct adequate due diligence as to the UDF IV and UDF V offerings before undertaking to promote them.  As noted herein, the RCS Individual Defendants frequently touted RCS' due diligence team and its adherence to best practices.

71

302.    To establish the applicable standard of care under the circumstances, the Court may examine professional standards of conduct in the industry.

303.    The RCS Individual Defendants owed Plaintiffs and the Proposed Class the duty to act as a reasonable broker-dealer would do under the same or similar circumstances. The duties set forth herein arise from the regulations, customs and usage of the brokerage trade, including rules promulgated by the SEC and by FINRA, a self-regulatory organization to which non-Defendant RCS belonged and whose rules it was required to obey.

304.    The RCS Individual Defendants negligently breached their duties to Plaintiffs and the Proposed Classes by, *inter alia*:

a.      failing to perform adequate due diligence regarding the UDF IV and UDF V Offerings and failing to obtain reliable information as to those offerings before underwriting them and distributing or directing and overseeing the distribution of the Prospectuses to Plaintiffs and members of the Proposed Classes; and

b.      failing to warn Plaintiffs and the Proposed Class that RCS did not have a reasonable basis to offer and promote and had not adequately vetted the UDF IV and UDF V Offerings.

305.    The negligence of the RCS Individual Defendants was the proximate cause of injury to Plaintiffs and the Proposed Classes.

306.    Plaintiffs and the Proposed Classes suffered damages.

**<u>Count X</u>**
**Negligence**
**Defendant Whitley Penn**

307.    Plaintiffs repeat and reallege the foregoing paragraphs as if stated in full.

308.    In its capacity as independent public accountant for UDF IV and UDF V during the Class Periods, Defendant Whitley Penn had a duty to Plaintiffs and the Proposed Classes to

conduct its annual audits of UDF IV and UDF V according to applicable professional standards for an independent public accountant.

309.    To establish the applicable standard of care for an independent public accountant under the circumstances, the Court may examine professional standards of conduct in the public accounting industry.

310.    Defendant Whitley Penn owed Plaintiffs and the Proposed Classes the duty to act as a reasonable independent public accountant would do under the same or similar circumstances. The duties set forth herein arise from the auditing and accounting standards of the accounting industry, including generally accepted audit standards and generally accepted accounting principles.

311.    Defendant Whitley Penn negligently breached its duties to Plaintiffs and the Proposed Classes by, *inter alia*:

a.      failing to design and perform its annual audits of UDF IV and UDF V in accordance with GAAS, prior to issuing opinions that UDF IV's and UDF V's financial statements were prepared in conformity with GAAP.

b.      failing to warn Plaintiffs and the Proposed Classes that UDF IV's and UDF V's financial statements were materially false and misleading.

312.    Whitley Penn's negligence was the proximate cause of injury to Plaintiffs and the Proposed Classes.

313.    Plaintiffs and the Proposed Class suffered damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on their own behalf and on behalf of the Proposed Class, pray for

judgment as follows:

(a) Certifying this action as a class action pursuant to Fed. R. Civ. Proc. Rule 23(b)(3);

(b) Certifying Plaintiffs as class representative and appointing the under-signed counsel

as class counsel;

(c) Awarding rescission and/or rescissory damages against the UDF and RCS Individual

Defendants, in favor of Plaintiffs and the members of the Proposed Class, including interest;

(d) Awarding compensatory damages in favor of Plaintiffs and the members of the

Proposed Class against all Defendants, including interest;

(e) Awarding punitive damages in favor of Plaintiffs and the members of the Proposed

Class against all Defendants;

(f) Awarding Plaintiffs their reasonable attorneys' fees and costs; and

(h) Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury for all issues triable thereby.

Date: June 8, 2016                          Respectfully submitted,


 _/s/ Alan Rosca_____
Alan L. Rosca, Esq. (*pro hac vice*)
**PEIFFER, ROSCA, WOLF,**
**ABDULLAH, CARR & KANE,**
**A PROFESSIONAL LAW**
**CORPORATION**
1422 Euclid Avenue, Suite 1610
Cleveland, Ohio 44115
Telephone: (216) 570-0097
Facsimile: (888) 411-0038
E-mail: arosca@prwlegal.com

Richard A. Lewins, Esq., TX Bar No. 794163
**LEWINS LAW**
7920 Belt Line Road, Suite 650
Dallas, Texas 75254
Telephone: (972) 934-1313
Facsimile: (972) 231-3983

Michael K. Yarnoff, Esq. (*pro hac pending*)
**THE KEHOE LAW FIRM**
2 Penn Center, Suite 1020
1500 JFK Blvd.
Philadelphia, PA 19102
Telephone: (215) 792-6676
E-mail: myarnoff@kehoelawfirm.com

*Counsel for Plaintiffs*